**No. 2022-1520**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

---

BARBARA RICHARDSON, in her capacity as receiver of
Nevada Health CO-OP,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

---

On Appeal from the United States Court of Federal Claims
Case No. 18-1731C (Judge Solomson)

---

# CORRECTED OPENING BRIEF FOR THE UNITED STATES

---


BRIAN M. BOYTON
*Principal Deputy Assistant Attorney General*

TERRANCE A. MEBANE
PHILLIP SELIGMAN
*United States Department of Justice*
*Civil Division, Commercial Litigation Branch*
*P.O. Box 875*
*Ben Franklin Station*
*Washington, DC 20044*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

STATEMENT OF JURISDICTION .......... 2

STATEMENT OF THE ISSUES .......... 2

STATEMENT OF THE CASE .......... 3

A. Statutory and Regulatory Background .......... 3

B. The Loan Agreement and Nevada Health's Formation .......... 6

C. State Court Insolvency Proceedings .......... 12

D. Trial Court Proceedings .......... 14

SUMMARY OF ARGUMENT .......... 17

STANDARD OF REVIEW .......... 19

ARGUMENT .......... 19

I. HHS Paid Nevada Health Through Offset, and Those Offsets Were Legally Permissible Under Federal Law, Nevada Insolvency Law, and the Loan Agreement .......... 19

A. HHS's Offsets Were Permissible Under Governing Law and the Loan Agreement .......... 19

B. The Trial Court Erred In Holding That Section 3.4 of the Loan Agreement Waived HHS's Offset Right .......... 24

II. The Trial Court Erred By Holding That No Waiver of Sovereign Immunity Was Required to Permit a State Court to Bind the United States .......... 31

A. This Court's *Conway* Decision Does Not Eliminate the Need For a Sovereign Immunity Waiver in State Court ....................32

B. The Trial Court Identified No Other Basis for Ignoring the Lack of a Sovereign Immunity Waiver in State Court ....................34

III. The Trial Court Erred In Ruling on 31 U.S.C. § 3728 and Granting the Receiver Non-Monetary Relief Beyond the Trial Court's Jurisdiction .............. 38

CONCLUSION .................................................................... 40

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases**

*Applied Cos. v. United States*,
144 F.3d 1470 (Fed. Cir. 1998) .......... 20, 25, 26

*Aviation Ventures, Inc. v. Joan Morris, Inc.*,
110 P. 3d 59 (Nev. 2005) .......... 20, 21

*Cisneros v. Alpine Ridge Group*,
508 U.S. 10 (1993) .......... 21, 29

*Citizens Bank of Md. v. Strumpf*,
516 U.S. 16 (1995) .......... 19

*City of Fulton v. United States*,
680 F.2d 115 (Ct. Cl. 1982) .......... 23

*Conway v. United States*,
145 Fed. Cl. 514 (2019) .......... 33, 34

*Conway v. United States*,
997 F.3d 1198 (Fed. Cir. 2021) .......... 16, 33, 39

*Crnkovich v. United States*,
202 F.3d 1325 (Fed. Cir. 2000) .......... 21, 22

*Dept. of Army v. Blue Fox, Inc.*,
525 U.S. 255 (1999) .......... 32

*Donovan v. City of Dallas*,
377 U.S. 408 (1964) .......... 35

*Dugan v. Rank*,
372 U.S. 609 (1963) .......... 36, 37

*Finisar Corp. v. DirecTV Group, Inc.*,
523 F.3d 1323 (Fed. Cir. 2008) .......... 27

*Fischer v. American United Life Ins. Co.*,
314 U.S. 549 (1942) ........................................................................................ 35

*Gardiner, Kamiya & Assocs., P.C. v. Jackson*,
467 F.3d 1348 (Fed. Cir. 2006) .............................................................................. 29

*Hol-Gar Mfg. Corp. v. United States*,
351 F.2d 972 (Ct. Cl. 1965) ................................................................................... 22

*In re Lehman Bros., Inc.*,
574 B.R. 52 (Bankr. S.D.N.Y. 2017) ...................................................................... 25

*In re Southeast Banking Corp.*,
156 F.3d 1114 (11th Cir. 1998) ........................................................................ 24, 25

*Johnson v. All-State Constr., Inc.*,
320 F.3d 848 (Fed. Cir. 2003) ................................................................................ 25

*Johnson v. United States*,
329 F.3d 848 (Fed. Cir. 2003) .......................................................................... 20, 24

*King v. Burwell*,
576 U.S. 473 (2015) .................................................................................................. 3

*Leiter Minerals, Inc. v. United States*,
352 U.S. 220 (1957) ................................................................................................ 35

*Liberty Maritime Corp. v. United States*,
928 F.2d 413 (D.C. Cir. 1991) ................................................................................ 22

*Lockhart v. United States*,
577 U.S. 347 (2016) ................................................................................................ 27

*Maine Community Health Options v. United States*,
140 S. Ct. 1308 (2020) ...................................................................................... 14, 15

*Markham v. Allen*,
326 U.S. 490 (1946) .......................................................................................... 35, 36

*McAbee Const. Co. v. United States*,
97 F.3d 1431 (Fed. Cir. 1996) ........................................................................ 28
*McCall Stock Farms, Inc. v. United States*,
14 F.3d 1562 (Fed. Cir. 1993) ........................................................................ 20
*Metropolitan Area Transit, Inc. v. Nicholson*,
463 F.3d 1256 (Fed. Cir. 2006) ........................................................................ 22
*Princess Lida of Thurn & Taxis v. Thompson*,
305 U.S. 456 (1939) ........................................................................ 34
*Quality Tooling, Inc. v. United States*,
47 F.3d 1569 (Fed. Cir. 1995) ........................................................................ 32
*Smith v. Orr*,
855 F.2d 1544 (Fed. Cir. 1988) ........................................................................ 33
*Starr Int'l Co. v. United States*,
856 F.3d 953 (Fed. Cir. 2017) ........................................................................ 19
*State of Minnesota v. United States*,
305 U.S. 382 (1939) ........................................................................ 37
*Loan Agreement. Abraham v. Rockwell Intern. Corp.*
326 F.3d 1242 (Fed. Cir. 2003) ........................................................................ 22
*United States v. Bank of New York & Trust Co.*,
296 U.S. 463 (1936) ........................................................................ 34, 35
*United States v. King*,
395 U.S. 1 (1969) ........................................................................ 32, 40
*United States v. Munsey Trust Co. of Washington, DC*,
332 U.S. 234 (1947) ........................................................................ 24
*United States v. Nordic Vill., Inc.*,
503 U.S. 30 (1992) ........................................................................ 36

*United States v. Shaw*,
309 U.S. 495 (1940) .......... 37

*United States v. Sherwood*,
312 U.S. 584 (1941) .......... 32

*United States v. U.S. Fidelity & Guaranty Co.*,
309 U.S. 506 (1940) .......... 37, 38

*Zych v. Wrecked Vessel Believed to be the Lady Elgin*,
960 F.2d 665 (7th Cir. 1992) .......... 36

**Statutes**

28 U.S.C. § 1295 .......... 2

28 U.S.C. § 1491 .......... 2

31 U.S.C. § 3728 .......... 17, 18, 38, 39, 40

42 U.S.C. § 18042 .......... 4, 5, 6

42 U.S.C. § 18061 .......... 3

42 U.S.C. § 18063 .......... 3

**Other Authorities**

45 C.F.R. § 156.505 .......... 4

45 C.F.R. § 156.520 .......... 5-6, 6, 7, 10, 23

*Patient Protection and Affordable Care Act; Establishment of Consumer Operated and Oriented Plan (CO-OP) Program*, 76 Fed. Reg. 77,392 (Dec. 13, 2011) .......... 5, 30, 31

Nev. Rev. Stat. § 696B.440 .......... 1, 8, 18, 20

Nev. Rev. Stat. § 697B.120 .......... 8

Nevada Rev. Stat. § 680A.160 .......... 8

Nevada Rev. Stat. § 681B.080 .......... 8

Nevada Rev. Stat. § 693A.180 .......... 8

## STATEMENT OF RELATED CASES

No other appeal from the present civil action has previously been before this or any other appellate court. The United States is not aware of any related cases within the meaning of Federal Circuit Rule 47.5(b).

## INTRODUCTION

This appeal arises from a dispute over the Department of Health and Human Services' (HHS) right to offset the federal debts of Nevada Health CO-OP (Nevada Health), an insolvent insurance company being liquidated in a Nevada state court. HHS loaned money to Nevada Health, which failed after two years and defaulted on the loan. Subsequently, Nevada Health became eligible to receive payments under the Affordable Care Act (ACA). Rather than pay Nevada Health directly, HHS reduced Nevada Health's loan debt. Nevada Health's state-court-appointed receiver, Barbara Richardson (Receiver), contends that HHS's collection of the loan debt was impermissible under the parties' loan agreement and Nevada insolvency law and brought this action to recover through judgment the amounts HHS collected through debt reduction.

Federal law has long recognized the United States' right to offset in the collection of federal debts, and Nevada insolvency law requires that "such credits and debts shall be setoff and the balance only shall be allowed or paid," Nev. Rev. Stat. § 696B.440(1). The parties further preserved HHS's offset rights in the loan agreement, which provides HHS with the right to offset in the event of default "notwithstanding" any other provision to the contrary.

The trial court erred by failing to give effect to federal law, Nevada insolvency law, and the only loan agreement provision that addresses offset, and by relying on a provision that does not address offset or default to hold that HHS contracted away its

offset rights. That holding is not supported by the plain or express terms of the agreement.

The trial court further erred by holding that the United States is collaterally estopped from challenging the Receiver's determinations and that doing so would interfere with the state court proceedings. No sovereign immunity waiver permitted the state court to adjudicate the United States' rights, and the United States is permitted to challenge state court decisions entered without an immunity waiver (or jurisdiction). Accordingly, the judgment below should be reversed.

## STATEMENT OF JURISDICTION

The Receiver invoked the jurisdiction of the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491. Appx151. The trial court entered final judgment on January 4, 2022. Appx49. The United States timely filed a notice of appeal on March 4, 2022. Appx2736; *see* Fed. R. App. P. 4(a)(1)(B). This Court has appellate jurisdiction under 28 U.S.C. § 1295(a)(3).

## STATEMENT OF THE ISSUES

1. Whether the Receiver's demand for payment fails because HHS already paid the amounts at issue by offsetting the funds against amounts owed by Nevada Health to HHS in accordance with federal law, Nevada insolvency law, and the parties' loan agreement.

2. Whether the trial court erred by holding that the United States is collaterally estopped from contesting, in federal court, a state court adjudication entered without a sovereign immunity waiver (or jurisdiction).

## STATEMENT OF THE CASE

### A. Statutory and Regulatory Background

In the ACA, Congress enacted "a series of interlocking reforms designed to expand coverage" in the individual and small-group health insurance markets. *King v. Burwell*, 576 U.S. 473, 478-79 (2015). Among other measures, the ACA provides federal consumer subsidies to help individuals pay for insurance and prohibits insurers from denying coverage or charging higher premiums based on individual's health status. *Id.* at 81-82. The ACA also created three interrelated premium stabilization programs to transfer funds among health insurers in an effort to mitigate adverse selection, reduce incentives for health insurers to avoid enrolling sicker people, and protect health insurers against uncertainly in setting premiums. These premium stabilization programs, informally known as the "3Rs," are risk adjustment, reinsurance, and risk corridors. *See* 42 U.S.C. § 18061 (reinsurance); *id.* § (18062) (risk corridors); *id.* § 18063 (risk adjustment); Appx4.[1]

[1] Although broadly similar in nature in purpose, the 3Rs programs varied in the classes of insurers covered and the criteria for determining which insurers would make or receive payments. HHS administered these programs in almost every state, including Nevada.

The ACA also established the Consumer Operated and Oriented Plan (CO-OP) program to support the creation of new, non-profit health insurance companies known as CO-OPs. These CO-OP insurance companies were eligible for two types of loan financing from HHS: start-up loans and solvency loans. 42 U.S.C. § 18042(a)(1)-(2), (b)(1).[2] A start-up loan assists a CO-OP "in meeting its start-up costs." 42 U.S.C. § 18042(b)(1)(A). *See also* 45 C.F.R. § 156.505 ("Start-up Loan means a loan provided by [the Centers for Medicare & Medicaid Services (CMS)] to a loan recipient for costs associated with establishing a CO-OP."). A solvency loan assists a CO-OP "in meeting any solvency requirements of States" in which the CO-OP will be licensed. 42 U.S.C. § 18042(b)(1)(B). *See also* 45 C.F.R. § 156.505 ("Solvency Loan means a loan provided by CMS to a loan recipient in order to meet State solvency and reserve requirements.").

In setting up the CO-OP loan program, the ACA required HHS to "tak[e] into consideration any appropriate State reserve requirements, solvency regulations, and requisite surplus note arrangements that must be constructed in a State to provide for

[2] The statute describes start-up funds as "loans" and solvency funds as "grants," but makes clear that both loans and grants are to be repaid, albeit on a different timeline. *See* 42 U.S.C. § 18042(b)(3) ("[T]he Secretary shall promulgate regulations with respect to the repayment of such loans and grants[.]"). Like the trial court and the relevant documentation, we refer to both categories of funds as "loans."

such repayment." 42 U.S.C. § 18042(b)(3).[3] CO-OPs are subject to state insurance law, which generally requires that insurers maintain certain capital reserves. *See Patient Protection and Affordable Care Act; Establishment of Consumer Operated and Oriented Plan (CO-OP) Program*, 76 Fed. Reg. 77,392, 77,403 (Dec. 13, 2011).

In promulgating rules to implement the CO-OP program, HHS observed that state insurance regulators may regard both start-up and solvency loans as debts on an insurer's balance sheet, rather than treating the start-up loan as debt and the solvency loan as an asset that contributes toward required capital reserves. *Id.* To address this problem, HHS would "structure Solvency Loans to each loan recipient in a manner that meets State reserve and solvency requirements so that the loan recipient can fund its required capital reserves." *Id.*; *accord id.* at 77,404 (reiterating that CO-OPs would be provided "[s]ignificant flexibility" in structuring loan terms). HHS's regulations accordingly provide that "Solvency Loans . . . will be structured in a manner that ensures that the loan amount is recognized by State insurance regulators as contributing to the State-determined reserve requirements or other solvency requirements (rather than debt) consistent with the insurance regulations for the States in which the loan recipient will offer a CO–OP qualified health plan." 45 C.F.R.

[3] A surplus note is an unsecured debt under which any payments of interest or principal must be approved by the state insurance commissioner and claims under the note are subordinated to all other claims from policyholders or other creditors, and for which any right of offset is waived, with repayment approved by the insurance commissioner of the state. *See* Appx2260 (National Association of Insurance Commissioners, Statutory Statement of Accounting Principals No. 41.)

§ 156.520(a)(2). The regulations do not, however, contain comparable provisions for start-up loans provided to CO-OPs.

The start-up loan and the solvency loan funds were also required to "be used in a manner that is consistent with . . . the loan agreement, and all other statutory, regulatory, or other requirements." 45 C.F.R. § 156.520(a)(1). In the event that HHS terminates a CO-OP loan agreement because the CO-OP is "not in compliance with program rules" or "the terms of the loan agreement . . . the loan recipient must repay 110 percent of the aggregate amount of loans received" (both the start-up loan and solvency loan debts) and pay a higher interest rate for the period the loans were outstanding. 45 C.F.R. § 156.520(c)(3); *see also* 42 U.S.C. § 18042(b)(2)(C)(iii). The failure to make loan payments subjects the CO-OP "to any and all remedies available to [HHS] under law to collect the debt." 45 C.F.R. § 156.520(d).

### B. The Loan Agreement and Nevada Health's Formation

**1.** Nevada Health was formed under the CO-OP program in 2012 and sold insurance in Nevada for two years in 2014 and 2015.[4] HHS loaned Nevada Health approximately $65.8 million in taxpayer funds, comprised of a $17.1 million start-up loan to aid with "start-up costs" (Start-Up Loan), and a $48.8 million solvency loan to aid with meeting Nevada's capital reserve requirements (Solvency Loan). Appx47-142.

[4] Nevada Health is the successor in interest to Hospitality Health, Ltd.

The parties entered into a single loan agreement (Loan Agreement) encompassing terms applicable to the Start-Up Loan and terms applicable to the Solvency Loan. *Id.*

The Loan Agreement defines the "start-up loan" as "the Loan to [Nevada Health] for costs associated with establishing a CO-OP that is governed by this Agreement, and the particular requirements of Appendix 2 – Start-Up Loan Promissory Note." Appx62 (Loan Agreement § 2.1). The funds from the Start-Up Loan could "only be used in accordance with the Business Plan, the Start-Up Loan Disbursement Plan and the CO-OP FOA [Funding Opportunity Announcement]." Appx66 (Loan Agreement § 4.1).

The Loan Agreement defines the "solvency loan" as "the Loan provided to [Nevada Health] in order to meet State solvency and State Reserve Requirements that is governed by this Agreement, and the particular requirements of Appendix 3 – Solvency Loan Promissory Note." Appx62 (Loan Agreement § 2.1). The funds from the Solvency Loan could "only be used to establish Risk-Based Capital Reserves to be held by [Nevada Health] and other capital reserves necessary to meet State Reserve Requirements[.]" Appx68 (Loan Agreement § 5.1).

As originally drafted, repayment of the Start-Up Loan was secured by a promissory note dated May 17, 2012, and repayment of the Solvency Loan was secured by a promissory note dated May 10, 2012; at that time, both promissory notes were nearly identical and required payment of principal and interest, with few other terms. Appx112-115, Appx121-123 (Loan Agreement, Appendixes 2 & 4).

**2.** The Nevada Insurance Commissioner authorizes insurance companies to operate in Nevada. Nev. Rev. Stat. §§ 697B.120, 680A.160.[5] In order for Nevada Health to receive authorization from the Commissioner, Nevada Health was required to "possess and thereafter maintain . . . unimpaired basic surplus" in an amount determined by Nevada law. Nevada Rev. Stat. § 680A.120 (emphasis added); *see also id.* § 680A.120(4) (providing that the "surplus required for qualification" was "governed by chapter 693A."). Nevada Health was permitted to "borrow money to . . . provide surplus funds," but "[a]ny such loan" of "surplus funds" had to be approved by the Nevada Insurance Commissioner. *Id.* § 693A.180(1), (3) (emphasis added); *see also id.* § 681B.080 ("For all health insurance policies the insurer shall maintain an active life reserve . . . and be not less than the reserve according to appropriate standards set forth in regulations issued by the Commissioner. . ."). "Money so borrowed" by Nevada Health could not "form a part of the insurer's legal liabilities . . . or be the basis of any setoff." *Id.* § 693A.180(2) (emphasis added).

When Nevada Health initially sought licensure from the Nevada Insurance Commissioner, the then-Commissioner indicated that the Solvency Loan did not qualify as an asset under state law because it did not meet the requirements of a

[5] Nevada law provides that the current commissioner serves as "receiver" of an insolvent insurer. *See* Nev. Rev. Stat. § 696B.250(1). Ms. Richardson is the current Nevada Insurance Commissioner.

"surplus note."[6] Nevada Health and HHS entered into a Second Amendment to the Loan Agreement, the sole purpose of which was to replace the Solvency Loan's promissory note. Appx135-145 (Loan Agreement, Appendix 10).

The amended promissory note contains several material differences from the Solvency Loan's original note (and the Start-Up Loan's promissory note). In particular, the amended promissory note contains a subordination agreement:

> By acceptance of this Surplus Note, the Note Holder agrees that the payment of principal and interest hereunder is expressly subordinated to claims of creditors and members of Borrower, including a) policyholders of Borrower; b) claimant and beneficiary claims of policies issued by Borrower; c) all other classes of creditors others than surplus note holders; d) Operating expenses of Borrower, and e) reserve and solvency requirements as determined by applicable State law.

Appx140-141. The amended promissory note also expressly waives HHS's offset rights: "The obligations of Borrower under this Promissory Note may not be offset or be subject to recoupment with respect to any liability or obligation owed to Borrower." Appx141.

The parties did not amend the Start-Up Loan's promissory note or otherwise alter Nevada Health's payment obligations under the Start-Up Loan's note. The then-Nevada Insurance Commissioner also did not request or require that the parties similarly amend the Start-Up Loan. Consistent with the Loan Agreement and each loan's promissory note, Nevada Health treated the Start-Up Loan as debt and the

[6] At that time, Scott Kipper served as Nevada Insurance Commissioner. Appx131.

Solvency Loan as regulatory capital (or surplus). *See, e.g.*, Appx810, Appx818, Appx822-823; *see* 45 C.F.R. § 156.520(a)(1).

**3.** While Nevada Health was operating, HHS prioritized the CO-OP's payment of claims and maintenance of reserves, which were necessary for the CO-OP to continue operating, over its repayment of the loans. For example, Section 3.4 of the Loan Agreement provides that the "Loans will have a claim on cash flow and reserves of [Nevada Health] that is subordinate to (a) claims payments, (b) Basic Operating Expenses, and (c) maintenance of required reserve funds while [Nevada Health] is operating as a CO-OP under State Insurance Laws." Appx63.[7]

Section 4.4 requires Nevada Health to "make Principal and Interest payments as described in the Start-Up Loan Promissory Note, . . . subject to [Nevada Health]'s ability to meet State Reserve Requirements and other solvency regulations or requisite surplus note arrangements." Appx64. Similarly, Section 5.6 requires Nevada Health to "make Principal and Interest payments as described in . . . the Solvency Loan Promissory Note, . . . subject to [Nevada Health]'s ability to meet State Reserve

[7] "Loans" are defined as "the total amount of all outstanding Start-Up Loan disbursements, or the total amount of all outstanding Solvency Loan disbursements, respectively and individually, as the context or use requires," and "Loans" is defined as "both of them together." Appx60 (Loan agreement § 2.1).

The term "claims payments" is not defined in the Loan Agreement.

"Basic Operating Expenses" are defined as "the ordinary and necessary expenses incurred by [Nevada Health] in carrying out its day-to-day business activities that are permitted under Section 3 of this Agreement[.]" Appx58 (Loan agreement § 2.1).

Requirements and other solvency regulations or requisite surplus note arrangements." Appx67.

Section 6.5 provides that if Nevada Health "is unable to make a payment as a result of a . . . State Reserve Requirements, other State Insurance Laws or other solvency regulations, or requisite surplus note arrangements," HHS can "provide [Nevada Health] with a 60-day grace period" or "add[] [missed payments] to the last scheduled payment due[.]" Appx69. "[A]ny unused Loans" were to be repaid "following the resolution of any outstanding debts and run out of outstanding claim obligations, consistent with State Insurance Laws." Appx87 (Loan Agreement § 15.3(c)).

**4.** Section 15 of the Loan Agreement addresses default and HHS's rights following a default. Section 15.1 defines "Event(s) of Default." Appx85-88. Under this provision, an event of default occurs when Nevada Health "ceases to be solvent," or "declares bankruptcy or instigates or prosecutes any case proceeding or other action . . . relating to bankruptcy, [or] insolvency[.]" Appx85-88 (Loan Agreement § 15.1(d)). In Section 15.3, the parties "understood and agreed that [HHS] may pursue any and all . . . rights or remedies available under applicable law and to the extent it deems appropriate in its sole and absolute discretion[.]" Appx87.

The parties delineated HHS's offset and other debt collection rights in Section 19.12, which provides:

> *Notwithstanding any other provisions of th[e] [Loan] Agreement to the contrary*, in the event any Event of Default is not cured . . ., [HHS] shall have at its disposal the full range of available rights, remedies, and techniques to collect delinquent debts, such as those found in the Federal Claims Collection Standards and applicable Treasury regulations, as appropriate, *including* demand letters, *administrative offset*, salary offset, tax refund offset, private collection agencies, cross-servicing by the Treasury, and litigation.

Appx91 (emphasis added).[8]

### C. State Court Insolvency Proceedings

In 2015, after operating for less than two years, Nevada Health's financial condition became unsound. In August 2015, the then-Nevada Insurance Commissioner, Amy Parks (Former Receiver), suspended Nevada Health's license and ordered it to stop operating. Appx183-184.[9] In September 2015, the Former Receiver petitioned a Nevada state court to place Nevada Health into receivership and later into liquidation. Appx183. The state court appointed the Former Receiver as receiver of Nevada Health's estate and the law firm of Cantilo & Bennett LLP as special deputy receiver (Deputy Receiver). Appx183. The state court also issued an order purporting to "permanently enjoin" all "governmental agencies who have claims against" Nevada Health from "[s]eeking or obtaining any preferences." Appx184.

---

[8] "Event(s) of Default" is defined as "the occurrence or happening, from time to time, of one or more of the events identified in Section 15.1[.]" Appx59 (Loan Agreement § 2.1).

[9] Commissioner Parks served as Nevada Insurance Commissioner from July 2015 to February 2016, at which time Ms. Richardson became Commissioner.

In her petition to the state court, the Former Receiver recognized that "Startup Loans . . . were intended to assist co-op applicants with approved costs for beginning operations" and "Solvency Loans . . . were intended to assist applicants with meeting the capital reserve requirement . . . ." Appx2022. After voluntarily giving up its license to operate, the Former Receiver permitted Nevada Health "a limited one-time permitted practice to report the . . . Startup funds as surplus rather than as a liability." Appx2023, Appx2049-2050. At all other times Nevada Health (and the Nevada Insurance Commissioner) recognized the Start-Up Loan as a liability (not surplus or capital). Appx2049.

In December 2015, HHS terminated the Loan Agreement and decertified Nevada Health from the CO-OP program, effective December 31, 2015, pursuant to: (1) Section 15.1, as an "event of default" was triggered by the receivership proceedings; (2) Section 15.3, due to the suspension of Nevada Health's license to operate in Nevada; and (3) Section 16.2, for "program viability" reasons. Appx9, Appx85-89, Appx2081-2082. Once terminated from the CO-OP program, any favorable treatment afforded Nevada Health with regard to the Start-Up Loan ceased, and Start-Up Loan and Solvency Loan became immediately due and payable. Appx85-90, (Loan Agreement §§ 15 & 16). After Nevada Health failed to repay the Start-Up Loan, HHS notified Nevada Health that it had placed an administrative hold on Nevada Health's account. Appx2084. Between August 2016 and December 2017, HHS applied payments due to Nevada Health under various ACA programs to the

balance Nevada Health owed on the Start-Up Loan. Appx2084-2096. HHS has not collected any amounts owed on Nevada Health's $48.8 million Solvency Loan.

Meanwhile, HHS also filed a proof of claim in Nevada Health's insolvency proceedings and expressly reserved in the proof of claim its offset rights. Appx9, Appx35, Appx2107-2112. In June 2017, the Deputy Receiver sent a letter to HHS stating that, "under applicable state and federal law," HHS could not use setoff to collect its debts and that "any purported set-off . . . would impermissibly elevate the claims of the United States above the priority accorded them under [Nevada Revised Statute] § 696B.420 and the Loan Agreement" and would also "violate" an injunction issued by the state court. Appx2114-2117. The Special Deputy's letter further provided that any objection to his decision must be presented to him within sixty (60) days, after which time he would report the objection to the state court, and stated that a subsequent order by the state court "may be appealable" to the Nevada Supreme Court. Appx2118-2119.

### D. Trial Court Proceedings

In 2018, the Receiver filed suit in the Court of Federal Claims contesting HHS's offsets and demanding direct payment of approximately $55 million under the ACA. *See* ECF No.1. After the United States moved to dismiss and the Receiver opposed that motion, the trial court stayed the proceedings pending the Supreme Court's decision in *Maine Community Health Options v. United States*, 140 S. Ct. 1308

(2020).[10] After the stay was lifted, the Receiver was permitted to file an updated response to the United States' motion to dismiss and a new cross-motion for summary judgment. ECF No. 32. The United States filed a reply brief and opposition to the Receiver's summary judgment motion, ECF No. 34, and the Receiver filed a reply, ECF No. 36. The trial court ultimately denied the United States' motion to dismiss, granted summary judgment in plaintiff's favor, and awarded the Receiver monetary damages of approximately $55 million and non-monetary declaratory relief. Appx45, Appx47-49.

The trial court recognized that "the Nevada Offset Statute seems to permit the assertion of an offset," Appx23, n.23, and that "the government likely is correct that Nevada state law generally permits the assertion of an offset," Appx14. But the trial court held that "[t]he plain language of [Section 3.4 of the loan agreement] limits the government's power to offset for several reasons." Appx20. Rather than rely on the Loan Agreement's "plain language," however, the trial court merely characterized Section 3.4 as a "subordination agreement," Appx20-23, and the funds provided by the Start-Up Loan as "risk based capital," Appx22-25, and based on those characterizations, concluded that offset was not available. The trial court also stated

---

[10] Under the Supreme Court's holding in *Maine*, Nevada Health became entitled to amounts under Section 1342 of the ACA, the risk corridors program, for benefit years 2014 and 2015. The United States does not contest liability under Section 1342, but as explained below, the Loan Agreement permits offset against any payments to which Nevada Health may be entitled, including payments under Section 1342.

that its characterizations were "consistent with the Nevada priority statute," Appx25, but did not explain how the Nevada priority statute is inconsistent with HHS's exercise of its offset rights. *Cf.* Appx23, n.23 ("the Nevada Offset Statute seems to permit the assertion of an offset even by a lower priority creditor").

In addressing Section 19.12, entitled "Right of Set-Off"—the sole provision in the Loan Agreement that addresses (or even mentions) offset—the trial court acknowledged that it "must construe the Loan Agreement to give meaning to every provision" and "not in a manner that would render a contract provision useless, inexplicable, inoperative, void, insignificant, meaningless, or superfluous." Appx30 (internal quotations omitted). The trial court then gave no meaning to the "notwithstanding" clause and determined that Section 19.12 is only a "truism" that provides "nothing" and "merely begs the question[] . . . whether the government's administrative offset is available." Appx29-30. Ultimately, the trial court held that HHS had contracted away its offset rights in Section 3.4 of the Loan Agreement. Appx30-31.

The trial court also held that, even if HHS had the legal right to offset, it saw "no reason" to interfere with the Deputy Receiver's determinations regarding HHS's rights under the Loan Agreement because the court had read a recent decision from this Court as "determining that . . . the liquidation process [ ] is controlling." Appx33-34 (citing *Conway v. United States*, 997 F.3d 1198, 1207-08 (Fed. Cir. 2021)). Although the trial court acknowledged that "neither the trial court nor the appellate court in

[*Conway*] was . . . confronted directly with the question," the trial court nonetheless concluded that the United States' defenses would constitute a collateral attack on the Deputy Receiver's determinations. Appx33. In doing so, the trial court held that a sovereign immunity waiver (or jurisdiction) is not required for a state court to enjoin or grant relief against a sovereign. Appx33-40.

The trial court further awarded non-monetary relief by declaring the applicability of 31 U.S.C. § 3728 to potential, future litigation. Appx42-45. Section 3728 requires the Secretary of the Treasury to "withhold paying that part of a judgment" equal to the amount of a debt presented by the United States to the Secretary and to have a civil action brought on the debt. In doing so, the trial court puts the cart before the horse: Nevada Health did not yet have a judgment, and HHS did not have a debt to present to the Secretary (as the Start-Up Loan debt had been collected already). Moreover, neither party had raised Section 3728, and the Treasury Secretary was not a party to the proceedings. The trial court preemptively declared that "any civil action" subsequently brought by the Treasury Secretary "would be barred as res judicata." Appx43.

## SUMMARY OF ARGUMENT

HHS's collection of a federal debt through offset was permissible under federal law, Nevada insolvency law, and the Loan Agreement. Federal law has long recognized the United States' right to collect delinquent federal debts through offset, and Nevada insolvency law requires that "such credits and debts . . . be setoff and the

balance only . . . allowed or paid," Nev. Rev. Stat. § 696B.440(1). The parties further preserved HHS's offset rights following Nevada Health's default in Section 19.12 of the Loan Agreement, which permits offset "notwithstanding" any other provision of the Agreement.

The trial court erred by holding that HHS explicitly contracted away its offset rights in Section 3.4 of the Loan Agreement. Section 3.4 does not address, or even mention, offset or default. Instead, Section 3.4 reflects the parties' agreement that Nevada Health prioritize payments required for its continued operations over loan payments while Nevada Health "is operating as a CO-OP." Nothing about that preference indicates an intention to waive HHS's offset rights, and federal law requires an *explicit* contractual provision that bars its exercise. The parties' course of conduct, prior to this litigation, further indicates that all parties understood the Start-Up Loan to be a liability, not surplus or reserves.

The United States is also not collaterally estopped from asserting its offset rights in federal court. The trial court erred by reading this Court's decision in *Conway* and other inapposite cases as abrogating sovereign immunity when an insolvent insurer is being liquidated. No sovereign immunity waiver applied to the state court proceedings.

Finally, the trial court erred by granting non-monetary relief, declaring the Secretary of the Treasury's authority under 31 U.S.C. § 3728 and applying the statute to a hypothetical future dispute. Neither party briefed or argued Section 3728, the

Secretary of the Treasury was not a party to these proceedings, and the relief granted was beyond the trial court's jurisdiction. The trial court's decision should be reversed.

## STANDARD OF REVIEW

The decision below rests on conclusions of law that are subject to de novo review. *See, e.g.*, *Starr Int'l Co. v. United States*, 856 F.3d 953, 963 (Fed. Cir. 2017).

## ARGUMENT

### I. HHS PAID NEVADA HEALTH THROUGH OFFSET, AND THOSE OFFSETS WERE LEGALLY PERMISSIBLE UNDER FEDERAL LAW, NEVADA INSOLVENCY LAW, AND THE LOAN AGREEMENT

HHS paid Nevada Health the amounts at issue through offset. As discussed, Nevada Health was due payments under various ACA programs and owed HHS approximately $17 million under the Loan Agreement to repay the Start-Up Loan. Rather than pay Nevada Health directly, HHS reduced (or offset) the amount that Nevada Health owed to HHS on the Start-Up Loan. That offset was authorized by law.

#### A. HHS's Offsets Were Permissible Under Governing Law and the Loan Agreement

**1.** The proper application of offset forecloses the Receiver's demand for additional payments. The right of "setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the 'absurdity of making A pay B when B owes A.'" *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995) (quoting *Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 528 (1913)).

This Court, and its predecessor Court of Claims, have "repeatedly recognized the government's right of set-off." *Johnson v. United States*, 329 F.3d 848, 852 (Fed. Cir. 2003); *see id.* (collecting cases); *cf. McCall Stock Farms, Inc. v. United States*, 14 F.3d 1562, 1566 (Fed. Cir. 1993) (noting that federal statutes governing debt collection were "intended to supplement, and not displace, the government's pre-existing offset rights under the common law").

Although the United States' offset rights can be waived, the mere "agreement to 'pay' a certain amount does not bar the government from exercising its common law right of setoff against the agreed-to obligation." *Applied Cos. v. United States*, 144 F.3d 1470, 1475 (Fed. Cir. 1998). Rather, "the government retains [its] setoff right unless there is some *explicit* statutory or contractual provision that bars its exercise." *Johnson*, 329 F.3d at 854 (quoting *Applied Cos.*, 144 F.3d at 1476) (emphasis added)).

As the trial court recognized, Nevada law is consistent with federal law in permitting offset. Appx14 (acknowledging that "the government likely is correct that Nevada state law generally permits the assertion of an offset under some circumstances"). In fact, Nevada insolvency law *requires* that "in all cases of mutual debts or mutual credits between the insurer and another person . . . , such credits and debts *shall be setoff and the balance only shall be allowed or paid*." Nev. Rev. Stat. § 696B.440(1) (emphasis added). "[S]etoff . . . allows mutually indebted parties to apply the debts of the other so that by mutual reduction everything but the difference is extinguished." *Aviation Ventures, Inc. v. Joan Morris, Inc.*, 110 P. 3d 59, 64 (Nev. 2005)

(citation and quotation omitted); *see also id.* ("Setoff is a doctrine used to extinguish the mutual indebtedness of parties who each owe a debt to one another."). As the Nevada Supreme Court explained, "setoff . . . is especially necessary in cases where one party is insolvent to protect the interests of the solvent party." *Id.*

**2.** Far from waiving offset, the Loan Agreement expressly preserved HHS's offset rights in the event of a default. Section 19.12 of the Loan Agreement, entitled "Right of Set-Off," is the sole provision of the Loan Agreement addressing offset. That provision provides that "*[n]otwithstanding* any other provisions of this Agreement to the contrary," if an "Event of Default" occurs and is not cured, HHS "shall have at its disposal *the full range* of available rights, remedies, and techniques to collect delinquent debts . . . including . . . *administrative offset*." Appx94 (Loan Agreement § 19.12) (emphasis added). The Loan Agreement also specifically includes Nevada Health's insolvency (as well as liquidation or comparable proceedings) as a ground for default. *See* Appx85-86 (explaining that a default occurs if Nevada "ceases to be solvent" or enters proceedings such as "winding-up liquidation"). Thus, when Nevada Health's insolvency triggered an event of default under the Loan Agreement, HHS had the absolute right to offset.

The parties' "use of such a 'notwithstanding' clause clearly signals [their] intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1993) (citation omitted); *see also Crnkovich v. United States*, 202 F.3d 1325, 1334 (Fed. Cir.

2000) (defining 'notwithstanding" to mean "in spite of"). Indeed, "a clearer statement is difficult to imagine." *Liberty Maritime Corp. v. United States*, 928 F.2d 413, 416 (D.C. Cir. 1991). Because HHS's offset right applies "notwithstanding any other provisions," it necessarily follows that the right of offset controls, regardless of anything contained in any other sections of the Loan Agreement. *Abraham v. Rockwell Intern. Corp.*, 326 F.3d 1242, 1254 (Fed. Cir. 2003) (explaining that in contract interpretation terms "which relate to a particular matter control" over more general terms (quotation and emphasis omitted)); *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 980 (Ct. Cl. 1965) (same).

**3.** Although the plain text of the Loan Agreement establishes that HHS retained its offset rights, other tools of contract interpretation confirm the point. To begin, everyone involved—HHS, Nevada Health, and (until this litigation) the Nevada Insurance Commissioner—understood that HHS retained offset rights in the Loan Agreement. *Metropolitan Area Transit, Inc. v. Nicholson*, 463 F.3d 1256, 1260 (Fed. Cir. 2006) ("When . . . contract language is ambiguous, the parties' own course of performance is highly relevant to contract interpretation."). After the parties signed the Loan Agreement, the Nevada Insurance Commissioner indicated that Nevada Health could not treat the Solvency Loan as an asset contributing to reserve requirements unless the Solvency Loan was structured as a surplus note. Such notes must be expressly subordinated to all other claims for payment and all other creditors, and thus require waiver of any right of offset. *Supra* at 5, 8-9. The parties thus agreed

to an amendment to convert the Solvency Loan into a surplus note, substituting a new promissory note for that loan that contained an express subordination clause and provided that Nevada Health's "obligation under this Promissory Note may not be subject to offset." Appx141.

The parties did not similarly amend the promissory note for the Start-Up Loan, which remained subject to offset, and Nevada Health accordingly treated the Start-Up Loan as debt instead of regulatory capital. *Supra* at 7-10; *see* 45 C.F.R. § 156.520(a)(1). And further confirming the point, as insolvency neared, the Nevada Insurance Commissioner granted Nevada Health "a limited one-time permitted practice to report the . . . Startup funds as surplus rather than as a liability." Appx2023, Appx2049-2050. In sum, the conduct of the parties and the Nevada Insurance Commissioner demonstrates that all understood Section 19.12 to mean what it says: the United States retains its offset rights.

That understanding is also consistent with the statutory and regulatory scheme at issue. *City of Fulton v. United States*, 680 F.2d 115, 120 (Ct. Cl. 1982) (observing that giving language its "ordinary meaning is particularly appropriate where the contract language is easily construed in harmony with the governing statute or regulation"). In implementing its responsibilities under the ACA, HHS made clear in its regulations that failure to repay will subject the borrower "to any and all remedies available to [HHS] under law to collect the debt." 45 C.F.R. § 156.520(d). Offset is one such well-established remedy: it has long been recognized by this Court and the Supreme Court

that "[t]he government has the same right which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him." *United States v. Munsey Trust Co. of Washington, DC*, 332 U.S. 234, 239 (1947) (quotation marks omitted); *accord Johnson*, 329 F.3d at 852 (collecting cases in which this Court and its predecessor court have "repeatedly recognized the government's right of set-off").

### B. The Trial Court Erred In Holding That Section 3.4 of the Loan Agreement Waived HHS's Offset Right

The trial court rested its contrary conclusion on a different provision of the Loan Agreement—Section 3.4. That provision, entitled "Security for the Loans," provides in relevant part:

> Because the intent of the Loans, and the Solvency Loan in particular, is to provide financing to [Nevada Health] that meets the definition of 'risk based capital' for State Insurance Law purposes, the Loans will have a claim on cash flow and reserves of [Nevada Health] that is subordinate to (a) claims payments, (b) Basic Operating Expenses, and (c) maintenance of required reserve funds while [Nevada Health] is operating as a CO-OP under State Insurance Laws.

Appx63. The trial court understood this provision to mean that HHS "agree[d] that, in the event of a default or bankruptcy, another creditor (senior creditor) will receive repayment in full before the junior creditor receives payment," and that "[e]ven if [Nevada Health] defaulted or otherwise breached the Loan Agreement," HHS would have "at most . . . a subordinated claim for damages." Appx21 (quoting *In re Southeast*

*Banking Corp.*, 156 F.3d 1114, 1118 (11th Cir. 1998) (emphasis in original); *In re Lehman Bros., Inc.*, 574 B.R. 52, 61-62 (Bankr. S.D.N.Y. 2017)).

**1.** The trial court's reasoning depends upon its conclusion that Section 3.4 applies in the event of a default, thereby controlling other provisions in the Loan Agreement that address HHS's rights in the event of a default. *E.g.*, Appx6 ("In the event of [Nevada Health]'s default, the Loan Agreement provisions provides as follows: [Section 3.4]."); Appx25, n.27 ("Indeed, the entire point of such an agreement is that it delineates the lender's security interest – and relative priority – in case of the borrower's *default*.") (emphasis added). But the text of Section 3.4 does not mention "default," "bankruptcy" (or insolvency), "senior" or "junior" creditors, or subordinated damages claims. Indeed, Section 3.4 does not address the effect of a default at all, much less say anything about HHS's offset rights in the event of a default.

By contrast, several other provisions of the Loan Agreement do expressly address default—and none of those provisions reference Section 3.4. *See* Appx85-87, Appx93-94 (Loan Agreement §§ 15.1, 15.2, 15.3, 19.8, 19.12). Section 3.4 thus cannot be read to override the specific provisions of the Loan Agreement that address default, including Section 19.12's express reservation of offset rights, especially given that "the government's set-off right can be defeated only by explicit language." *Johnson v. All-State Constr., Inc.*, 320 F.3d 848, 853 (Fed. Cir. 2003); *accord Applied Cos. v. United States*, 144 F.3d 1470, 1475 (Fed. Cir. 1998) (explaining that the United States "retains

its setoff right unless there is some explicit statutory or contractual provision that bars its exercise”).

Section 3.4, instead, operates as a security provision that expresses the parties’ agreement that Nevada Health prioritize the payments required for its continued operations over repayment of the loans while Nevada Health is operating as a CO-OP. This agreement protects the United States’ $68 million investment of taxpayer funds into Nevada Health and supports the central objective of the CO-OP program under the ACA—the provision of affordable health insurance by an operating insurer. That is why Section 3.4 of Loan Agreement addresses HHS’s “claim on [the] cash flow and reserves” of Nevada Health, specifies that its claim on those sources is subordinate to “(a) claims payments, (b) Basic Operating Expenses, and (c) maintenance of required reserve funds,” and limits that subordination to “while [Nevada Health] is operating as a CO-OP under State Insurance Laws.” Appx63. In that respect, Section 3.4 is in accord with other provisions of the Loan Agreement that likewise stress the primacy of continued operations over repayment of the loans, emphasizing that payments should occur only if they would not interfere with Nevada Health’s ability to meet reserve requirements, *see* Appx67-68, Appx70 (Loan Agreement §§ 4.4, 5.6), and allowing for a grace period or rescheduling of payments if reserve requirements or other obligations prevented an on-time payment, Appx72 (Loan Agreement § 6.5).

The trial court's view that Section 3.4 applies to default rested in part on its application of the "rule of the last antecedent." On its view, Section 3.4 subordinated the Loans to "claims payments" and "Basic Operating Expenses" after default, but only subordinated the Loans to "required reserves" while Nevada Health was operating, because the proviso "while [Nevada Health] is operating as a CO-OP under State Insurance Laws" appears after that final category. Appx25. But "the doctrine of the last antecedent" is "more guideline[] than absolute rule[]," *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1336 (Fed. Cir. 2008), and "structural or contextual evidence may 'rebut the last antecedent inference,'" *Lockhart v. United States*, 577 U.S. 347, 355 (2016) (quoting *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 344, n.4 (2005)). Reading the sentence as a whole makes plain that it is addressing the HHS's claim on the "cash flow and reserves" of Nevada Health—attributes of an operating insurance company, not the attributes of an entity in liquidation. Nothing in Section 3.4 suggests that the parties intended a different treatment for HHS's "claim on cash flow and reserves" when applied to "claims payments" and "Basic Operating Expenses" as opposed to the "maintenance of required reserve funds." Appx60. Moreover, HHS has asserted no "claim" to Nevada Health's "cash flow" or "reserves."

The trial court's reading generally—and its application of the last-antecedent rule specifically—is especially inappropriate where other provisions expressly address the government's rights in the event of a default brought on by insolvency or

liquidation. By reading Section 3.4 to address instances of default, the trial court rendered Section 19.12's express reservation of offset rights meaningless. *See McAbee Const. Co. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (noting that a court must "interpret the contract in a manner that gives meaning to all of its provisions and makes sense"). As the trial court acknowledged, the only conceivable circumstance in which Section 19.12 could operate on its reading is "where the CO-OP is *not* in liquidation, has surplus funds available to pay back the Loans, but, for whatever reason, fails to do so." Appx30-31 (emphasis added). But Section 19.12 does not reference that improbable scenario. Nor does it say offset is available only when Nevada Health has sufficient surplus to pay its other claims or only when Nevada Health has satisfied state reserve requirements. It says offset is available upon "any Event of Default," which includes liquidation or insolvency. The trial court's interpretation would relegate the operative phrase "any Event of Default" to mere surplusage.

**2.** As these points illustrate, the trial court erred insofar as it understood Section 3.4 and Section 19.12 to both address the government's rights in the event of a default, and the plain terms of Section 19.12 should have resolved matters in the government's favor. Even accepting the trial court's mistaken premise that there was some conflict between these two provisions or ambiguity in their relationship, the trial court still erred. Most notably, the trial court provided no explanation for Section 19.12's express statement that it applies—and reserves offset rights—

"notwithstanding any other provisions of th[e] [Loan] Agreement to the contrary." Appx91. The trial court stated that this language created merely a "latent ambiguity" that should be "construed against the Government as the drafter." Appx31 n.30 (quoting *Northrop Grumman Corp. v. United States*, 42 Fed. Cl. 1, 13 (1998)). But the entire purpose of a "notwithstanding" clause is to avoid ambiguity by "clearly signal[ing] the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." *Alpine Ridge Grp.*, 508 U.S. at 18. The trial court erred in converting the clear statement that Section 19.12 controls in the event of a conflict into an ambiguity to be held against HHS.

In any event, reliance on the *contra proferentum* rule is a "last resort" applied only if ambiguity persists after "reading the contract as a whole or looking to the circumstances attending the transaction and the conduct of the parties." *Gardiner, Kamiya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1352 (Fed. Cir. 2006) (quoting *Chris Berg, Inc. v. United States*, 455 F.2d 1037, 1044 (Ct. Cl. 1972)). Here, as discussed, the text of the Loan Agreement as a whole demonstrates that Section 3.4 does not speak to events of default. And the "conduct of the parties" in amending the Loan Agreement to waive offset for the Solvency Loan—as requested by the Nevada Insurance Commissioner—confirms that the "notwithstanding" clause in fact reserved HHS's offset rights.

The trial court discounted the amendment—and the provisions of the Loan Agreement specifically addressing default—based on the opening lines of Section 3.4.

In its view, because Section 3.4 states that "the intent of the Loans, and the Solvency Loan in particular, is to provide financing to [Nevada Health] that meets the definition of 'risk based capital' for State Insurance Law purposes," the parties must have always intended to waive offset for both loans. Appx22, Appx26. And the trial court attempted to bolster this conclusion by citing language from the amendment to the Loan Agreement emphasizing that the change to the agreement reflected the parties' "original intentions." Appx26-27. That approach, too, suffers from the fundamental flaw that Section 3.4 does not address circumstances of default, unlike the specific provisions governing that scenario.

Even on its own terms, however, the trial court's reasoning mistakenly assumes that the parties believed that the provision of "risk based capital" would necessarily require waiving offset rights. The regulatory backdrop—which the trial court repeatedly referenced, Appx26-29—refutes that inference. In crafting rules governing the contract terms, HHS specifically addressed comments urging that some states would only accept "surplus notes"—loans for which offset is waived, among other features—as assets that qualify toward satisfying capital requirements. 76 Fed. Reg. at 77,403. In response, HHS did not adopt an inflexible rule that all solvency loans must be structured as surplus notes or must waive offset. HHS instead emphasized that CO-OPs would have "flexibility" to structure loans to meet regulatory requirements, with a surplus note merely one potential arrangement, and placed the onus on CO-

OPs to "work with State insurance regulators to identify loan structures that will meet State requirements." *Id.* at 77,403-04.

The Loan Agreement, as originally drafted, sought simultaneously to provide risk-based capital that could be counted toward reserve requirements and to protect the investment of taxpayer funds in Nevada Health to the maximum extent possible through the preservation of offset rights. Once it became clear that those two goals were in irreconcilable conflict with respect to the Solvency Loan—because the Nevada Insurance Commissioner stated that the Solvency Loan could not be treated as regulatory capital—the parties amended the agreement to expressly waive offset rights and ensure that the Solvency Loan would be treated as an asset. No comparable change was made for the Start-Up Loan, which remained subject to the original terms of the Loan Agreement and promissory note.

## II. THE TRIAL COURT ERRED BY HOLDING THAT NO SOVEREIGN IMMUNITY WAIVER WAS REQUIRED TO PERMIT A STATE COURT TO BIND THE UNITED STATES

The trial court's conclusion that the Loan Agreement waived HHS's offset rights, though erroneous, was sufficient to resolve the Receiver's claims. The court went further, however, additionally holding that the United States was bound by the results of the state court insolvency proceeding. No waiver of sovereign immunity permitted the state court to adjudicate the United States' rights, and the trial court misunderstood this Court's prior decision in *Conway*.

"The United States, as sovereign, is immune from suit save as it consents to be sued." *United States v. Sherwood*, 312 U.S. 584, 586 (1941). A court's "jurisdiction to grant relief depends wholly upon the extent to which the United States has waived its sovereign immunity to suit and . . . such a waiver cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4 (1969). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies," without regard to any perceived unfairness, inefficiency, or inequity. *Dept. of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999). The United States thus cannot have "claims decided against it in the courts of another sovereign[,]" unless there is a "Congressional act . . . that expressly authorize[s] the state court to adjudicate the federal interests involved." *Quality Tooling, Inc. v. United States*, 47 F.3d 1569, 1576-77 (Fed. Cir. 1995) (citing *United States v. Shaw*, 309 U.S. 495, 60 (1940); *Minnesota v. United States*, 305 U.S. 382 (1939)).

The trial court did not identify a sovereign immunity waiver that would have permitted the state court to exercise jurisdiction over the United States (and no such waiver exists). Instead, it posited that no such waiver was necessary.

### A. This Court's *Conway* Decision Does Not Eliminate the Need For a Sovereign Immunity Waiver in State Court

The trial court first suggested that this Court's decision in *Conway* dictated that all aspects of the "liquidation process" under state law are "controlling" on the United States, including factual and legal determinations by the Deputy Receiver. Appx33 (emphasis omitted). That fundamentally misunderstands *Conway*, which involved

another CO-OP's liquidation in a state (Colorado) that limited offset to contractual debts. 997 F.3d at 1204-06. This Court considered whether the United States could still exercise offset to collect a non-contractual debt, whether through use of a federal common-law right or because the Colorado limitation was preempted by federal law. *Conway* held that the ACA did not preempt Colorado law, *id.* at 1208-14, and that federal common law incorporated the state law limitation, *id.* at 1214-15, and thus concluded that the United States could not exercise offset to collect its non-contractual debts. *Conway* thus has no bearing on the sovereign immunity analysis.[11]

Nothing in *Conway* suggests that the United States' rights would be subject to adjudication in state court. Indeed, if that were the rule, much of the analysis in *Conway* would have been superfluous; in *Conway* itself, the United States submitted claims in the state court, but this Court did not hold or imply that the state court's determinations were dispositive. *See Conway v. United States*, 145 Fed. Cl. 514, 520 (2019) (noting that the Colorado liquidator "disallow[ed]" the United States' claims,

[11] *Conway* also states that "Colorado Health's loan documents recognize Congress' intent, subordinating 'any HHS claim for repayment of the [CO-OP] loan amounts . . . to the claims of policyholders and other claimants,'" 997 F.3d at 1212-13, and the trial court relied on this statement, Appx23. But this Court was quoting from an allegation in the plaintiff's complaint, and in any event, no loan agreement was at issue in that case. *Conway*'s statements regarding the loan agreement are not entitled to weight. *Kastigar v. United States*, 406 U.S. 441, 454-55 (1972) ("Because statements made in dicta do not implicate the substantive holding of the case, they cannot be considered binding authority.") (citation omitted); *Smith v. Orr*, 855 F.2d 1544, 1550 (Fed. Cir. 1988) ("It is well established that a general expression in an opinion, which expression is not essential to the disposition of the case, does not control a judgment in a subsequent proceeding.").

that the United States "did not object to that claim determination within the 60-day limit under Colorado law," and later "a Colorado court affirmed the Liquidator's claim determination"). Indeed, reading *Conway* in this fashion was especially inappropriate where this Court engaged in *no* consideration of whether Congress had waived the United States' sovereign immunity.

### B. The Trial Court Identified No Other Basis for Ignoring the Lack of a Sovereign Immunity Waiver in State Court

The trial court offered several other justifications for its view, but none of them overcome the basic failing that no sovereign immunity waiver applied in state court.

**1.** The trial court relied on a narrow line of cases holding that as between federal and state courts, "the court first assuming jurisdiction over property may maintain and exercise that jurisdiction to the exclusion of the other," a principle that applies "where suits are brought to marshal assets, administer trusts, or liquidate estates, and in suits of a similar nature, where, to give effect to its jurisdiction, the court must control the property." *United States v. Bank of New York & Trust Co.*, 296 U.S. 463 (1936); *see also Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456 (1939) (similar).

Those cases address circumstances where the state court already possessed the property, and a federal court could not compel the state court to relinquish it. In *Bank of New York*, for example, the Soviet Union assigned its rights to the funds of American branches of Russian insurance companies to the United States. 296 U.S. at

470. The funds were in the custody of the New York state courts, which had administered liquidation proceedings for the companies and made provision for distribution of the surplus funds. *Id.* at 471-75. In that circumstance, the Supreme Court held, it did not "sacrifice . . . [the] proper dignity" of the United States to "prosecute[] its claim in the appropriate forum where the funds are held." *Id.* at 481.

But as that explanation indicates—and the Supreme Court has repeatedly made clear since—the fact that the funds were in the possession of the state court was decisive. As the Supreme Court subsequently explained, "the Bank of New York case presented the more unusual situation where the United States, like any private claimant, made a claim against funds that it never possessed and that were in the hands of depositaries appointed by the state court." *Leiter Minerals, Inc. v. United States*, 352 U.S. 220, 227 (1957); *see also Donovan v. City of Dallas*, 377 U.S. 408, 412 (1964) (describing rule as addressing situations "where a court has custody of property"); *Fischer v. American United Life Ins. Co.*, 314 U.S. 549, 554 (1942) (citing *Princess Lida* for the proposition that a "federal court may not seize and control the property which is in the possession of the state court nor interfere with the state court or its functions" (quotation omitted)); *Markham v. Allen*, 326 U.S. 490, 494 (1946) (similar). Indeed, underscoring the narrowness of the rule enunciated in *Bank of New York*, the Supreme Court has made clear that even when such property is in the custody of a state court, a federal court may still "exercise its jurisdiction to adjudicate rights in such property where the final judgment does not undertake to interfere with the state court's

possession save to the extent that the state court is bound by the judgment to recognize the right adjudicated by the federal court." *Markham*, 326 U.S. at 494. The facts of this case are far more straightforward: the funds at issue are and always have been in the possession of the United States, and the Receiver, standing in Nevada Health's shoes, has brought suit in federal court to compel payment of monies it contends are owed.

More generally, the state court's in rem jurisdiction does not preclude the need for a waiver of sovereign immunity. Any determination by a state court (or those appointed by a state court) as to the United States' offset rights is not directed at any res possessed by the state court and does not operate in rem. *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 38 (1992) (noting that a suit was not in rem where a party "sought to recover a sum of money, not particular dollars" (quotation omitted)). The Deputy Receiver instead purported to issue what is quintessentially in personam relief against the United States, necessarily adjudicating the lawfulness of the United States' conduct and determining the United States' affirmative rights. And in any event, the Supreme Court has "never applied an *in rem* exception to the sovereign-immunity bar against monetary recovery, and ha[s] suggested that no such exception exists." *Id.* at 39; *accord Zych v. Wrecked Vessel Believed to be the Lady Elgin*, 960 F.2d 665, 669 (7th Cir. 1992) ("[T]here is no general *in rem* exception to principles of sovereign immunity[.]"). Instead, sovereign immunity extends to *any* compulsive (or preclusive) action, not only formal lawsuits naming the United States as a defendant. *See Dugan v. Rank*, 372 U.S.

609, 620 (1963) ("The general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act.") (internal citations and quotations omitted). The state court's authority thus does not extend to determining the United States' rights to funds in the United States' possession.

**2.** The trial court also erred in attributing significance to the government's submission of a proof of claim in the state insolvency proceedings. Appx35 (emphasizing that "the government participated in the state liquidation process" and stating that there was "no reason to interfere with the results of that process"). The Supreme Court has for decades made clear that a waiver of sovereign immunity must come from *Congress*; the actions of an executive official cannot waive sovereign immunity. *State of Minnesota v. United States*, 305 U.S. 382, 388-89 (1939) ("Where jurisdiction has not been conferred by Congress, no officer of the United States has power to give to any court jurisdiction of a suit against the United States."); *United States v. Shaw*, 309 U.S. 495, 501 (1940) ("No officer by his action can confer jurisdiction[.]"). "If the contrary were true, it would subject the government to suit in any court in the discretion of its responsible officers. This is not permissible." *United States v. U.S. Fidelity & Guaranty Co.,* 309 U.S. 506, 513 (1940). Moreover, where a state court exercises jurisdiction without Congress' consent, "[t]he failure of officials to seek review cannot give force to this exercise of judicial power." *Id.* at 514.

For the same reasons, the trial court's concern with permitting a "collateral[] attack" on the Nevada proceedings misses the point. Appx39. Because Congress did not consent to have the United States' claims adjudicated in state court, the Nevada court lacked jurisdiction, and the Nevada proceeding does not and cannot bind the United States before the Court of Federal Claims—where Congress *has* waived sovereign immunity and provided that suits of this kind must be brought. *U.S. Fidelity & Guar.*, 309 U.S. at 514 (explaining that immunity considerations "govern likewise the question of res judicata" and explaining that a judgment entered without a waiver of immunity is subject to "collateral attack" as "void").

**3.** The trial court further erred by invoking abstention principles, even after acknowledging that abstention "does *not* apply here." Appx37. Implicit in a federal court's consideration of the abstention doctrine is that state and federal courts have concurrent jurisdiction. Where sovereign immunity precludes exercise of state court jurisdiction, any consideration of the principles underpinning abstention is inappropriate. The trial court was wrong to rely on these principles and that error led the trial court to make an error of law.

## III. THE TRIAL COURT ERRED IN RULING ON 31 U.S.C. § 3728 AND GRANTING THE RECEIVER NON-MONETARY RELIEF BEYOND THE TRIAL COURT'S JURISDICTION

The trial court, addressing an issue not presented in the case and not briefed or argued by either party, opined on the applicability of 31 USC § 3728 to a hypothetical future dispute. In 31 U.S.C. § 3728, Congress instructed the "Secretary of the

Treasury [to] withhold paying . . . part of a judgment against the United States Government presented to the Secretary that is equal to a debt the plaintiff owes the Government," 31 U.S.C. § 3728(a), and "requires the government to bring a civil action to recover the setoff amount[,]" Appx43. This portion of the trial court's opinion was inappropriate not only because the question was not raised, but because that statute speaks to the Secretary of the Treasury, who was not a party in the trial court. The court's reasoning was thus entirety unnecessary to the judgment it entered, as confirmed by this Court's decision in *Conway*, which reserved questions about the applicability of Section 3728 in these disputes for a case in which the question was actually presented. *Conway*, 997 F.3d at 1215-16 (explaining that Section 3728 "may prevent Conway from enforcing his judgment against the government," but "not reach[ing] that issue").

Moreover, the trial court erred in granting non-monetary relief, beyond the Court of Federal Claims' jurisdiction. The trial court preemptively addressed 31 U.S.C. § 3728 "in the interest of avoiding future, – and, in the [trial court]'s view, unnecessary – proceedings, " and held that the United States is "not entitled" to bring any future civil action because the court had preemptively determined that any yet-to-be filed action lacks merit and that any effort to obtain a judicial determination of the United States' rights in federal court "would be barred as res judicata." Appx42-45. The trial court then declared that "[t]he government cannot invoke 31 U.S.C. 3728 to reassert the offsets and thereby somehow avoid the final judgment in this case." Appx144.

The trial court lacked jurisdiction to grant "relief other than money damages." *See King*, 395 U.S. at 4, and the declaration regarding the Treasury Secretary's authority under 31 U.S.C. § 3728 was in error.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court should be reversed.

Respectfully submitted,

BRIAN M. BOYTON
*Principal Deputy Assistant Attorney General*
*Civil Division*

RUTH A. HARVEY
*Director, Commercial Litigation Branch*

KIRK T. MANHARDT
*Deputy Director*

/s/ Terrance A. Mebane
TERRANCE MEBANE
PHILLIP SELIGMAN
*U.S. Department of Justice*
*Civil Division, Commercial Litigation Branch*
*P.O. Box 875*
*Washington, DC 20044*
*(202) 307-0493*
*terrance.a.mebane@usdoj.gov*

July 22, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2022, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Terrance A. Mebane
Terrance A. Mebane

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,056 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

/s/ Terrance A. Mebane
Terrance A. Mebane

# ADDENDUM

# TABLE OF CONTENTS

<u>Matters Under Review (Fed. Cir. R. 28(a)(11)):</u>

Opinion and Order, ECF No. 48 (Nov. 30, 2021) .......... Appx1-46

Order, ECF No. 50 (Dec. 31, 2021) .......... Appx47-48

Judgment, ECF No. 51 (Jan. 4, 2022) .......... Appx49

# In the United States Court of Federal Claims

No. 18-1731C

(Filed: November 30, 2021)

**BARBARA D. RICHARDSON, in her capacity as Receiver of Nevada Health Co-Op.,**

***Plaintiff,***

**v.**

**THE UNITED STATES,**

***Defendant.***

*Mark E. Ferrario*, Greenberg Traurig, LLP, Las Vegas, NV, for Plaintiff. With him on the briefs were *Eric W. Swanis*, *Donald L. Prunty*, and *Tami D. Cowden*. Of counsel were *Michael J. Schaengold*, *Daniel D. Straus*, and *Melissa P. Prusock*, Greenberg Traurig, LLP, Washington, D.C.

*Phillip M. Seligman*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant. With him on the briefs were *Ruth H. Harvey*, Director, *Kirk T. Manhardt*, Deputy Director, and *Frances M. McLaughlin*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

***SOLOMSON*, Judge.**

## I. INTRODUCTION

Plaintiff, Barbara D. Richardson, the Nevada Commissioner of Insurance, acting in her position as the receiver (the "Receiver") for the Nevada Health CO-OP ("NHC"), sued Defendant, the United States, for payments it allegedly owes pursuant to the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) (codified as amended in scattered sections of Titles 26 and 42 of the United States Code) (the "ACA"). Specifically, the Receiver alleges that the government has improperly

withheld such payments — totaling (approximately) at least $38 million and perhaps exceeding $55 million — based on administrative offsets[1] asserted by the Centers for Medicare and Medicaid Services ("CMS"), an agency of the U.S. Department of Health and Human Services ("HHS"), for amounts it contends NHC owes the government pursuant to contract. Because the Court holds that the contract at issue precludes the government's offsets, the Receiver is entitled to judgment on its claims.

## II. PROCEDURAL HISTORY

On November 8, 2018, the Receiver filed suit in this Court to recover amounts due to NHC pursuant to the ACA, including sums that the government asserted as an offset against what was due to NHC. ECF No. 1 ("Compl.").[2] On March 7, 2019, the government filed a motion to dismiss pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims (the "RCFC") for failure to state a claim upon which relief can be granted. ECF No. 11 ("Def. MTD"). On July 31, 2019, the Receiver filed a response in opposition to the government's motion to dismiss and a cross-motion for partial summary judgment. ECF No. 20. On August 12, 2019, this Court granted the government's motion to stay this case pending the United States Supreme Court's resolution of several other cases seeking payment pursuant to various alleged money-mandating provisions of the ACA. ECF No. 21. On February 5, 2020, this case was reassigned to the undersigned Judge. ECF Nos. 22, 23.

On April 27, 2020, the Supreme Court issued its decision in *Maine Community Health Options v. United States*, 590 U.S. --, 140 S. Ct. 1308 (2020). The Supreme Court held that insurers seeking amounts owed under the ACA's Risk Corridors program, discussed *infra*, "have a right to payment under § 1342 [of the ACA] and a damages remedy for the unpaid amounts." *Id.* at 1315 (concluding "that § 1342 of the [ACA] established a money-mandating obligation, that Congress did not repeal this obligation, and that petitioners may sue the Government for damages in the Court of Federal Claims").

---

[1] The terms "offset" and "setoff" are synonymous and are used interchangeably in this Opinion.

[2] Prior to commencing this matter, the Receiver filed suit in the United States District Court for the District of Nevada, seeking a declaratory judgment that the government was not "legally entitled to assert setoffs . . . for monies claimed against NHC through funds that HHS/CMS is statutorily obligated to pay to NHC." Complaint & Demand for Jury Trial ¶ 6, *Richardson v. U.S. Dep't of Health & Hum. Servs.*, 2018 WL 1569772 (D. Nev. 2018) (No. 17-775). On March 30, 2018, the district court dismissed the Receiver's complaint for lack of subject matter jurisdiction. *Richardson*, 2018 WL 1569772, at *2. The district court held that the Receiver's complaint "ultimately seeks monetary relief," and, accordingly, the United States Court of Federal Claims possesses exclusive jurisdiction to hear the Receiver's claims. *Id.*

Because of the need to supplement the briefing before this Court to address *Maine Community Health*, and based upon the parties' agreement, the Court ordered the Receiver to file an updated response in opposition to the government's motion to dismiss to include a new cross-motion for partial summary judgment. ECF No. 29. The Receiver filed that brief on September 9, 2020. ECF No. 32 ("Pl. Resp."). The government filed a reply brief on October 26, 2020. ECF No. 34 ("Def. Rep."). The Receiver filed its reply on November 13, 2020. ECF No. 36 ("Pl. Rep.").

On May 19, 2021, the Receiver filed a Notice of Supplemental Authority concerning the decision of our appellate court, the United States Court of Appeals for the Federal Circuit, in *Conway v. United States*, 997 F.3d 1198 (Fed. Cir. 2021). ECF No. 42. The government filed its response on May 21, 2021. ECF No. 44 ("Def. Resp. to Supp. Auth."). On May 24, 2021, the Court held oral argument on the parties' pending motions. ECF No. 46 ("Tr.").[3]

## III. LEGAL AND FACTUAL BACKGROUND[4]

### A. The ACA and Its Programs

In March 2010, Congress enacted the ACA, "a series a series of interlocking reforms designed to expand coverage in the individual health insurance market." *King v. Burwell*, 576 U.S. 473, 478–79 (2015). A key section of the ACA mandated the creation of virtual health insurance markets, called "Health Benefit Exchanges" in each state. 42 U.S.C. § 18031(b)(1). The ACA required that plans offered through such exchanges satisfy certain criteria, including offering a minimum level of "essential" coverage; these plans are referred to as "qualified health plans" ("QHPs"). *Id.* §§ 18021, 18022, 18031.

At the outset, insurance carriers offering QHPs faced heightened risk because they lacked "reliable data to estimate the cost of providing care for the expanded pool of individuals seeking coverage" on the new Exchanges. *Maine Cmty. Health Options*, 140 S. Ct. at 1316 (quoting *Moda Health Plan, Inc. v. United States*, 892 F.3d 1311, 1314 (Fed. Cir. 2018)). To encourage insurers to enter the Exchanges, the ACA established

---

[3] Citations to the transcript of oral argument proceedings conducted on May 24, 2021 are denoted by "Tr. __," with page and line numbers indicated.

[4] As explained in more detail below, the material facts are not in dispute and, as summarized herein, are drawn from documents attached as appendices to the Receiver's complaint and the parties' briefs. Because those various appendices contain overlapping documents that are generally redundant of each other, the Court primarily relies upon those included in the corrected appendix to the Receiver's response brief, as it appears to represent the most comprehensive collection of such documents. *See* ECF Nos. 37-1 to 37-5. Citations to those documents are denoted as "A__," with the page number of the appendix indicated.

several programs to defray the financial burden on insurers and to mitigate their risks. *See id.* at 1315. Among these initiatives were three premium stabilization programs, dubbed the "3Rs": (1) risk corridors; (2) risk adjustment; and (3) reinsurance. *See Conway*, 997 F.3d at 1202 (citing 42 U.S.C. §§ 18061–63).

The risk corridor program was a temporary program for the exchanges' first three years, 2014 to 2016, pursuant to which amounts collected from profitable insurance plans effectively funded payments to unprofitable plans. 42 U.S.C. § 18062; *see also Maine Cmty. Health Options*, 140 S. Ct. at 1316 (Section "1342 stated that the eligible profitable plans 'shall pay' the Secretary of the Department of Health and Human Services (HHS), while the Secretary 'shall pay' the eligible unprofitable plans") (quoting 42 U.S.C. § 18062)). The risk adjustment program, in contrast, is a permanent program under which amounts collected from insurers with healthier-than-average enrollees are used to fund payments to insurers with sicker-than-average enrollees. 42 U.S.C. § 18063. Finally, the reinsurance program was a temporary program that "required insurers to pay premiums into a pool that compensated carriers covering 'high risk individuals.'" *Maine Cmty. Health Options*, 140 S. Ct. at 1316 n.1 (quoting 42 U.S.C. § 18061).[5]

The "Cost Sharing Reduction" program permits the government to subsidize premium costs for lower income participants. 42 U.S.C. § 18071. Under this program, insurers offering QHPs are required to reduce eligible individuals' costs by specified amounts based on household income, *id.* § 18071(a)–(c), and HHS is required to reimburse the insurers for those costs, *id.* § 18071(c)(3)(A). The government issues periodic subsidy payments to the insurers, *id.* §§ 18071(c)(3)(a), 18082(c)(3), with a yearly reconciliation for payments that are too high or too low, 45 C.F.R. § 156.430.

To "foster the creation of qualified nonprofit health insurance issuers to offer qualified health plans in the individual and small group markets," the ACA established the "Consumer Operated and Oriented Plan" ("CO-OP") program. 42 U.S.C. § 18042(a)(2). The ACA authorized HHS to lend money to prospective health insurers seeking to qualify as CO-OPs offering QHPs. *Id.* § 18042(b)(1). As discussed in more detail below, the ACA required HHS to promulgate regulations governing the issuance of loans, as well as their repayment "in a manner consistent with State solvency regulations and other similar State laws that may apply." *Id.* § 18042(b)(3).

---

[5] The ACA contemplated states administering their own reinsurance and risk adjustment programs, with HHS responsible for operating the programs in states that did not elect to administer the programs. 42 U.S.C. § 18041(b)–(c). In Nevada, HHS operated the reinsurance and risk adjustment programs. Compl. ¶ 26 (citing 45 C.F.R. § 153.310); Def. MTD at 6.

### B. NHC's Participation in the CO-OP Program

#### 1. The Government's Loans to NHC

NHC's predecessor in interest, Hospitality Health, Ltd., was a Nevada health maintenance organization that participated in the CO-OP program. Pl. Resp. at 6–7; A151 (Loan Agreement, Section 1.1). On May 17, 2012, Hospitality Health, Ltd. and CMS executed a loan agreement (the "Loan Agreement") that included two promissory notes: (1) a start-up loan of $17,105,047 (the "Start-Up Loan"); and (2) a solvency loan of $48,820,349 (the "Solvency Loan"). Compl. ¶ 56; Pl. Resp. at 7; A157 (Loan Agreement, Section 3.2). Collectively, the Loan Agreement defined the term "Loans" to "mean[] both of them together" — *i.e.*, both the Start-up Loan and the Solvency Loan. A154 (Loan Agreement, Section 2.1).[6] These Loans subsequently were assigned to NHC, A226–28 (Amendment to Loan Agreement), and were intended to facilitate NHC's offering "health plans primarily in the individual and small group markets." Pl. Resp. at 7; A157 (Loan Agreement, Section 3.1).

The Loan Agreement addresses, *inter alia*, NHC's repayment obligations:

> 4.4 Repayment of the Start-Up Loan. . . . Principal repayments on the Start-Up Loan will be . . . subject to [NHC]'s ability to meet State Reserve Requirements and other solvency regulations or requisite surplus note arrangements. Unless [CMS] terminates this Agreement for cause under Section 16.3 below, [NHC] shall be obligated to repay 100% of the Start-Up Loan amount disbursed, plus any capitalized Interest to [CMS] . . . subject to its ability to meet State Reserve Requirements and other solvency regulations, or requisite surplus note arrangements. If [CMS] terminates this Agreement for cause under Section 16.3 below, [NHC] shall be obligated to repay 110% of the Start-Up Loan Principal disbursed, plus any capitalized Interest . . . .

A161 (Loan Agreement, Section 4.4); *see also* A164 (Loan Agreement, Section 5.6) (containing a similar repayment provision for the Solvency Loan, also "subject to [NHC]'s ability to meet State Reserve Requirements and other solvency regulations, or requisite surplus note arrangements").

---

[6] This Opinion uses the term "Loans" as defined in the Loan Agreement.

In the event of NHC's default, the Loan Agreement provides as follows:

> 3.4. Security for the Loans. The Loans and other Obligations will be general obligations of [NHC]. Because of the intent of the Loans, and the Solvency Loan in particular, is to provide financing to [NHC] that meets the definition of "risk based capital" for State Insurance Law purposes, the Loans will have a claim on cash flow and reserves of [NHC] that is subordinate to (a) claims payments, (b) Basic Operating Expenses, and (c) maintenance of required reserve funds while [NHC] is operating as a CO-OP under State Insurance Laws.

A157 (Loan Agreement, Section 3.4).

The Loan Agreement also addresses CMS's remedies in the event of NHC's default:

> 19.12. Right of Set-Off. Notwithstanding any other provisions of this Agreement to the contrary, in the event any Event of Default is not cured or another accommodation permissible under this Agreement is not otherwise reached within applicable notice and cure periods, [CMS] shall have at its disposal the full range of available rights, remedies and techniques to collect delinquent debts, such as those found in the Federal Claims Collection Standards and applicable Treasury regulations, as appropriate, including demand letters, administrative offset, salary offset, tax refund offset, private collection agencies, cross-servicing by the Treasury, and litigation.

A188 (Loan Agreement, Section 19.12).

In early 2013, the Loan Agreement was amended to "acknowledge the promissory note contained in Appendix 4 of the Agreement as a surplus note within the meaning of the Statement of Statutory Accounting Principles (SSAP) No. 41 and thus accept the proceeds of the Solvency Loan provided through the Agreement as an asset for regulatory purposes, *consistent with the original intent of the parties*." A229–30 (Second Amendment to Loan Agreement) (emphasis added).

### 2. NHC's Receivership and the Subsequent Claims Process

In 2015, NHC experienced significant financial distress, with the Nevada Division of Insurance ("NDOI") declaring NHC "unsound," pursuant to section 696B.210(2) of the Nevada Revised Statutes. A335 (Pet. for Appointment of Commissioner as Receiver). On August 21, 2015, NDOI suspended NHC's Certificate of Authority and ordered NHC to cease operating as a Nevada insurer. A367 (Order of Voluntary Suspension of Certificate of Authority). On September 25, 2015, the then-acting Nevada Commissioner of Insurance filed a petition in the Eighth Judicial District Court of the State of Nevada (the "Receivership Court"), requesting appointment as receiver of NHC, for issuance of a temporary injunction, and for other related relief. A329–39 (Pet. for Appointment of Commissioner as Receiver). On October 1, 2015, the Receivership Court appointed a temporary receiver for NHC. A375–77. On October 14, 2015, the Receivership Court issued a permanent injunction and order appointing the Acting Commissioner of Insurance as the Receiver of NHC, and Cantilo & Bennett, LLP as the Special Deputy Receiver. A379–91 (the "Receivership Order").

The Receivership Order also provided, in relevant part, as follows:

> (5) All persons, corporations, partnerships, and all other entities wherever located, are hereby enjoined and restrained from interfering in any manner with the Receiver's possession of the Property or her title to or right therein and from interfering in any manner with the conduct of the receivership of CO-OP. Said persons, corporations, partnerships, associations and all other entities are hereby enjoined and restrained from wasting, transferring, selling, disbursing, disposing of, or assigning the Property and from attempting to do so except as provide herein.
>
> . . . .
>
> (8) *All claims against CO-OP[,] its assets[,] or the Property must be submitted to the Receiver as specified herein to the exclusion of* any other method of submitting or *adjudicating such claims in any forum, court, or tribunal subject to the further Order of this Court*. The Receiver is hereby authorized to establish a Receivership Claims and Appeal Procedure, for all receivership claims. The Receivership Claims and Appeal Procedures shall be used to facilitate the orderly disposition or resolution of claims or controversies involving the receivership or the receivership estate.

. . . .

(10) All secured creditors or parties, pledge holders, lien holders, collateral holders or other persons claiming secured, priority or preferred interest in any property or assets of CO-OP, including any governmental entity, are hereby enjoined from taking any steps whatsoever to transfer, sell, encumber, attach, dispose of or exercise purported rights in or against the Property.

(11) The officers, directors, trustees, partners, affiliates, brokers, agents, creditors, insureds, employees, members, and enrollees of CO-OP, and all other persons or entities of any nature including, but not limited to, claimants, plaintiffs, petitioners, and *any governmental agencies who have claims of any nature against CO-OP*, including cross-claims, counterclaims and third party claims, *are hereby permanently enjoined and restrained from doing or attempting to do any of the following*, except in accordance with the express instructions of the Receiver or by Order of this Court:

. . . .

c. Making or executing any levy upon, selling, hypothecating, mortgaging, wasting, conveying, dissipating, or asserting control or dominion over the Property or the estate of CO-OP;

d. *Seeking or obtaining any preferences*, judgments, foreclosures, attachments, levies, or liens of any kind against the Property;

e. Interfering in any way with these proceedings or with the Receiver . . . in their acquisition of possession of, the exercise of dominion or control over, or their title to the Property, or in the discharge of their duties as Receiver thereof[.]

. . . .

(19) No judgment, order, attachment, garnishment sale, assignment, transfer, hypothecation, lien, security interest or other legal process of any kind with respect to or affecting CO-OP or the Property shall be effective or enforceable or form the basis for a claim against CO-OP or the Property unless entered by the Court, or unless

> the Court has issued its specific order, upon good cause shown and after due notice and hearing, permitting same.

A382–89 (Receivership Order) (emphasis added).

On December 23, 2015, CMS terminated the Loan Agreement, effective December 31, 2015, pursuant to: (1) Section 15.1, as an "event of default" was triggered when the Receivership Order was issued; (2) Section 15.3, due to the suspension of NHC's Certificate of Authority; and (3) Section 16.2, permitting the government to terminate the Loan Agreement for "program viability" reasons. A393–94 (Letter from Kevin J. Counihan, Chief Executive Officer, Health Insurance Marketplaces, CMS, to Pam Egan, Chief Executive Officer, NHC (Dec. 23, 2015)); A422 (Def. Proof of Claim); Compl. ¶ 111. On March 8, 2016, CMS notified NHC that it had placed an "administrative hold" on payments due to NHC. Compl. ¶ 118; *see also, e.g.*, A396–97, A398, A399–400, A401, A402–03, A404–05, A406, A407, A408 (collectively, "Offset Letters"). Thereafter, between August 2016 and December 2017, the government offset payments due to NHC with amounts NHC allegedly owed the government pursuant to the Start-Up Loan. *See* Offset Letters. The Commissioner did not authorize these offsets. A4–5 (Decl. of Barbara D. Richardson); A14 (Decl. of Mark F. Bennett).[7] The Receivership Court also has not approved any offsets. *See* A427–28 (Notice of Claim Determination).

On September 21, 2016, a Nevada state court placed NHC in liquidation. A410–12 (Final Order of Liquidation). On or about October 10, 2016, the Receivership Court approved the Receivership Claims and Appeal Procedure, A414–17 (Final Order Granting Other Relief), and set April 28, 2017 as the deadline for creditors to file claims, A411 (Final Order of Liquidation). On April 28, 2017, the government filed a Proof of Claim for repayment of the Start-Up and Solvency Loans, asserting that such claims were "entitled to treatment as secured claims to the extent they are subject to set-off by a claim of [NHC] against the United States." A419–24 (Def. Proof of Claim).

In June 2017, the Special Deputy Receiver, acting on behalf of the Receiver, issued a Notice of Claim Determination ("NCD") on the government's claim, finding, among other things, that: (1) pursuant to state law and the Loan Agreement, the government's claim was subordinate in priority to policyholder and administrative expense claims; (2) NHC's estate was not anticipated to be sufficient to satisfy even claims that had a higher priority than the government's claim; and (3) the government's claimed setoff would violate the Receivership Order. A426–29 (Notice of Claim Determination). Accordingly, the Special Deputy Receiver denied the government's

---

[7] Ms. Richardson and Mr. Bennett submitted declarations in their official capacity as representatives of the Receiver and Special Deputy Receiver, respectively.

claim. A427–28. The NCD included an explanation of the appeals process and advised that "[i]f [the government] do[es] not appeal this NCD in accordance with the provisions of the Receivership Appeal Procedure, the determination regarding priority and other aspects of [the government's] claim made herein will become final and nonappealable." A428. The government did not appeal the NCD. Pl. Resp. at 14; A17 (Decl. of Mark F. Bennett); Tr. 8:9–10.

### C. The Receiver's Complaint

The Receiver's pending Complaint before this Court contains four principal claims for an affirmative recovery. In particular, pursuant to applicable ACA statutory and regulatory provisions, the Receiver claims that it is entitled to: (1) at least $43,042,673.80 in risk corridor payments for 2014 and 2015, *see* Compl. ¶¶ 125–132 (Count I); (2) a reinsurance payment of at least $8,846,611.34, *see* Compl. ¶¶ 133–138 (Count II); (3) a net individual market risk adjustment payment of $5,244,157.68 for 2015, *see* Compl. ¶¶ 139–143 (Count III); and (4) financial assistance payments in the amount of at least $3,178,944.60, *see* Compl. ¶¶ 144–150 (Count IV).

Presumably anticipating the government's assertion of an affirmative defense or counterclaim in response to Counts I–IV — and based on the fact that the government already has asserted its right to setoff "funds it owed to NHC to pay off amounts allegedly owed by NHC to the Government under the Start-up Loan," Compl. ¶ 157 — the Receiver further claims, in Count V, that the government's assertion of a setoff is illegal and breached the Loan Agreement, *id.* ¶¶ 157–158. *See* Compl. ¶¶ 151–169 (Count V). In particular, the Receiver asserts that "[r]epayment of the Start-Up Loan and the Solvency Loan were both contractually subordinated by the Government to the payment of other creditor claims of NHC." Compl. ¶ 152.

Finally, the Receiver asserts, under an illegal exaction theory, *see* Compl. ¶¶ 170–173 (Count VI), that the "Government unilaterally and improperly offset sums against NHC's Risk Corridors, Reinsurance, Risk Adjustment, and Financial Assistance balances of $55,757,236.41, which the Government owed to NHC." Compl. ¶ 171. Any setoffs, in the Receiver's view, "violate federal law, Nevada State law, the Loan Agreement, and the Nevada Permanent Receivership Order." Compl. ¶ 172.

## IV. JURISDICTION

Pursuant to the Tucker Act, the United States Court of Federal Claims has jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress . . . or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Because the Tucker Act "does not create any substantive right enforceable against the United States for money damages," the Court must inquire whether the statute at issue "can

fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *United States v. Testan*, 424 U.S. 392, 398, 400 (1976) (quoting *Eastport S. S. Corp. v. United States*, 372 F.2d 1002, 1009 (Ct. Cl. 1967)); *see also United States v. Navajo Nation*, 556 U.S. 287, 290 (2009).

Here, the Receiver's claims are based on the ACA, which is a money-mandating source of substantive law. *Maine Cmty. Health Options*, 140 S. Ct. at 1329 (holding that 42 U.S.C. § 18062 "falls comfortably within the class of money[-]mandating statutes that permit recovery of money damages in the Court of Federal Claims"); *Sanford Health Plan v. United States*, 969 F.3d 1370, 1372–73 (Fed. Cir. 2020) (opining that 42 U.S.C. § 18071 "imposes an unambiguous obligation on the government to pay money" and "th[is] obligation is enforceable through a damages action in the Court of Federal Claims under the Tucker Act"). The government does not dispute the Court's jurisdiction to decide the Receiver's claims and, indeed, previously argued that this case should be brought in this Court, pursuant to the Tucker Act (and not in the district court).[8] Consistent with the Supreme Court's decision in *Maine Community Health*, 140 S. Ct. at 1329, and the Federal Circuit in *Conway*, 997 F.3d at 1198, this Court finds that it has jurisdiction to decide this case.

## V. STANDARDS OF REVIEW

In deciding a motion to dismiss for failure to state a claim under RCFC 12(b)(6), the Court views the facts in the light most favorable to the plaintiff and accepts as true all factual allegations — but not conclusory legal assertions — contained in the complaint. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1380 (Fed. Cir. 2019). Those facts must yield a "reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff may not simply plead "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citations omitted). The Court must dismiss a complaint "when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute is one that could permit a court to find in the non-moving party's favor, and a material fact is one that could affect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A summary judgment motion is properly granted against a party who fails to make a showing sufficient to establish the existence of an essential element to that

---

[8] *See supra* note 2.

party's case and for which that party bears the burden of proof at trial." *Univ. of S. Fla. v. United States*, 146 Fed. Cl. 274, 280 (2019) (citing *Celotex*, 477 U.S. at 324).

In this case, "the issue at the core of the dispute has been treated as purely legal" and "there has been no serious contention that the facts are contested." *Easter v. United States*, 575 F.3d 1332, 1336 (Fed. Cir. 2009). Because "this case involves essentially undisputed facts and turns on the legal consequences that attach to those facts . . . , nothing of significance turns on the distinction between a ruling on the pleadings and summary judgment." *Id.*

## VI. DISCUSSION

This case boils down to whether the government's offsets against amounts owed to the Receiver are proper. For the reasons explained below, the Court concludes that the Receiver is entitled to judgment because the government's offsets were (and remain) improper pursuant to (1) the Loan Agreement, and (2) the results of Nevada's liquidation process.

### A. The Receiver is Entitled to Summary Judgment on Count I

Although the government originally moved to dismiss Count I of the Receiver's Complaint on the ground that it was inconsistent with binding decisions of the Federal Circuit, *see* Def. MTD at 14, the Supreme Court effectively ended that argument in the Receiver's favor. *See Maine Cmty. Health Options*, 140 S. Ct. at 1323, 1331. The government agrees, conceding that "[a]s to Count I, the Supreme Court has resolved the liability of the United States under the risk corridors program of the ACA." Def. Rep. at 2 (admitting that "NHC is due risk corridors payments for benefit years 2014 and 2015," but asserting that "the amount owed is in dispute").

Accordingly, the Court **DENIES** the government's motion to dismiss Count I and **GRANTS** the Receiver's motion for summary judgment on Count I as to liability.

### B. The Receiver is Entitled to Summary Judgment on Counts II–V Because the Government's Offsets Are Improper

The parties agree that the sole remaining question for the Court is whether the government's claimed offsets are proper as a matter of law. *See* Def. MTD at 1 ("The sole dispute presented in Counts II–VI concerns the propriety of [CMS]'s exercise of offset."); Pl. Resp. at 14. If the government is correct that the offsets are proper, then the remaining counts in the Complaint fail as a matter of law "because the amounts sought have been paid" via the offsets. Def. MTD at 15. In contrast, if the Receiver is correct, then it is entitled to judgment as a matter of law because the government concurs that

"there is no dispute regarding the amounts at issue[.]" *Id.*[9] Because the Court holds that the government's asserted offsets are (a) improper under the Loan Agreement, and (b) inconsistent with the Nevada state liquidation proceedings, the Court **DENIES** the government's motion to dismiss, and **GRANTS** the Receiver's motion for summary judgment with respect to Counts II–V.[10] Thus, even assuming that the government has the better interpretation of a Nevada statute generally permitting the assertion of offsets during the liquidation process, the government cannot invoke that statute to justify the administrative offsets at issue.

Before turning to the specifics of this case, the Court pauses to highlight that the Federal Circuit's decision in *Conway* – while not entirely dispositive of the outcome in this case – greatly illuminates the way forward. In *Conway*, the government, facing suit from an insolvent Colorado CO-OP, "attempted to leapfrog other insolvency creditors through offset, rather than paying its debt in full and making a claim against [the CO-OP's] estate as an insolvency creditor." 997 F.3d at 1201. Judge Hertling, of this Court, rejected the government's various offset theories, and the Federal Circuit affirmed. *Conway v. United States*, 145 Fed. Cl. 514, 522–29 (2019), *aff'd*, 997 F.3d 1198. In brief, the Federal Circuit concluded: (1) that the government could not offset a CO-OP's "statutory obligations" – as opposed to its "contractual obligations" – pursuant to Colorado state law (*i.e.*, either statutory or common law), *Conway*, 997 F.3d at 1204–06; (2) HHS specifically "preserved state insolvency law for repayment of CO-OP program loans," *id.* at 1212 (noting that "[b]y requiring consistency with state priority law, Congress preserved state creditor priority statutes"); (3) "the federal scheme does not preempt Colorado's creditor priority framework," *id.* at 1214; and (4) federal common law does not "override" a state's "liquidation priority scheme," *id.* at 1215.

Accordingly, the Court agrees with the government that, following *Conway*, this case's complexities reduce to this question: whether the government's offset was "specifically authorized by contract and Nevada state law." Def. Resp. to Supp. Auth. at 2 (arguing that *Conway* "does not address Nevada law or HHS's contractual offset rights here" and that "Nevada law establishes a right to offset here that precedes, and is separate from, a liquidation priority"). For the reasons explained below, the Court answers that question in the negative and holds that the government must pay the Receiver the total sum to which it is entitled without applying any offset. In particular, the Court holds that the government's offsets are precluded by: (1) the parties' Loan Agreement; and (2) Nevada state law as implemented via the state receivership and

---

[9] Because resolving the offset issue is purely a question of law — and there is no dispute of material fact — the Court agrees with the Receiver that "addressing the propriety of the offset under both standards [of review] would be redundant." Pl. Resp. at 16.

[10] The Receiver agrees that "Counts V and VI present alternate legal theories for the recovery of the same amounts sought in Counts II–IV" and acknowledges that "NHC does not request a duplicative recovery" via those two counts. Pl. Resp. at 2 n.2.

liquidation proceedings, in which the government participated. Accordingly, even though the government likely is correct that Nevada state law generally permits the assertion of an offset under some circumstances — *i.e.*, that an offset pursuant to section 696B.440 of the Nevada Revised Statutes ("the Nevada Offset Statute") is not inherently inconsistent with the state's statutory creditor priority scheme — the government's offsets at issue are nevertheless improper, given the facts of this case.

### 1. The Loan Agreements — Statutory and Regulatory Framework

Because the parties agree — as does the Court — that the terms of the Loan Agreement govern the outcome of this dispute, the Court begins there. In that regard, the Court recognizes that the Loan Agreement must be construed against the backdrop of the statute authorizing it, along with related implementing regulations. *City of Fulton v. United States*, 680 F.2d 115, 120 (Ct. Cl. 1982) ("The rule that contract terms will be given their ordinary meaning is particularly appropriate where the contract language is easily construed in harmony with the governing statute or regulation."); *Roedler v. Dep't of Energy*, 255 F.3d 1347, 1352 (Fed. Cir. 2001) ("when, as here, the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose"); *Ohio v. United States*, 154 Fed. Cl. 233, 237 (2021) ("where a contract fulfills or implements a statutory requirement, the underlying statute must guide the court's interpretation of the contract"); *Pucciariello v. United States*, 116 Fed. Cl. 390, 413 (2014) (rejecting contract interpretation that would conflict with statute); *Batavia Times Pub. Co. v. United States*, 96 Ct. Cl. 166, 171 (1942) (Jones, J., concurring) (construing statutes "[t]o get a true concept of the background of th[e] contract" at issue).[11] Accordingly, and before turning to the specific provisions of the Loan Agreement and the parties' arguments, the Court summarizes in greater detail the relevant statutory and regulatory framework on which the Loan Agreement is based.

#### a. The CO-OP Statute

Section 18042 of Title 42 of the United States Code (the "CO-OP Statute") authorizes HHS to "establish a program to carry out the purposes of this section to be known as the [CO-OP] program." 42 U.S.C. § 18042(a)(1). That statute further requires that HHS "*shall* provide through the CO-OP program" two categories of financial assistance to qualified CO-OPs: "(A) *loans* to provide assistance . . . in meeting its start-up costs; and (B) *grants* to provide assistance . . . in meeting any solvency requirements of States in which the [CO-OP] seeks to be licensed to issue qualified

---

[11] The Court does *not* conclude that the authorizing statute and its implementing regulations are somehow incorporated into the Loan Agreement to create terms that are not there, *see Silver State Land LLC v. United States*, 148 Fed. Cl. 217, 239–43 (2020), but rather only that such background is helpful to understanding the contractual language the parties employed in their agreement at issue.

health plans." *Id.* § 18042(b)(1) (emphasis added). To "receiv[e] a loan or grant under the CO-OP," a recipient had to enter a contract with the HHS. *Id.* § 18042(b)(2)(C)(i).

The CO-OP Statute expressly distinguishes between the defined loans and grants *only in terms of their respective repayment timelines*:

> Not later than July 1, 2013, and prior to awarding loans and grants under the CO-OP program, the Secretary shall promulgate regulations with respect to the repayment of such loans and grants *in a manner that is consistent with State solvency regulations and other similar State laws that may apply*. In promulgating such regulations, the Secretary shall provide that such loans shall be repaid within 5 years and such grants shall be repaid within 15 years . . . .

42 U.S.C. § 18042(b)(3) ("Repayment of loans and grants") (emphasis added).

Congress further required HHS to "tak[e] into consideration *any appropriate State reserve requirements, solvency regulations, and requisite surplus note arrangements* that must be constructed in a State to provide for such repayment *prior to awarding such loans and grants*." *Id.* (emphasis added). Again, the CO-OP Statute does not distinguish between the prescribed loans and grants *except as to the payment timelines*. Thus, the other mandatory considerations — *i.e.*, regarding state solvency regulations, reserve requirements, and surplus notes — apply with equal force to both Loans.

**b. The CO-OP Regulations**

To implement the CO-OP program as Congress instructed in the CO-OP Statute, HHS proposed a set of regulations. *See* Patient Protection and Affordable Care Act; Establishment of Consumer Operated and Oriented Plan (CO-OP) Program, 76 Fed. Reg. 43,237 (proposed July 20, 2011) (to be codified at 45 C.F.R. pt. 156) ("Proposed Rule"). After receiving comments on the Proposed Rule, HHS issued a final rule, codified at 45 C.F.R. Part 156. *See* Patient Protection and Affordable Care Act; Establishment of Consumer Operated and Oriented Plan (CO-OP) Program, 76 Fed. Reg. 77,392 (Dec. 13, 2011) ("Final Rule").

Notwithstanding the CO-OP Statute's distinction in nomenclature between loans and grants, the Final Rule refers only to loans. *See* 45 C.F.R. § 156.500 ("Under this program, loans are awarded to encourage the development of CO-OPs. Applicants . . . may apply to receive loans to help fund start-up costs and meet the solvency

requirements of States in which the applicant seeks to be licensed . . . .”).[12] HHS's commentary accompanying the Final Rule explains why the regulation refers only to loans (and not grants): “[a]lthough the statute refers to Solvency Loans as ‘grants,’ they are loans because they must be repaid.” Final Rule, 76 Fed. Reg. at 77,394. In the Final Rule, “Start-up Loan” is defined as “a loan provided by CMS to a loan recipient for costs associated with establishing a CO-OP” while “Solvency Loan” refers to “a loan provided by CMS to a loan recipient in order to meet State solvency and reserve requirements.” 45 C.F.R. § 156.505.

With respect to the Solvency Loan in particular, the implementing regulation provides:

> Solvency Loans awarded under this section will be structured in a manner that ensures that the loan amount is recognized by State insurance regulators as contributing to the State-determined reserve requirements or other solvency requirements (rather than debt) consistent with the insurance regulations for the States in which the loan recipient will offer a CO-OP qualified health plan.

*Id.* § 156.520(a)(2). That precise language does not expressly apply to the Start-Up Loan component; but, with respect to both Loans, the regulation *does* similarly provide that “[t]he loan recipient must make loan payments . . . until the loan is paid in full consistent with State *reserve requirements*, *solvency regulations*, and *requisite surplus note arrangements*.” *Id.* § 156.520(b) (emphasis added); *see also id.* § 156.520(a)(1) (“[a]ll loans awarded under this subpart must be used in a manner that is consistent with . . . the loan agreement, and all other statutory, regulatory, or other requirements”).

### 2. State Solvency Requirements and Surplus Notes

In implementing the CO-OP Statute, HHS explained the state regulatory issue, pertaining to solvency, as follows:

> Solvency and the financial health of insurance issuers is historically a State-regulated function. As a condition of licensure as a health insurance issuer, State insurance departments require that an issuer maintain an amount of capital that is consistent with its size and risk profile. This measure of reserve is called risk-based capital (RBC). A loan is considered a liability and typically would not assist an

[12] *See also* 45 C.F.R. § 156.520(a) (providing that “[a]pplicants may apply for the following loans under this section: Start-up Loans and Solvency Loans”).

> organization in meeting solvency requirements, since the liability would have to be subtracted from the calculation of reserves in order to determine the net protection afforded to enrollees.

Final Rule, 76 Fed. Reg. at 77,403.

HHS thus addressed the concern that the Solvency Loans, in particular, "will be treated by States as debt rather than capital that satisfies State solvency and reserve requirements." Final Rule, 76 Fed. Reg. at 77,403. HHS acknowledged that, pursuant to the CO-OP Statute, "the standards for the repayment of loans awarded under the CO-OP program must take into consideration 'any appropriate State reserve requirements, solvency regulations, and requisite surplus note arrangements that must be constructed in a State.'" *Id.* (quoting 42 U.S.C. § 18042(b)(3)). To meet that statutory requirement, "CMS proposed to structure Solvency Loans to each loan recipient in a manner that meets State reserve and solvency requirements so that the loan recipient can fund its required capital reserves." *Id.*; *see also* 45 C.F.R. § 156.520(a)(2) (providing Loans to be repaid "consistent with State reserve requirements, solvency regulations, and requisite surplus note arrangements"). Although the government, as explained below, now attempts to distinguish between the Solvency Loan and the Start-Up Loan in terms of "State reserve and solvency requirements," the interpretive difficulty, as previously noted, is that the CO-OP Statute itself does *not* neatly differentiate between the two types of loans (except with respect to repayment timelines).[13]

This brings the Court to the topic of "surplus notes." According to the National Association of Insurance Commissioners ("NAIC"), insurers issue surplus notes (also known as "surplus debentures and capital notes") to raise capital; they "are unsecured debt subordinated to all claims by policyholders and creditors, as such interest and principal payments on the notes are made only after approval has been granted by the commissioner of the state of domicile."[14] The advantage of a surplus note is that while they "are debt instruments similar in some ways to issued corporate bonds offering a coupon, i.e. interest rate of return, and having a maturity date, under statutory

---

[13] *See* Proposed Rule, 76 Fed. Reg. at 43,239 ("Repayment terms in the award of *loans* must take into consideration any appropriate State reserve requirements, solvency regulations, and requisite surplus note arrangements that must be constructed by a qualified health insurance issuer in a State to receive and maintain licensure." (emphasis added)); 45 C.F.R. § 156.520(b).

[14] *Surplus Notes*, NAIC, https://content.naic.org/cipr_topics/topic_surplus_notes.htm (June 24, 2020) [hereinafter *NAIC Def'n of Surplus Note*]. "The National Association of Insurance Commissioners, the umbrella organization for insurance regulators in the United States, has set out accounting standards for insurers, and all 50 states require insurance companies to adhere to the NAIC standards." *Silva v. Aviva PLC*, 2016 WL 1169441, at *2 (N.D. Cal. Mar. 25, 2016).

accounting principles surplus notes are classified as equity."[15] The reason for that special treatment "is because of the subordinate nature of the surplus notes and the restrictions for payment that requires approval by the domiciliary state commissioner."[16]

In sum, the key point is that "[s]tate insurance regulators treat surplus notes as statutory capital because they are unsecured and are at the bottom level of insurers' capital structure, which [are] subordinate to policyholders, claimant and beneficiary claims, and to all other classes of creditors."[17] Accordingly, surplus notes are "part of the insurer's total adjusted capital under Risk-Based Capital calculations."[18]

In addressing the Proposed Rule, "some commenters" noted that "Solvency Loans must be structured as surplus notes as they are the only types of loans that State insurance regulators will recognize as assets rather than debt[,]" while another respondent generally "recommended that CMS coordinate with NAIC to establish a means for CO-OPs to meet State solvency and reserve requirements." Final Rule, 76 Fed. Reg. at 77,403. Addressing those comments, HHS explained:

> We will work with each loan recipient to structure their Solvency Loans in a manner that will contribute towards meeting State reserve and solvency requirements consistent with State insurance regulation. *States are not required to take action that would be inconsistent with State insurance regulation.* Therefore, *loan recipients must work with State insurance*

[15] *NAIC Def'n of Surplus Note*, *supra* note 14; *see also Statutory Accounting Principles*, NAIC, https://content.naic.org/cipr_topics/topic_statutory_accounting_principles.htm (Feb. 27, 2020) ("Most insurers authorized to do business in the United States and its territories are required to prepare statutory financial statements in accordance with statutory accounting principles (SAP). . . . [SAP] are designed to assist state insurance departments in the regulation of the solvency of insurance companies.").

[16] *NAIC Def'n of Surplus Note*, *supra* note 14.

[17] *NAIC Def'n of Surplus Note*, *supra* note 14 (explaining that "[t]hese debt-instruments are permitted to be reported as capital, and not as debt, due to the subordinate nature of the notes, and they require approval by the commissioner of the state of domicile before original issuance and before interest and principal repayments can be made").

[18] *NAIC Def'n of Surplus Note*, *supra* note 14; *see also Carnegie v. Mut. Sav. Life Ins. Co.*, 2004 WL 3715446, at *9 n.57 (N.D. Ala. Nov. 23, 2004) (discussing NAIC's risk-based capital system, which "uses a formula that establishes the minimum amount of capital necessary for an insurance company to support its overall business operations" and then compares "[t]hat amount . . . to the company's actual statutory capital to determine whether a company is technically solvent" (quoting Brian K. Atchinson, *The NAIC's Risk–Based Capital System*, 2 NAIC Research Q. 1 (Oct. 1996))).

> *regulators to identify loan structures that will meet State requirements*. Significant flexibility is afforded to loan applicants in structuring their Solvency Loans to meet State standards. Applicable loan structures may include but are not limited to structuring a Solvency Loan as a surplus note *or responsibly structuring a Solvency Loan so that premium revenue is applied towards paying claims for covered services to enrollees and meeting cash reserve requirements before loan repayments to CMS*.

*Id.* at 77,403–04 (emphasis added). HHS generally warned prospective CO-OPs that "[i]t is incumbent upon applicants to work with their State insurance regulators to identify appropriate loan structures that will meet the requirements of their State insurance department." *Id.* at 77,404.

### 3. The Loan Agreement Limits the Government's Power to Offset Amounts Owed to the Receiver

In *Huna Totem Corp. v. United States*, the Federal Circuit succinctly explained how this Court must approach contract interpretation:

> The "principal objective in deciding what contractual language means is to discern the parties' intent at the time the contract was signed." [*Winstar Corp. v. United States*, 64 F.3d 1531, 1540 (Fed. Cir. 1995)]. However, a court may only give effect to the expectations that are consistent with the objective language of the contract. *City of Oxnard v. United States*, 851 F.2d 344, 347 (Fed. Cir. 1988). This court has also recently stated that "[w]e must interpret the contract in a manner that gives meaning to all of its provisions and makes sense." *McAbee Const. Co. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (citations omitted).

135 F.3d 775 (Fed. Cir. 1998). If any ambiguity exists, the Court interprets the contract to reflect "the intent of the parties at the time the agreement was made." *Pagan v. Dep't of Veterans Affairs*, 170 F.3d 1368, 1371 (Fed. Cir. 1999) (citing *King v. Dep't of Navy*, 130 F.3d 1031, 1033 (Fed. Cir. 1997)). In either case, the Court "must interpret the language in the context in which it is written" — to include "the context of a regulatory statute." *Am. Bankers Ass'n*, 932 F.3d at 1382. For the reasons explained below, the Court agrees with the Receiver, Pl. Resp. at 30–31; Pl. Rep. at 3, 7–9, that the Loan Agreement precludes the government's offsets.

**a. The Plain Meaning of Section 3.4 of the Loan Agreement Controls**

Having reviewed in detail all the Loan Agreement provisions upon which the parties rely, the Court concludes that the alpha and omega of this case is Section 3.4 of the Loan Agreement, which covers "Security for the Loans"[19] and provides, in relevant part:

> Because the intent of *the Loans*, and the Solvency Loan in particular, is to provide financing to [NHC] that meets the definition of "risk based capital" for State Insurance Law purposes, the Loans will have a claim on cash flow and reserves of [NHC] that is *subordinate to* (a) claims payments, (b) Basic Operating Expenses, and (c) maintenance of required reserve funds while [NHC] is operating as a CO-OP under State Insurance Laws.

A157 (Loan Agreement, Section 3.4) (emphasis added). The plain language of this provision limits the government's power to offset for several reasons. *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 68 (D.D.C.) ("plain-meaning analysis . . . end[s] the matter . . . in the interpretation of contracts, judgments, and statutes"), *judgment entered,* 987 F. Supp. 2d 82 (D.D.C. 2013), and *aff'd sub nom. Chevron Corp. v. Ecuador*, 795 F.3d 200 (D.C. Cir. 2015).

*First*, the provision applies to the "Loans" — plural — which term the Loan Agreement expressly defines as including *both* the Start-Up Loan *and* the Solvency Loan disbursements. A154 (Loan Agreement, Section 2.1 ("Defined Terms")) ("'**Loan**' means the total amount of all outstanding Start-Up Loan disbursements, or the total amount of all outstanding Solvency Loan disbursements, respectively and individually, as the context or usage requires; *'**Loans**' means both of them together*." (emphasis added)). Thus, the Court proceeds on the premise that whatever Section 3.4 accomplishes, it does so not only with respect to the Solvency Loan but also for the Start-Up Loan.

*Second*, Section 3.4 reflects the parties' subordination agreement, with the plain language making clear that the Loans' claim on NHC's funds are "subordinate to"

---

[19] "Security" is defined as "[c]ollateral given or pledged to guarantee the fulfillment of an obligation; esp., the assurance that a creditor will be repaid (usu. with interest) any money or credit extended to a debtor." *Security*, Black's Law Dictionary (11th ed. 2019). A "security agreement serves the purpose of defining and limiting the collateral subject to the creditor's security interest." *In re Macronet Grp., Ltd.*, 2004 WL 2958447, at *4 (Bankr. N.D. Ill. Apr. 22, 2004); *see also Franch v. HP Locate, LLC,* 2015 WL 7251678, at *5 (N.D. Tex. Nov. 16, 2015) (a "security agreement defines the collateral to enable the debtor and other interested persons to identify the property that the creditor may claim as security").

claims payments and basic operating expenses. A157 (Loan Agreement, Section 3.4).[20] The very definition of "subordinate" means that a claim's priority is reordered to a lower position. *See Subordinate*, Black's Law Dictionary (11th ed. 2019) (defining "subordinate" as "[p]laced in or belonging to a lower rank, class, or position"); *Debt*, Black's Law Dictionary (11th ed. 2019) (defining "subordinate debt" as a "[a] debt that is junior or inferior to other types or classes of debt" and noting that "[s]ubordinate debt may be unsecured or have a low-priority claim against property secured by other debt instruments"); *see also Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 254 n.6 (6th Cir. 2012) (explaining that "subordination refers to the order of payment"); *In re Plourde*, 418 B.R. 495, 506 n.18 (B.A.P. 1st Cir. 2009) ("practically speaking, relegation to subordinated status means receiving no distribution from the estate in most cases").

Accordingly, Section 3.4 is a subordination agreement, "whereby one creditor (the junior creditor) agrees that, in the event of a default or bankruptcy, another creditor (the senior creditor) will receive repayment *in full before the junior creditor receives payment on its loans*." *In re Southeast Banking Corp.*, 156 F.3d 1114, 1118 (11th Cir. 1998) (emphasis added); *see also In re Ocean Blue Leasehold Prop. LLC*, 414 B.R. 798, 804 (Bankr. S.D. Fla. 2009) ("Subordination agreements provide that in the event of a default or bankruptcy, the senior creditor will receive repayment in full before the junior creditor receives *any* payment." (emphasis added)).[21]

Even if NHC defaulted or otherwise breached the Loan Agreement in some manner, "the subordination provisions . . . would still be operable and any breach of contract claim would at most result in a subordinated claim for damages." *In re Lehman Bros. Inc.*, 574 B.R. 52, 61–62 (Bankr. S.D.N.Y. 2017) (explaining that "[a]ny claim by the Employees against [the debtor] for breach of contract should not put the Employees in a better position than they would have occupied had the contract been fulfilled according to its terms"), *aff'd*, 2018 WL 10454936 (S.D.N.Y. Sept. 26, 2018), *aff'd sub nom. In re Lehman Bros. Holdings Inc.*, 792 F. App'x 16 (2d Cir. 2019); *see also In re Lantana Motel*, 124 B.R. 252, 255–56 (Bankr. S.D. Ohio 1990) ("In a debt subordination, the agreement provides that the subordinated creditor's right to payment and collection will be subordinate to the rights of another claimant. If the debt subordination is 'complete,' the

---

[20] *See* Pl. Resp. at 30 (arguing that "to the extent the Start-Up Loan could even be considered a "debt" . . . , it is contractually subordinated to NHC's liabilities for policyholder claims and basic operating expenses" (citing Loan Agreement, Section 3.4)).

[21] *Cf.* Nev. Rev. Stat. Ann. § 104.9339 (West) ("Priority subject to subordination by agreement") (Uniform Commercial Code Comment noting that "[t]his section makes it entirely clear that a person entitled to priority may effectively agree to subordinate its claim"); 11 U.S.C. § 510(a) ("Subordination") (United States Bankruptcy Code section providing that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law").

subordinated creditor is barred from receiving payments until the superior debt is paid in full.").

The government is bound by its subordination agreement. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 733 (1979) ("Because each application currently receives individual scrutiny, the agencies can readily adjust loan transactions to reflect state priority rules, just as they consider other factual and legal matters before disbursing Government funds."); *In re Nivens*, 22 B.R. 287, 292 (Bankr. N.D. Tex. 1982) ("SBA concedes that it has subordinated its lien against crops and proceeds of crops to the liens of the bank. The determination of the validity of the bank's liens on crops and proceeds, and thus the perfection of liens against the subject 'deficiency' payments and 'disaster' payments, leaves nothing for SBA to setoff."); *Buffalo Nat'l Bank v. United States*, 26 Cl. Ct. 1436, 1442 (1992) ("The meaning of the terms set forth in the subordination agreement is a question of contract interpretation, an issue of law that may be disposed of by summary judgment.").

*Third*, Section 3.4 indicates that the very purpose of the "Loans" — again, both of them —was to provide funding qualifying as "risk based capital." A157 (Loan Agreement, Section 3.4). The Loan Agreement defines "Risk-Based Capital Reserves" as "the amount of required capital that [NHC] must maintain to remain in compliance with State Reserve Requirements." A156 (Loan Agreement, Section 2.1). The Loan Agreement, in turn, defines "State Reserve Requirements," in relevant part, to "mean[] the financial reserve requirements that [NHC] must meet under applicable State Insurance Laws for the delivery of health insurance under a CO-OP" and further provides that "[a] statement of compliance from the host state will be [a] milestone of Start-Up and ongoing operations." *Id.* In that regard, the Loan Agreement included a document the parties themselves characterized as the "[a]ffirmation of [s]tate [r]egulatory [a]cceptance of CO-OP [l]oans as [r]egulatory [c]apital." A224 (Loan Agreement, Appendix 10). Thus, the parties agreed to treat both Loans as contributing to required reserves.[22] Although the Court acknowledges that the Proposed Rule and Final Rule were more concerned with how the Solvency Loan would be treated by state regulators, nothing in the Final Rule precludes the Start-Up Loan from being treated as regulatory capital or from contributing to risk-based capital requirements. More importantly, nothing in the CO-OP Statute reflects a distinction between the two loan types, in terms of obtaining the preferred regulatory treatment for the Loans; nor, for that matter, does the Loan Agreement make such a distinction, as noted above.

[22] "[T]he most accurate picture of the parties' intent for this contract is their conduct at a time when both parties still anticipated timely and full performance of the contract." *Pac. Gas & Elec. Co. v. United States*, 536 F.3d 1282, 1290–91 (Fed. Cir. 2008) (citing *Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1058 (Fed. Cir. 1983) (per curiam) ("A principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy.").

*Fourth*, the subordination agreement reflected in Section 3.4 of the Loan Agreement, as described above, is consistent with the Nevada priority statute covering the CO-OP in the liquidation proceedings, *see* section 696B.420 of the Nevada Revised Statutes (the "Nevada Priority Statute") — at least vis-à-vis the government's claims. The Nevada Priority Statute first prioritizes "[a]dministration costs and expenses" and then "[a]ll claims under policies" over "claims of the Federal Government," the latter of which are generally fourth in line. Nev. Rev. Stat. § 696B.420(1)(a)–(d). Thus, it is hardly surprising that the parties agreed to effectuate a similar priority scheme via contract.[23] Indeed, the Court's holding here is strongly supported by the Federal Circuit's view that the "loan documents recognize Congress' intent, subordinating any HHS claim for repayment of the [CO-OP] loan amounts . . . to the claims of policyholders and other claimants." *Conway*, 997 F.3d at 1212–13 (alteration in original) (internal quotation marks omitted); *see also U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 493 (1993) (upholding, in case involving insurance company's liquidation, a state priority statute favoring — ahead of government claims — policyholders and the payment of administrative expenses, the latter on the ground that they were essential for the liquidation and, therefore, for the protection of policyholders).

Accordingly, the Court rejects the government's attempt to drive a sharp wedge between the Start-Up Loan and the Solvency Loan. While the government concedes that any amounts owed to it pursuant to the Solvency Loan cannot be used to offset sums payable to the Receiver, Def. MTD at 23; Tr. 15:8–9, 26:21–23, the government nevertheless contends that NHC's Start-Up Loan debt may be used to offset sums owed to the Receiver. Def. MTD at 21–23; Def. Rep. at 3–8; Tr. 15:12–15, 16:16–17:3.

The government's putative distinction between the Loans is not supported by other elements of the Loan Agreement's plain text. For starters, the Loan Agreement contains two sections describing the permitted and prohibited uses of the Loan Funds,[24] A157–58 (Loan Agreement, Section 3.5 ("Permitted Use of Loan Funds")); A158–59 (Loan Agreement, Section 3.6 ("Prohibited Uses of Loan Funds")), and makes no distinction between the Loans. Notably, both Loans may be used for the "[c]ost associated with establishing and maintaining capital reserves for [NHC] (including Risk-Based Capital Reserves) consistent with State Reserve Requirements." A158 (Loan

---

[23] The critical difference is that while the Nevada Offset Statute seems to permit the assertion of an offset even by a lower priority creditor, here the government specifically agreed that its ability to collect on the Loans would be subordinate to the other superior creditor categories identified in Section 3.4 of the Loan Agreement.

[24] "'**Loan Funds**' or '**Funds**' means the Disbursements received under this Agreement as from time to time amended for Start-Up and Solvency Loans, including accrued Interest thereon under the Amounts of Loan Principal described on the Title Page." A154 (Loan Agreement, Section 2.1).

Agreement, Section 3.5).[25] In responding to a comment on the Proposed Rule that "recommended that CMS prohibit loan recipients from using their loan funding to pay claims or subsidize reimbursements to providers[,]" HHS explained at length that such a restriction is unwarranted due to the purpose of the Loans and the intended use of the Funds:

> Under the Affordable Care Act, loan recipients are permitted to use their loan funds to assist with their start-up costs and State solvency requirements, provided that the funds are not used to conduct propaganda, or otherwise attempt to influence legislation, or for marketing. The purpose of State reserve requirements is to preserve the financial viability of carriers and enable the payment of claims when provider costs exceed premium revenue. A CO-OP that fails to maintain appropriate reserves or surplus may be subject to regulatory action, seizure, or liquidation. Such a prohibition would therefore not only defeat the purpose of the loans but would be contrary to the framework of State regulation. Furthermore, the statute does not prohibit these costs. Given that these loans must be repaid to us in full and that CO-OPs should structure their premiums, claims, and administrative costs to ensure sustainability, we do not believe that the use of loan funds to pay claims would give CO-OPs an advantage over existing health insurance issuers.

Final Rule, 76 Fed. Reg. at 77,404.

In sum, neither the Proposed Rule nor the Final Rule nor the Loan Agreement itself reflects a clean division between the Start-Up Loan and Solvency Loan. Both Loans — including the Start-Up Loan — were intended to be used for surplus,[26] to

---

[25] *See also* Final Rule, 76 Fed. Reg at 77,395 ("The CO-OP program offers resources, in the form of loans, to responsibly capitalize new, private, consumer-oriented issuers by increasing the availability of adequate reserve funding and boosting the ability of CO-OPs to compete in a brand new, broader insurance marketplace."); A176 (Loan Agreement, Section 13.1.7 ("Use of Proceeds")) (providing that "[NHC] shall use the Funds of the *Loans* solely for the purposes permitted under Sections 3.4" (emphasis added)); A177 (Loan Agreement, Section 13.2.4 ("Use of Proceeds")) (providing that "[NHC] shall not use Loan Funds or any proceeds of the *Loans* for any purposes specified in Section 3.5 above" (emphasis added)). The reference in Sections 13.1.7 and 13.2.4 to Sections 3.4 and 3.5, respectively, are likely scrivener errors and instead should refer to Sections 3.5 and 3.6.

[26] Whether the Start-Up Loan qualifies as a surplus note *per se* is a different issue, but one that is not dispositive, as the Court explains below.

contribute to regulatory capital, and to meet solvency requirements. Nothing in the Loan Agreement provides anything to the contrary.

*Finally*, the government contends that Section 3.4 is entirely inapplicable here based on the final qualifying phrase — "while [NHC] *is operating* as a CO-OP under State Insurance Laws." Def. MTD at 17 (emphasis in original) (quoting A157 (Loan Agreement, Section 3.4); *see also* Def. Rep. at 4 n.4. But that phrase quite clearly applies only to the last item in the lettered list of the subordination language: *i.e.*, to "(c) maintenance of required reserve funds . . . ." A157 (Loan Agreement, Section 3.4). The government's argument to the contrary runs afoul of the grammatical "rule of the last antecedent." *Lockhart v. United States*, 577 U.S. 347, 351 (2016) ("This Court has applied the rule from our earliest decisions to our more recent."). That rule provides that "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) (citing 2A Norman J. Singer, Sutherland Statutes and Statutory Construction § 47:33 (6th ed. 2000) ("Referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent.")). This interpretative rule is reflected in Federal Circuit jurisprudence, *see Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1336 (Fed. Cir. 2008), and is applied in the interpretation of contracts, *see Yahoo! Inc. v. Nat'l Union Fire Ins. Co. of Pitt.*, 255 F. Supp. 3d 970, 975 (N.D. Cal. 2017) ("Another tool for interpreting the contract provision's text is the last antecedent rule."); *Miniat v. Ed Miniat, Inc.*, 315 F.3d 712, 715 (7th Cir. 2002) (employing the last antecedent rule in contract interpretation); *In re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 655–56 (7th Cir. 2010); *In re Grogan*, 476 B.R. 270, 280 (Bankr. D. Or. 2012) (noting that "[a]lthough usually applied to statutes, the [doctrine] has been applied to contracts as well"), *aff'd*, 2013 WL 5630627 (B.A.P. 9th Cir. Oct. 15, 2013); *United States v. Cmty. Health Sys., Inc.*, 666 F. App'x 410, 414 & n.2 (6th Cir. 2016) ("Although the last-antecedent presumption is often used for statutory interpretation, we have also employed the presumption in contract interpretation.").

In sum, Section 3.4 — as a security and subordination agreement — remains alive, well, and operative.[27]

---

[27] Indeed, the entire point of such an agreement is that it delineates the lender's security interest — and relative priority — in case of the borrower's default. *See supra* note 19; *see also In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 2021 WL 5121892, at *10 (D.P.R. Oct. 29, 2021) ("Although the DRA Parties do agree that the Security Agreement subordinates the legal priority of some creditors' liens to those of other creditors, they oppose any interpretation of the Security Agreement that would subordinate the payment priorities of the Loans to those of the Bonds. . . . Nevertheless, that is precisely what the Security Agreement accomplishes."); *In re Kors, Inc.*, 819 F.2d 19, 22 (2d Cir. 1987) (explaining that a particular "Loan and Security Agreement" included "an obligation by [parties] to subordinate their security interests to the Bank's security interest"); *Bank of Am., N.A. v. Won Sam Yi*, 294 F. Supp. 3d 62, 76 (W.D.N.Y. 2018) (noting that

**b. The Parties Intended Both Loans to Qualify as Regulatory Capital**

The government proposes a further distinction between the two Loans based on the parties' execution of a Solvency Loan promissory note to replace the original one included as Appendix 4 to the Loan Agreement. *Compare* A212–14 (Loan Agreement, Appendix 4) (superseded), *with* A233–36 (Loan Agreement, Appendix 4) (replacement). The *new* promissory note expressly provides that it "is a Surplus Note." A234. This terminology is significant because, as explained above, a surplus note, by definition, places the holder at the back of the line for liquidation purposes. Because the new, replacement promissory note (for the Solvency Loan) provides that "[t]he obligation of [NHC] under this Promissory Note may not be offset or be subject to recoupment with respect to any liability or obligation owed to NHC[,]" A235, the government argues that the Court should infer that such a restriction on the government's offset rights does *not* apply to the Start-Up Loan (*i.e.*, because the Start-Up Loan's promissory note does not include similar language).

The government's argument gives the Court some pause, but the Court nevertheless rejects it for several reasons.

*First*, the mere fact that the parties agreed to make clear for Nevada state regulatory purposes that the Solvency Loan unquestionably qualifies as a surplus note does not necessitate an inference that the Loan Agreement's plain language can be read to limit Section 3.4's subordination agreement to the Solvency Loan only. In other words, as explained above, the subordination agreement covers both Loans irrespective of whether the Start-Up Loan qualifies as a surplus note.

*Second*, the new promissory note does not tell the entire story, but rather must be read in conjunction with the "Second Amendment to Loan Agreement," which is the mechanism the parties used to substitute the new promissory note for the old one. A229–30 (the "Second Amendment"). In the Second Amendment, the parties agreed it was "necessary to advance [their] mutual interest that the Nevada Insurance Commissioner acknowledge the promissory note contained in Appendix 4 of the [Loan] Agreement as a surplus note within the meaning" of NAIC accounting rules, "and thus accept the proceeds of the Solvency Loan provided through the Agreement as an asset for regulatory purposes, *consistent with the original intentions of the Parties.*" A229 (emphasis added). The parties further agreed in Section 3 of the Second Amendment that it "*advances the original intentions of the Parties under the Agreement*, and is not intended to reflect, and *does not reflect, any change to the original intentions of either Party under the [Loan] Agreement.*" *Id.* (emphasis added).

---

"Defendants are subject to the ramifications of their default, according to the terms of the Security Agreement").

The interpretive problem for the government is that there simply is *no* language in the original, unmodified Loan Agreement that distinguishes between the Loans in terms of the subordination agreement, creditor priority, and offset. The fact that the parties sought to further clarify their intent with regard to the Solvency Loan for a specific audience — the Nevada Insurance Commissioner (*i.e.*, for regulatory accounting purposes) — simply does not *compel* the inference that a different treatment was intended for the Start-Up Loan, particularly not where the terms of the underlying Loan Agreement itself make no such distinctions. *See* A157 (Loan Agreement, Section 3.1) ("Under this Agreement, [CMS] is providing to [NHC] funds for CO-OP Program purposes through two Loans, each of which shall be on par with the other for security purposes[.]"). Put differently, if the Second Amendment merely effectuates the original intent of Loan Agreement, and its plain language does not distinguish between the Loans regarding subordination, creditor priority, or offset, the Court cannot make the inference the government seeks. That is particularly true where, as here, the government drafted the Loan Agreement.[28] Compl. ¶ 56; Proposed Rule, 76 Fed. Reg. at 43,244 ("Other than the 5-year and 15-year repayment periods, the statute leaves the specific terms of the loans to CMS's discretion but requires that CMS take into consideration State solvency requirements."); Final Rule, 76 Fed. Reg. at 77,392 (noting that "[t]his final rule. . . establishes terms for loans").

*Third*, the Loan Agreement provides for certain "Conditions Precedent for Loan Disbursement." A159–60 (Loan Agreement, Section 3.8). That section of the Loan Agreement requires that, "[t]o receive any Funds under this Agreement, [NHC] must . . . continuously meet . . . specific conditions[,]" including that, "[a]s a condition precedent to Closing of this Agreement, [NHC] must submit an 'Affirmation of

---

[28] "General rules of contract interpretation apply to contracts to which the government is a party." *Lockheed Martin IR Imaging Sys., Inc. v. West*, 108 F.3d 319, 322 (Fed. Cir. 1997). "[T]he rule of *contra proferentem* . . . requires that ambiguous or unclear terms that are subject to more than one reasonable interpretation be construed against the party who drafted the document." *Turner Constr. Co. v. United States*, 367 F.3d 1319, 1321 (Fed. Cir. 2004); *see also Guzar Mirbachakot Transp. v. United States*, 104 Fed. Cl. 53, 65 (2012) ("Where a contract has a latent ambiguity, under the rule of *contra proferentem*, the contract is construed against its drafter if the interpretation advanced by the nondrafter is reasonable."). Thus, where the government is the contract drafter, "the rule of *contra proferentem* requires that [a latent] ambiguity be construed against the government." *WDC W. Carthage Assocs. v. United States*, 324 F.3d 1359, 1364 (Fed. Cir. 2003); *see also States Roofing Corp. v. Winter*, 587 F.3d 1364, 1369 (Fed. Cir. 2009) (explaining that the "rule of *contra proferentem* continues to apply" against the government); *United Pac. Ins. Co. v. United States*, 497 F.2d 1402, 1407 (Ct. Cl. 1974) ("[I]f a [contract] is ambiguous and the [contracting party] follows an interpretation that is reasonable, this interpretation will prevail over one advanced by the Government, even though the Government's interpretation may be a more reasonable one since the Government drafted the contract."); *Blount Bros. Corp. v. United States*, 873 F.2d 1451 (Fed. Cir. 1989) ("[T]he government may not now enforce its preferred interpretation of contract terms it alone drafted because of the doctrine of *contra proferentem*.").

Regulatory Acceptance of CO-OP Loans as Regulatory Capital,' to be attached as Appendix 10, signed by the Deputy Insurance Commissioner of the State of Nevada." A159–60 (Loan Agreement, Section 3.8(iii)(c)). As noted above, NHC submitted the required documentation, it was included as Appendix 10 to the Loan Agreement, the parties closed, and, thereafter, and pursuant to that affirmation, the Funds were disbursed. Now, the Court can readily understand why anyone reviewing the document at Appendix 10 might question how it satisfies the requirements of Section 3.8 of Loan Agreement. But the parties were free to conclude, as a contractual matter, whatever they wanted about the import of the documentation at Appendix 10. In that regard, there is simply no question, both as a matter of fact and law, that the parties agreed to treat the Appendix 10 document as sufficient; plus, the purpose of that document was to demonstrate that the Loans — again, plural — were accepted by the Nevada insurance regulator as regulatory capital.[29]

The bottom line is that the government cannot square its view of the terms of the Start-Up Loan — if it were even possible to distill and isolate such terms out from the Loan Agreement — with the plain language of the Loan Agreement as a whole. Whether the Court looks to the plain language of Section 3.4 (containing the subordination agreement), the language of Section 3.8(iii)(c) (conditioning the closing of the Loan Agreement on NHC's submission of the documents in Appendix 10 to NDOI), or the parties' contractually agreed-upon treatment of the Loans as documented in Appendix 10 to the Loan Agreement, all roads lead to the conclusion that the parties intended *both Loans* to be treated as regulatory capital (or surplus) and any government claim against the CO-OP as subordinated pursuant to Section 3.4. Again, such an outcome is hardly surprising, given that (1) it is generally consistent with the Nevada Priority Statute, and (2) it is consistent with HHS's regulatory concern regarding the Loans' contributing to state solvency requirements. *See, e.g.*, Final Rule, 76 Fed. Reg. at 77,407 ("In the potential case of insurer financial distress, *a CO-OP follows the same process as traditional issuers and must comply with all applicable State laws and regulations*." (emphasis added)); Proposed Rule, 76 Fed. Reg. at 43,244 ("In order to assist CO-OPs in meeting State solvency requirements, the loans will be structured so that premiums would go to pay claims and meet cash reserve requirements before repayment to CMS.").

Moreover, the Court notes that even when HHS referred specifically to "Solvency Loans," HHS itself was not always so precise, using the term on at least one occasion to include the Start-Up Loans. In the Proposed Rule, for example, HHS explained as follows:

> Congress has provided budget authority of $3.8 billion [1] to assist sponsoring organizations in creating such plans and

[29] *See supra* note 22.

Case: 22-1523 Document: 19 Page: 81 Filed: 07/22/2022

> [2] to do so with enough capital and reserves to become licensed and ultimately effective competitors in State insurance markets. *These funds* will enable CO-OPs to use Federal government loans (''Solvency Loans'') *to meet the requirements for risk-based capital* that State insurance commissions impose on health plans to ensure that they will be able to finance the services they have contractually promised their enrollees.

Proposed Rule, 76 Fed. Reg. at 43,426 (emphasis added). In a similar vein, the Proposed Rule noted:

> Congress has provided $3.8 billion [1] to assist sponsoring organizations in creating such plans and [2] to do so with enough capital and reserves to become licensed and ultimately effective competitors in State insurance markets. The *capital requirements for CO-OPs would be financed*, in part, by member premiums and *in part by the $3.8 billion dollars available for loans* over the next five years.

*Id.* (emphasis added). In neither of the foregoing excerpts from the Proposed Rule does HHS distinguish between the two loan types in terms of meeting risk-based capital requirements. And, significantly, later in the Proposed Rule, HHS explains that the referenced $3.8 billion (to be used for such capital requirements) includes an "estimated . . . $600 million . . . for Start-up Loans and $3,200 million . . . used for Solvency Loans." *Id.* at 43,247. Moreover, in estimating net transfer costs — including likelihood of repayment — HHS did not distinguish between the Loans except in terms of loan period and applicable interest rate, which, of course, is consistent with the sole statutory distinction, as explained above. *Id.* In any event, what is clear is that HHS did not neatly distinguish between the two types of Loans and, if anything, recognized that both Loans would contribute to required regulatory capital. In contrast, there is no indication that HHS intended to make the Start-Up Loan portion of the Loan Agreement somehow more collectible via offset.

**c. Section 19.12 of the Loan Agreement Does Not Trump the Subordination Agreement in Section 3.4 of the Loan Agreement**

The government relies on Section 19.12 of the Loan Agreement, covering "Right of Set-Off," in arguing that it trumps the subordination agreement contained in Section 3.4. Def. Rep. at 3–4 (citing A188 (Loan Agreement, Section 19.12)). But, as the Receiver points out, *see* Pl. Rep. at 1–2, 3–4; Tr. 47:1–20, Section 19.12 is more of a truism that preserves to the government whatever rights the government would normally have "as appropriate," A188 (Loan Agreement, Section 19.12) (delineating that CMS "shall

have at its disposal the full range of available rights, remedies and techniques to collect delinquent debts, . . . *as appropriate*, including . . . administrative offset" (emphasis added)). Indeed, Section 19.12 appears to be nothing more than an expanded version of an applicable regulation providing that "Loan recipients that fail to make loan payments . . . will be subject to any and all remedies available to CMS *under law* to collect the debt." 45 C.F.R. § 156.520(d) (emphasis added). That, of course, merely begs the questions whether (1) there is a *currently payable* debt given the subordination agreement in Section 3.4, and (2) whether the government's administrative offset is available "under law" in this case. Again, the Court concludes that it is not, due to the subordination agreement contained in Section 3.4 of the Loan Agreement.

The Court simply cannot read Section 19.12 in the manner the government proposes without reading the Loan Agreement's subordination provision (*i.e.*, Section 3.4) out of the contract. The Court, however, must construe the Loan Agreement to give meaning to every provision whenever possible, and not in a manner that would render a contract provision "useless, inexplicable, inoperative, void, insignificant, meaningless or superfluous; nor should any provision be construed as being in conflict with another unless no other reasonable interpretation is possible." *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 979 (Ct. Cl. 1965); *see also Massachusetts Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1231 (Fed. Cir. 1997) ("It is a fundamental rule of contract interpretation that the provisions are viewed in the way that gives meaning to all parts of the contract, and that avoids conflict, redundancy, and surplusage among the contract provisions. No contract provision can be ignored." (citations omitted)); *Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 753 (Fed. Cir. 1999) ("Courts prefer . . . an interpretation of a contract that gives effect to all its terms and leaves no provision meaningless."); *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous." (citing *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991))); *Keeter Trading Co. v. United States*, 79 Fed. Cl. 243, 257 (2007) ("A corollary of the court's goal of harmonizing all contract provisions is that the court will not adopt an interpretation which renders a contract term nugatory." (citing *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir. 1983))).

In contrast to the government's reading of the Loan Agreement — which would effectively nullify the subordination agreement contained in Section 3.4 — the Court's approach does not render Section 19.12 meaningless, as the Court can conceive of circumstances where the CO-OP is not in liquidation, has surplus funds available to pay back the Loans, but, for whatever reason, fails to do so; in such a case, no "other provisions of this Agreement" may be read to eliminate the government's "full range of available rights . . . as appropriate" to pursue its debt. Moreover, the assertion of an offset consistent with Section 19.12 may be "appropriate" — putting aside the liquidation process — if we were dealing with funds exceeding that which is necessary

to satisfy the superior creditors referenced in the subordination agreement. In other words, the Court can imagine a case in which the government's priority is superior to a class of creditor other than those specified in the subordination agreement. In such a case, the Court might well agree that Section 19.12 could be deployed to permit the government's offset; the parties apparently concur, however, that all available funds will be exhausted by the superior creditors delineated in the Section 3.4.[30]

### d. Section 693A.180 of the Nevada Revised Statutes Is Irrelevant

The parties extensively debate the meaning and applicability of section 693A.180 of the Nevada Revised Statutes,[31] but the entire issue is something of a red herring. That statutory provision covers an insurance company's "Borrowing" and is contained within Chapter 693A of the Nevada Revised Statutes, which generally governs "Corporate Powers and Procedures of Domestic Stock and Mutual Insurers." The Borrowing provision merely explains how an insurance company must borrow money to achieve the preferred regulatory accounting treatment of the disbursements (*i.e.*, to qualify as a surplus note).[32] One prerequisite for such treatment is that borrowed amounts cannot "be the basis of any setoff." Nev. Rev. Stat. § 693A.180(2).

In this case, whether or not the Nevada Insurance Commissioner had the discretion to approve the Loan Agreement, generally — or the Start-Up Loan, in particular — as a surplus note for regulatory accounting purposes (and whether or not

---

[30] Although Section 19.12 of the Loan Agreement indicates that it applies "[n]otwithstanding any other provisions of this Agreement to the contrary," A188 (Loan Agreement, Section 19.12), such "'[n]otwithstanding' language may create" at best "a latent ambiguity in the contract," and thus "should be construed against the Government as drafter." *Northrop Grumman Corp. v. United States*, 42 Fed. Cl. 1, 13 (1998) (alteration in original). "By carefully selecting loan recipients and tailoring each transaction with state law in mind, the agencies are fully capable of establishing terms that will secure repayment." *Kimbell Foods*, 440 U.S. at 736. To the extent the government has failed to do so, the Court will not rewrite the agreement to effectuate what the government now asserts that it meant to accomplish. *Id.* at 735–36 ("We believe that had Congress intended the private commercial sector, rather than taxpayers in general, to bear the risks of default entailed by these public welfare programs, it would have established a priority scheme displacing state law."). Congress and federal agencies know how to make sure the government comes first as a creditor. *Montana v. United States*, 124 F.3d 1269, 1276 (Fed. Cir. 1997) ("We find that the regulations and contractual provisions promulgated by [the Commodity Credit Corporation], in conjunction with the [Commodity Credit Corporation] Charter Act, which provides that state law cannot be applied where it conflicts with such provisions, provide a comprehensive scheme for federal lien priority.").

[31] Compl. ¶¶ 58–60, 65; Def. MTD at 21–23; Pl. Resp. at 25–29; Def. Rep. at 7–8; Pl. Rep. at 13–14.

[32] In other words, this statute tells an insurance company how one type of loan must be structured but does not otherwise restrict "other kinds of loans obtained by the insurer." Nev. Rev. Stat. § 693A.180(5).

the Commissioner did so), has no bearing on whether *the parties themselves* contractually agreed to limit the government's offset rights. Here, the parties agreed that the government's security to collect the Loans was subordinated, and the government's offset rights accordingly limited, as reflected in: (1) the priority scheme contained in the Loan Agreement's subordination agreement (Section 3.4); (2) the parties' agreement to treat the Loans the same in terms of security (Section 3.1); and (3) the parties' agreement that both Loans qualified as regulatory capital *as if* they were approved as surplus notes (Section 3.8 and Appendix 10). *See* A157; A159–60; A224–36.[33]

In any event, there is a meaningful difference between saying, on the one hand, that to qualify as a surplus note, a loan must abandon setoff rights, and arguing, on the other hand, that the *only* way a setoff right may be abandoned is if a loan qualifies as a surplus note. The former appears to be true; the latter is not. Put differently, even if all

---

[33] On August 21, 2015, NDOI approved NHC's request to reclassify the Start-Up Loan as surplus capital on its financial statements. A360–61 (Letter from Amy L. Parks, Acting Commissioner, NDOI, to Pamela Egan, Chief Executive Officer, NHC (Aug. 21, 2015)); *see also* A335 (Pet. for Appointment of Commissioner as Receiver) (describing the accounting treatment as "a limited one-time permitted practice to report the [Start-Up Loan] as surplus rather than as a liability in accordance with SSAP No. 15 - Debt and Holding Company Obligations" and explaining that "this practice was limited to [NHC]'s second quarter reporting period[,] which ended on June 30, 2015"). These facts could cut either way. On the one hand, applying a presumption of regularity — and in the absence of any facts in the record demonstrating otherwise — it seems safe to assume that the Start-Up Loan actually qualified as surplus capital, which, by definition, would mean that, at least in the view of NDOI, amounts owed for that loan could *not* be used as an offset. On the other hand, the fact that the Start-Up Loan may have been treated differently until the special request suggests that perhaps that segment of the Loans does not qualify as surplus capital. The Court need not resolve this issue, however, in light of the Court's conclusion that the parties agreed to treat the Start-Up Loan and the Solvency Loan the same. Moreover, there is at least some unrebutted evidence in the record that NDOI approved the Loan Agreement *as a whole*, prior to any amendment, pursuant to section 693.180(3) of the Nevada Revised Statutes. *See* A601–02 (E-mail from Annette James, Lead Actuary, NDOI (Nov. 28, 2012, 12:49 PM)) (providing an update of the status of NHC's application for admission as a domestic insurer and asking NHC, among other things, to submit to NDOI "a copy of the final loan or other agreement(s) that will be used to fund the start-up or ongoing operations of NHC"); A463–548 (E-mail from Iris Salinas, NHC, to Annette James, Lead Actuary, NDOI (Nov. 28, 2012, 3:27 PM)) (NHC submission of Loan Agreement to NDOI); A3 (Decl. of Barbara D. Richardson) (explaining that "[i]n 2013, as part of its review to issue NHC its Certificate of Authority, the NDOI reviewed and approved [the Loan Agreement] between NHC, an HMO, and [CMS] . . . , which included a Start-Up Loan (and promissory note) and a Solvency Loan (and promissory note)").

surplus notes must disclaim offset rights, that does not mean that a subordination agreement must first qualify as a surplus note to be effective.[34]

**4. The Government Cannot Collaterally Attack the Denial of Its Claim in the Nevada State Liquidation Proceedings**

While the Federal Circuit in *Conway* addressed, *de novo,* the meaning of Colorado's offset provision, neither the trial court nor the appellate court in that case was apparently confronted directly with the question of whether the government could effectively avoid the results of the state insolvency process by asserting an administrative offset. The parties here, however, debate that precise issue. Compl. ¶¶ 50–54; Def. MTD at 19–20, 26–29; Pl. Resp. at 23–25, 34–38; Def. Rep. at 8–12; Pl. Rep. at 9–13, 18–19.

In resolving that question, the Court begins with *Conway*, in which the Federal Circuit recognized that Federal law ordinarily does not preempt state insurance law, and particularly not state law governing insolvent insurers:

> There are strong justifications for applying the presumption against preemption to insurer insolvency law. "[T]he regulation of 'insurance' . . . has traditionally been under the control of the States." *SEC v. Variable Annuity Life Ins. Co. of Am.*, 359 U.S. 65, 68–69, 79 S. Ct. 618, 3 L.Ed.2d 640 (1959) (citation omitted). . . . In fact, Congress has recognized the benefits of state regulation of insurance: "the continued regulation and taxation by the several States of the business of insurance is in the public interest." McCarran–Ferguson Act ch. 20, § 1, 59 Stat. 33, 33 (1945) (codified at 15 U.S.C. § 1011); *see also id.* § 2, 59 Stat. at 34 (codified as amended at 15 U.S.C. § 1012) (limiting federal preemption of state insurance law).

*Conway*, 997 F.3d at 1207–08 (alteration in original). This Court reads *Conway* as determining that state law — including the liquidation *process* — is controlling. *Id.* at 1212. Indeed, the Federal Circuit explained that "for federal law to control in state insurer insolvency proceedings, the government must overcome the presumption

---

[34] Joshua Landy, *Fallacy Corner #1: Hooray for the Fallacy of Conversion!*, Stanford: Arcade (Sept. 18, 2010), https://arcade.stanford.edu/blogs/fallacy-corner-1-hooray-fallacy-conversion (describing the logical "fallacy of conversion"); *Affirming the Consequent*, RationalWiki, https://rationalwiki.org/wiki/affirming_the_consequent (explaining "false conversion").

against preemption" and by identifying "a clear and manifest intent to preempt [state] law *that fixes creditors' rights during insolvency*." *Id.* at 1208 (emphasis added).[35]

In this case, just as in *Conway*, 997 F.3d at 1211–12, the government is simultaneously a creditor and debtor to an insolvent CO-OP, and the government's rights were fixed during the insolvency process. This Court sees no reason that the government should be able to collaterally attack the results of the Nevada state liquidation process, given the Federal Circuit's reasoning in *Conway*. There, our appellate court noted that an HHS regulation defined "liquidation" to mean "that a State court has issued an order of liquidation for the issuer that fixes the rights and liabilities of the issuer *and its creditors*, policyholders, shareholders, members, and all other persons of interest." *Id.* at 1212 (emphasis added) (quoting 45 C.F.R. § 153.630(g)(3)(iii)). According to the Federal Circuit, "[i]f a 'State court . . . order' fixes creditors' rights" — and "the government concedes HHS is a 'creditor' in the relevant sense" — that "is strong evidence HHS understood that state law would control creditor priority during insolvency[.]" *Id.* (quoting 45 C.F.R. § 153.630(g)(3)(iii)). Given that conclusion, and because "the government's right to offset is generally subject to state priority schemes," *id.* at 1214, this Court holds that the government cannot assert an offset that would undermine — and effectively would serve as an improper collateral attack on — the results of the Nevada state liquidation process. *See* Final Rule, 76 Fed. Reg. at 77,407 ("In the potential case of insurer financial distress, *a CO-OP follows the same process* as traditional issuers and must comply with all applicable State laws and regulations."); *see also Garrett v. Cassity*, 2011 WL 3420606, at *4 (E.D. Mo. Aug. 3, 2011) ("The Liquidation Plan in the Texas receivership proceeding provides a comprehensive and mandatory scheme for resolving creditor claims, and . . . [defendant's] pursuit of its counterclaims here effectively amounts to a collateral attack on certain requirements of that scheme.").[36]

Permitting the government to offset the amounts owed to the Receiver would be fundamentally inconsistent with the Federal Circuit's conclusion that "HHS preserved state insolvency law for repayment of CO-OP program loans." *Conway*, 997 F.3d at 1212

---

[35] The government was hard pressed in oral argument to explain the impact of the Federal Circuit's view of the liquidation process on this case. Tr. 19:18–22 ("THE COURT: [W]hat was the Federal Circuit telling me to do when it says that the state's liquidation process applies? [GOVERNMENT]: I think it was telling you to look at what is the state's liquidation process.").

[36] *See also Conway*, 997 F.3d at 1210 ("[A]lthough it is not conclusive, there is evidence that Colorado's priority framework is consistent with the ACA's ultimate goals. Other than administrative expenses, Colorado's priority structure only places policyholder-creditors over the federal government. Prioritizing policyholder-creditors increases the likelihood individuals will receive payment on their claims. . . . [A] policy goal promoting the claims of insured individuals above other debts . . . would be consistent with the ACA's policy goals." (citations omitted)).

("Congress delegated HHS authority to promulgate regulations regarding loan repayment 'in a manner that is consistent with State solvency regulations and other similar State laws that may apply'" (quoting 42 U.S.C. § 18042(b)(3))). For a state's insolvency law to function properly, it is axiomatic that the state liquidation process must be permitted to proceed such that all creditors, including the government, are subject to it. That is particularly true where, as here, an HHS regulation acknowledges that the state liquidation process "fixes the rights and liabilities" of the CO-OP and "its creditors." *Id.* (quoting 45 C.F.R. § 153.630(g)(3)(iii)).

In this case, as detailed *supra* Section III.B.2, the government participated in the state liquidation process, submitted a proof of claim, and the Nevada court-appointed Special Deputy Receiver denied it, explaining "that any purported set-off of amounts claimed by the United States in the CMS Claim against amounts owed by the United States to NHC" would: (1) "impermissibly elevate the claims of the United States above the priority accorded them under [the Nevada Priority Statute] *and the Loan Agreement on which the CMS Claim is based*"; and (2) "violate the [Receivership Order] entered by the Receivership Court." A427 (Notice of Claim Determination) (emphasis added). This Court sees no reason to interfere with the results of that process, even assuming the Court were to agree with the government that its offset is otherwise proper pursuant to the Nevada Offset Statute.

Supreme Court jurisprudence supports this Court's conclusion that the government should not be permitted to collaterally attack the results of the Nevada liquidation process. "[T]here are principles unrelated to considerations of proper constitutional adjudication and regard for federal-state relations which govern in situations involving the contemporaneous exercise of concurrent jurisdictions, either by federal courts or by state and federal courts." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Such "principles rest on considerations of '(w)ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *Id.* at 817 (alteration in original) (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183 (1952)).

Thus, the Supreme Court has long recognized, "for example, that the court first assuming jurisdiction over property may exercise that jurisdiction to the exclusion of other courts" and that "[t]his has been true *even where the Government was a claimant in existing state proceedings* and then sought to invoke [federal] district-court jurisdiction[.]" *Id.* at 818 (emphasis added) (citing and discussing cases, including *United States v. Bank of New York & Trust Co.*, 296 U.S. 463, 477, 479 (1936)). Similarly, in *Princess Lida of Thurn & Taxis v. Thompson*, the Supreme Court held:

> [T]he principle applicable to both federal and state courts that the court first assuming jurisdiction over property may maintain and exercise that jurisdiction to the exclusion of the

> other, is not restricted to cases where property has been actually seized under judicial process before a second suit is instituted, but applies as well where suits are brought to marshal assets, administer trusts, or liquidate estates, and in suits of a similar nature where, to give effect to its jurisdiction, the court must control the property. The doctrine is necessary to the harmonious cooperation of federal and state tribunals.

305 U.S. 456, 466 (1939) (footnote omitted).

In *Levy v. Lewis*, 635 F.2d 960, 963 (2d Cir. 1980), the United States Court of Appeals for the Second Circuit — discussing the Supreme Court's decision in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943) — explained that, "[i]n keeping with *Burford*'s concern with non-interruption of state administrative programs, the federal courts have abstained in numerous areas where state regulation involved matters of substantial state concern and where state policies were carried out in a statutorily established regulatory program by state officials." In *Levy*, the Second Circuit specifically recognized that "*Burford* abstention has been applied to state regulation of insurance" because of the "complex administrative and judicial system for regulating and liquidating domestic insurance companies." *Id.* ("Liquidation proceedings involve the adjustment of thousands of claims against the insurer by policyholders and those who claim under them, as well as claims by present employees, past employees, and general creditors. Moreover, the claims must be satisfied by marshalling the existing assets of the insolvent company and by reinsuring existing policies using a state fund established for this purpose.").[37] More significantly, with respect to the issues in the instant case, the Second Circuit explained:

> It is also highly significant that the state scheme has been adopted pursuant to congressional authorization. In the

---

[37] *See also Lac D'Amiante du Quebec, Ltee v. Am. Home Assur. Co.*, 864 F.2d 1033, 1043 (3d Cir. 1988) ("As read in subsequent cases, *Burford* stands for the proposition that where a state creates a complex regulatory scheme, supervised by the state courts and central to state interests, abstention will be appropriate if federal jurisdiction deals primarily with state law issues and will disrupt a state's efforts 'to establish a coherent policy with respect to a matter of substantial public concern.'" (quoting *Colorado River*, 424 U.S. at 814)); *Id.* at 1045 (explaining that "the regulation of insurance companies unable to meet their obligations entails the type of strong state interest in which application of *Burford* abstention is appropriate" and holding that "[l]ike the valuable natural resource involved in *Burford*, solvent and healthy insurance coverage is an essential state concern" and "[t]he McCarran–Ferguson Act specifically provides that it is in the public interest for states to continue serving their traditional role as the preeminent regulators of insurance in the federal system and indicates the special status of insurance in the realm of state sovereignty"); *In re Cash Currency Exch., Inc.*, 762 F.2d 542, 556 (7th Cir. 1985) ("Insurance

> McCarran–Ferguson Act, 15 U.S.C. [§§] 1011–1015, Congress mandated that regulation of the insurance industry be left to the individual states. Thus[,] the administrative and judicial scheme erected by [the state] to regulate insurance companies, *including that part enabling* the institution and *implementation of liquidation* proceedings, operates pursuant to an express federal policy of noninterference in insurance matters.

*Id.* (emphasis added); *see also id.* at 964 ("[T]he liquidation process would be greatly impeded by subjecting it to two authorities. The experience of our own federal bankruptcy courts evidences the importance of consolidating all of the assets of an insolvent company and gathering all those who have claims against those assets in a single forum.").[38]

Although this Court is fully aware that the Supreme Court has considerably narrowed the reach of the *Burford* abstention doctrine[39] — and, to be clear, it does *not* apply here[40] — its underlying principles,[41] when coupled with the Federal Circuit's

---

companies are among those entities precluded from being debtors under the [Bankruptcy] Code because Congress has determined not to interfere with the state's comprehensive liquidation scheme. In light of this, abstention from the exercise of federal court jurisdiction, as in *Levy*, over claims arising out of such state liquidation proceedings is particularly appropriate.").

[38] *See also Levy*, 635 F.2d at 965 (relying upon *Princess Lida* and *Bank of New York*, among other cases, in noting that the Supreme Court has held "that courts first assuming jurisdiction over property may exercise their jurisdiction in proceedings to dispose of the property to the exclusion of other courts").

[39] *See, e.g.*, *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989); *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716–18 (1996); *see also Munich Am. Reinsurance Co. v. Crawford*, 141 F.3d 585, 589 n.2 (5th Cir. 1998) ("Prior to *Quackenbush*, we and other courts had consistently approved *Burford* abstention in actions against an insurance company involved in ongoing state delinquency proceedings."); *Oklahoma ex rel. Doak v. Acrisure Bus. Outsourcing Servs., LLC*, 529 F. App'x 886, 896–97 (10th Cir. 2013) (unpublished) ("[T]he Supreme Court has narrowed application of the *Burford* abstention doctrine.").

[40] *See Deiter v. XL Specialty Ins. Co.*, 488 F. Supp. 3d 881, 886–87 (D.S.D. 2020) (recognizing that, following the Supreme Court's decision in *Quackenbush*, a court may apply *Burford* abstention — and thus "decline to exercise jurisdiction, dismiss a suit, or remand the case to a state forum" — "only when the federal court is sitting in equity, as opposed to a suit involving a claim for damages"). In this case, the Court is not declining to exercise jurisdiction, dismissing any suit, or remanding any issue to a state forum.

[41] *Levy*, 635 F.2d at 965–66 ("The [Supreme] Court was referring to the accepted principle that once a court has jurisdiction over a particular res, no other court can proceed in rem with respect to the same res. The principle is often stated as a matter of jurisdiction: that a second

view of the McCarran–Ferguson Act articulated in *Conway*, strongly support this Court's conclusion that the government is not permitted to assert an offset that is inconsistent with the results of the Nevada liquidation proceedings. *See Levy*, 635 F.2d at 967 (opining that courts should "prevent duplicative litigation in state and federal forums[] to enable the [state insurance regulator] to consolidate all claims against the insolvent insurance company, to avoid the delay and disruption which would result from piecemeal adjudication of such claims, and to promote the federal policy of leaving regulation of insurance matters to the states").

For example, in *Munich American Reinsurance Co. v. Crawford*, the United States Court of Appeals for the Fifth Circuit concluded that the district court improperly invoked *Burford* abstention because the district court did not have discretion under the Federal Arbitration Act ("FAA") to deny plaintiffs their right to an order compelling arbitration. 141 F.3d 585, 596 (5th Cir. 1998).[42] Nevertheless, the Fifth Circuit held:

> [T]he provisions of Oklahoma law vesting exclusive original jurisdiction of insurance company delinquency proceedings in Oklahoma receivership court and authorizing the court to enjoin any action interfering with such proceedings are laws enacted for the purpose of regulating the business of insurance and, therefore, fall within the scope of the McCarran–Ferguson Act.

*Id.* Accordingly, the Fifth Circuit concluded that "dismissal of the action was required because, by operation of the McCarran–Ferguson Act, the FAA is reverse pre-empted to the extent it permits [plaintiffs] to bring an action against assets of a delinquent insurance company in a forum other than the Oklahoma receivership court." *Id.*

Similarly, the government here should not be able to obtain —via the assertion of an administrative offset — that which could not be obtained in a direct suit against the Receiver. *Ruthardt v. United States*, 303 F.3d 375, 382 (1st Cir. 2002). Although the government asserts that such a conclusion implicates sovereign immunity concerns, Def. MTD at 27–29; Def. Rep. at 10–12,[43] the Supreme Court clearly has rejected that proposition. *Bank of New York*, 296 U.S. at 479 ("The fact that the complainant in these

---

court cannot have jurisdiction to proceed in rem if jurisdiction over the res is maintained by another court. Nevertheless, as the Court appeared to recognize, the principle involved is more accurately described as a prudential doctrine in which a second court with concurrent jurisdiction will exercise its discretion to defer to another court for the sake of comprehensive disposition of rights in a particular piece of property or in a fund.").

[42] This case was decided after *Quackenbush*. *See Munich Am. Reinsurance Co.*, 141 F.3d at 589 n.2.

[43] *See* Tr. 7:13–8:25 (discussing receivership process, the government's proof of claim in that process, and sovereign immunity).

suits is the United States does not justify a departure from the rule which would otherwise be applicable. . . . In this instance, it cannot be doubted that the United States is free to invoke the jurisdiction of the state court for the determination of its claim . . . ."); *Leiter Mins., Inc. v. United States*, 352 U.S. 220, 227 (1957) (explaining that, in *Bank of New York*, "there were numerous other claimants, indispensable parties, who had not been made parties to the federal court suit" and that "[i]n remitting the United States to the state court, the Court saw no 'impairment of any rights' of the United States or 'any sacrifice of its proper dignity as a sovereign.'" (quoting *Bank of New York*, 296 U.S. at 480–81)).[44]

These cases, along with *Conway*, all counsel in favor of this Court's holding that the government is bound by the Nevada state liquidation proceedings, like any other creditor, and cannot collaterally attack the results of those proceedings by asserting an administrative offset. *Ruthardt*, 303 F.3d at 382 ("*Fabe* itself upheld a priority for administrative expenses of liquidation (and apparently for administrative expenses of guaranty funds, too) because these reimbursements facilitated payment to policyholders. In other words, priorities that indirectly assure that policyholders get what they were promised can also trigger McCarran–Ferguson protection. . . ." (citing *Fabe*, 508 U.S. at 495 n.2, 509)); *Clark v. Fitzgibbons,* 105 F.3d 1049, 1051 (5th Cir. 1997) ("[A]llowing a creditor or claimant *to proceed against an insolvent insurer* in federal court while a state insolvency proceeding is pending would 'usurp [the state's] control over the liquidation proceeding by allowing [the claimant] to preempt others in the distribution of [the insurance company's] assets.'" (alteration in original) (emphasis added) (quoting *Barnhardt Marine Ins., Inc. v. New England Int'l Sur. of Am., Inc.*, 961 F.2d 529, 532 (5th Cir. 1992))); *see also AmSouth Bank v. Dale*, 386 F.3d 763, 784 (6th Cir. 2004) ("A coverage claim against a now-insolvent insurer that arose prior to the insolvency is

---

[44] Notably, the Supreme Court, in *Leiter*, distinguished the facts in that case from those at issue in *Bank of New York*, in part on the grounds that, in *Leiter*, "[a]ll the parties in the state court proceeding have been joined in the federal proceeding." 352 U.S. at 227. That condition does not apply here, where the only parties are the Receiver and the United States. *See United States v. Rural Elec. Convenience Coop. Co.*, 922 F.2d 429, 437, 438 (7th Cir. 1991) (rejecting the government's assertion of "a right to an *exclusive* federal forum" and holding, based on *Bank of New York*, that "the presence of federal regulatory interests should not serve to extinguish the state courts' power to adjudicate federal claims, particularly when questions of state law interpretation are involved"); *United States v. Pate*, 47 F. Supp. 965, 968 (W.D. Ark. 1942) ("Certainly, if the United States is bound to the same extent as other litigants when it enters one of its own courts, it is likewise bound when it enters a court of competent jurisdiction of one of the sovereign states."); *United States v. Vibradamp Corp.*, 257 F. Supp. 931, 937 (S.D. Cal. 1966) ("[T]he Government may file and prosecute its claim in the probate court in the same manner as any other creditor. It has been held, quite understandably, that if the Government chooses [that] course, it is bound by the determination made by the probate court. But it does not follow from anything that we have yet discussed that the Government may ignore the probate proceeding and then recover from those to whom the estate is distributed." (citations omitted)).

of course exactly the sort of claim that must be heard in the liquidation proceedings; although dismissal under *Burford* abstention is no longer appropriate under *Quackenbush* in damages actions, presumably McCarran–Ferguson protection would extend to this kind of claim."); *Lacy v. Old Standard Life Ins., Inc.*, 2005 WL 8171866, at *4 (D. Colo. Sept. 8, 2005) (noting that "[s]ince the passage of the McCarran–Ferguson Act, federal courts have increasingly deferred to state receivership proceedings" and that "most federal courts have declined to exercise jurisdiction in disputes that involve complex and comprehensive state procedures adopted for insurance companies pursuant to the McCarran–Ferguson Act").[45]

Finally, even the Supreme Court in *Quackenbush* recognized that an abstention-based stay may be appropriate when a "setoff issue was being decided by the state courts" and "to await the outcome of the state court litigation." 517 U.S. at 731. Such a "stay to await the outcome of the state court litigation" only makes sense if the parties are bound by its results. *Id.* (explaining that such a stay would be "in the interest of avoiding inconsistent adjudications on that point").

In sum, the government cannot use an administrative offset to make an end-run around the state liquidation process, particularly not where the government elected to participate in that process and had its claim decided. *See* Proposed Rule, 76 Fed. Reg. at 43,247 (explaining that "Executive Order 13132 on Federalism establishes requirements that an agency must meet when a proposed rule imposes substantial costs on State and local governments, preempts State law, or otherwise has Federalism implications" and concluding that "[t]his proposed rule does not trigger these requirements").

**5. The Nevada Offset Statute**

To be clear, although "[s]etoff, in effect, elevates an unsecured claim to secured status," *Lee v. Schweiker,* 739 F.2d 870, 875 (3d Cir. 1984), the Court is inclined to agree with the government, Def. Rep. at 2, that there is no inherent inconsistency between the assertion of an offset pursuant to the Nevada Offset Statute, Nev. Rev. Stat. § 696B.440, and the priority scheme reflected in the Nevada Priority Statute, Nev. Rev. Stat. § 696B.420. In fact, in some sense, an offset statute "is, by its very nature, a specie of preference." *Barnett Bank of Jacksonville v. Florida ex rel. Dep't of Ins.*, 507 So. 2d 142, 144

[45] *See also In re Amwest Sur. Ins. Co.*, 2004 WL 628217, at *2–3 (D. Neb. Mar. 30, 2004) (finding that "the Nebraska statute designating the state forum for adjudication of these claims regulates the business of insurance and, under the McCarran–Ferguson Act, cannot lawfully be 'invalidate[d], impair[ed], or supercede[d]' by permitting additional litigation in the federal court on the basis of diversity" because "[t]he McCarran–Ferguson Act reflects a strong federal policy of deferring to state regulation of the insurance industry, including insolvency statutes" (first alteration in original) (quoting *Murff v. Pro. Med. Ins. Co.,* 97 F.3d 289, 293 (8th Cir. 1996) (internal quotation marks omitted)).

(Fla. Dist. Ct. App. 1987). "It requires that qualifying mutual obligations be set off against each other and that 'the balance only shall be allowed or paid.'" *Id.* (quoting Fla. Stat. § 631.281, which is identical in substance to the Nevada Offset Statute). The purpose of an offset statute "is to provide a preference to this limited extent." *Id.* Thus, an offset statute is inherently "consistent with [the priority statute] because [the priority statute], by creating priorities of claims, also prefers some creditors over others." *Id.*[46]

The Court need not definitively decide the meaning of the Nevada Offset Statute, however, because even if the government were correct, the government could only assert an offset here if there would be funds remaining after the superior creditors specified in Section 3.4 of the Loan Agreement were satisfied. (And that is not the case here.)

*First*, as explained above, a creditor is permitted to relinquish its priority via a subordination agreement and, thus, the parties may contract around statutory priority schemes. Therefore, even if the Nevada Offset Statute is viewed as an exception to the Nevada Priority Statute, the former cannot displace the government's contractual agreement in Section 3.4 of the Loan Agreement.

*Second*, the Nevada Offset Statute applies only in the context of the liquidation proceedings and does not provide a freestanding basis for an agency's administrative offset (or counterclaim in this Court). *Sunset Com. Bank v. Fla. Dep't of Ins.*, 509 So. 2d 366, 367 (Fla. Dist. Ct. App. 1987) (holding that "[w]hile [Florida has] a statutory offset provision for mutual debts or credits, . . . [no] enactment . . . contains any exemption from filing requirements for offset claims" and that "the statutory scheme contemplates that all claims against an entity in receivership be filed with the receiver *and determined by the receivership court*" (emphasis added) (citations omitted)). Indeed, the Nevada

---

[46] *See, e.g.*, *Transit Cas. Co. v. Selective Ins. Co.*, 137 F.3d 540, 544 (8th Cir. 1998) ("The Missouri Insurance Code establishes the priority of creditors in the case of an insurer insolvency. This section, along with the remainder of the statute, dictates the order of distribution of the insolvent insurance company's assets at the time the receivership or liquidation order is entered. If, as is contemplated in *Scott v. Armstrong*, [146 U.S. 499, 507 (1892),] set-off defines the nature of the insolvent's assets, allowing set-off does not subvert the priority of creditors established by statute." (footnote omitted)); *Prudential Reinsurance Co. v. Superior Ct.*, 842 P.2d 48, 61 (1992) ("if the Legislature intended to deny setoff unless there were sufficient assets to satisfy the claims of all claimants in higher priority classes, that result would have been made explicit in the statute"); *In re Midland Ins. Co.*, 79 N.Y.2d 253, 262 (1992) ("Although permitting offsets may conflict with the statutory purpose of providing for the pro rata distribution of the insolvent's estate to creditors, the Legislature has resolved the competing concerns and recognized offsets as a species of lawful preference. Indeed, if an offset is otherwise valid, there would seem to be no reason why its allowance should be considered a preference: it is 'only the balance, if any, after the set-off is deducted which can justly be held to form part of the assets of the insolvent.'" (quoting *Scott*, 146 U.S. at 510)).

Offset Statute is part of the Nevada code called "the Insurers Conservation, Rehabilitation and Liquidation Law." Nev. Rev. Stat. § 696B.010 ("Short title"). The Nevada Offset Statute thus cannot be invoked outside of the state liquidation proceedings. This also provides further support for the Court's holding that the government is not exempt from the Nevada liquidation process.

*Third*, the government cannot invoke the Nevada Offset Statute to assert a right that the government effectively relinquished in the Loan Agreement itself (*i.e.*, in the subordination provision), as the Court has interpreted it above. *Owens-Corning Fiberglas Corp. v. Texas Com. Bank Nat'l Ass'n*, 763 P.2d 335, 337 (1988) ("When, as here, a knowledgeable and sophisticated party, in no need of the court's protection, enters an unconditional subordination agreement, this court will not imply or impute conditions into the agreement."); *see also In re Lantana Motel*, 124 B.R. at 256 ("By executing a lien subordination agreement, the subordinating party agrees to demote the priority of its lien to that of another secured creditor, thereby delaying its recourse to the identified collateral until the other party's secured claim has been satisfied."); *In re Lunan Fam. Rests.*, 194 B.R. 429, 444–54 (Bankr. N.D. Ill. 1996) (noting that the "law is well settled that rights of priority under an agreement of subordination extend to and are limited strictly by the express terms and conditions of the agreement" (quoting *Resol. Tr. Corp. v. BVS Dev., Inc.*, 42 F.3d 1206, 1214 (9th Cir. 1994))).[47]

### C. The Government Cannot Invoke 31 U.S.C. § 3728 to Reassert the Offsets

In *Conway*, the Federal Circuit reserved the issue of whether 31 U.S.C. § 3728 may "prevent [a plaintiff] from enforcing his judgment against the government[.]" 997 F.3d at 1215–16 (noting that the court "does not reach that issue here"). Although the parties have not addressed that statute in this case, the Court does so in the interest of avoiding future — and, in the Court's view, unnecessary — proceedings. *See, e.g.*, Complaint ¶¶ 1–4, *Conway v. United States*, No. 21-1808 (Fed. Cl. Sept. 3, 2021), ECF No. 1 (alleging that the government refused to pay plaintiff pursuant to 31 U.S.C. § 3728, even though

[47] Although not entirely on point, the United States District Court for the Western District of Oklahoma's decision in *Oklahoma ex rel. Doak v. Staffing Concepts International, Inc.*, 2014 WL 296643 (W.D. Okla. Jan. 24, 2014), provides some helpful guidance. In that case, a receiver pursued a debt from a professional services company. *Id.* at *1. The defendant company asserted a setoff, based on a state statute very similar to the Nevada Offset Statute. *Id.* at *4. The district court permitted the setoff, but implicitly concluded that the underlying contract giving rise to the setoff amount controlled the outcome. *Id.* at *5. In that case, however, "[t]he contract . . . provided for repayment" from a particular related-company's assets "in the event of a liquidation"; specifically, the contract provided that "repayment of the balance of the said borrowed funds . . . shall be paid . . . out of any assets remaining *after the repayment of all policy obligations and all other liabilities* . . . ." *Id.* (emphasis added) (quoting the relevant contract). While the district court did not focus on the emphasized language, what *is* clear is that the district court concluded the offset was proper only based on the applicable contract's terms. *Id.*

plaintiff obtained a money judgment from this Court, a result the Federal Circuit affirmed on appeal).

As the Federal Circuit noted, 31 U.S.C. § 3728 provides that "[t]he Secretary of the Treasury shall withhold paying that part of a judgment against the United States Government presented to the Secretary that is equal to a debt the plaintiff owes the Government." *Conway*, 997 F.3d at 1215-16 (quoting 31 U.S.C. § 3728). The remaining statutory language, however, makes clear that the Treasury may not employ § 3728 to avoid any part of a judgment entered in this case based on the same offsets addressed herein. In particular, that provision delineates specific steps the Treasury must follow when withholding part of a judgment, as follows:

> (b) The Secretary shall--
>
> (1) discharge the debt if the plaintiff agrees to the setoff and discharges a part of the judgment equal to the debt; or
>
> (2A) withhold payment of an additional amount the Secretary decides will cover legal costs of bringing a civil action for the debt if the plaintiff denies the debt or does not agree to the setoff; and
>
> (B) have a civil action brought *if one has not already been brought*.
>
> (c) If the Government loses a civil action to recover a debt or recovers less than the amount the Secretary withholds under this section, the Secretary shall pay the plaintiff the balance and interest of 6 percent for the time the money is withheld.

31 U.S.C. § 3728 (emphasis added). This provision thus permits a plaintiff which has obtained a judgment to object to the setoff and requires the government to bring a civil action to recover the setoff amount (and places the government at risk for an additional financial penalty for losing such an action).

In this case, however, the Court holds that the government is not entitled to collect any amounts under the Loan Agreement until superior creditors, specified in Section 3.4, are satisfied and the Nevada liquidation process permits the government to recover. Until then, there is nothing for the Treasury to setoff, and any civil action by the government to recover — following the issuance of a judgment in this case — would be barred as *res judicata*. *Bonnafon v. United States*, 14 Ct. Cl. 484, 490 (1878); *Hines v. United States ex rel. Marsh*, 105 F.2d 85, 89 (D.C. Cir. 1939) ("It is the judicially established judgment which allows the government to reduce by, and off-set, the

judgment obtained against it, and not the administrative determination that a set-off exists, or might exist."); *Am. Potash Co. v. United States*, 8 F. Supp. 717, 719–20 (Ct. Cl. 1934) ("The whole purpose of the act was to compensate a claimant by way of interest on an amount which had been allowed by legal authority for the time during which it was wrongfully withheld from him, if it should be ultimately determined that he was not otherwise indebted to the United States. . . . There might be reasonable cause for withholding an amount *duly allowed by legal authority* where there is a definite claim of indebtedness to the United States, but in the case at bar there was apparently no reasonable cause to believe at the time the amount was withheld that the plaintiff was otherwise indebted to the United States." (emphasis added)).[48]

In sum, § 3728 simply "does not confer upon the Secretary of the Treasury the power to review the decrees and judgments of established courts of justice." *Bonnafon*, 14 Ct. Cl. at 491 (citing Act of Mar. 3, 1875, ch. 149, 18 Stat. 481 (current version at 28 U.S.C. § 3728)). "Such a power would be in conflict with the fundamental principles of the whole judiciary system" and "would confer upon the Secretary of the Treasury, an executive officer of the government, judicial power, contrary to article 3, section 1, of the Constitution[.]" *Id.* (citing *United States v. O'Grady*, 89 U.S. 641 (1874)); *see also United States v. Jones*, 119 U.S. 477, 480 (1886) ("accounting officers of the government [possess] no authority to re-examine the judgment" but rather the statute "only provides a way of payment and satisfaction if the creditor shall, at the time of the presentation of his judgment, be a debtor of the United States for *anything except what is included in the judgment, which is conclusive as to everything it embraces*" (emphasis added) (citing 18 Stat.

---

[48] In *Bonnafon*, the Court of Claims explained the mechanics of a substantially similar predecessor statute to § 3728:

> The Secretary must inform the judgment creditor of the amount of debt claimed against him, that he may make his election whether he consents to the set-off, accepts the balance, and will discharge his judgment, or denies the indebtedness and refuses to consent thereto. In the former case, it becomes a voluntary settlement upon the execution of the proper discharges contemplated by the act, and whether or not the claim set up by the Secretary is a legal and valid debt which could be enforced at law becomes immaterial, since the debtor has waived his right to have it tested by proceedings in court, and he is estopped from setting up any further claim on his judgment. In the latter case, if the judgment creditor denies the indebtedness, and refuses to consent to the set-off, he may have the matter of his liability tried in a suit at common law.

14 Ct. Cl. at 490.

at 481 (current version at 28 U.S.C. § 3728))). Indeed, the Federal Circuit's predecessor tribunal, the United States Court of Claims, already has addressed this very issue:

> Congress did not mean to permit the Comptroller General to withhold payment of a judgment in whole or in part on his own ipse dixit; if he did withhold it, he must immediately seek a judicial determination of his right to do so, *unless the debt was already in suit*. If it was already in suit, the desired judicial determination could be had in that suit, and, hence, it was not required in such case that the Comptroller General institute suit. *The objective was the judicial determination*; it made no difference whether plaintiff or defendant initiated the action to secure the determination. So, if a suit was already pending, it was not necessary for the Comptroller General to institute a suit. The provision for a judicial determination of the propriety of the withholding was plainly for plaintiff's benefit. . . . There is nothing indicating an intention to prevent plaintiff from doing what he is doing here, that is, to sue for a wrongful withholding, and in this way to secure the judicial determination which Congress prescribed.

*Eastport S. S. Co. v. United States*, 130 F. Supp. 333, 335 (Ct. Cl. 1955) (emphasis added) (citing Act of Mar. 3, 1933, ch. 212, § 13, 47 Stat. 1489, 1516–17 (current version at 31 U.S.C. § 3728)).

The government may not invoke 31 U.S.C. § 3728 to avoid the final judgment ultimately entered in this case.

## VII. CONCLUSION

For all the above reasons, the Court holds that the Receiver is entitled to judgment as a matter of law on its claims. Plaintiff's motion for summary judgment on liability is **GRANTED** with respect to Counts I–V. The government's motion to dismiss is **DENIED**.

Because the Court cannot discern from the filings the precise amount owed to the Receiver (absent the government's offsets), the parties are directed to meet-and-confer regarding the damages payable to Plaintiff. On or before Thursday, December 30, 2021, the parties shall file a joint stipulation or joint status report, indicating an agreed-upon

sum for the purpose of entry of final judgment in this matter or proposing a schedule for further proceedings if they are required to fully resolve this case.

**IT IS SO ORDERED.**

s/Matthew H. Solomson
Matthew H. Solomson
Judge

**Corrected**

# In the United States Court of Federal Claims

No. 18-1731C

(Filed: December 31, 2021)

**NOT FOR PUBLICATION**

**BARBARA D. RICHARDSON, in her capacity as Receiver of Nevada Health Co-Op.,**

*Plaintiff,*

**v.**

**THE UNITED STATES,**

*Defendant.*

## ORDER

***SOLOMSON*, Judge.**

Plaintiff, Barbara D. Richardson, the Nevada Commissioner of Insurance, acting in her position as the receiver for the Nevada Health CO-OP ("NHC"), sued Defendant, the United States, for payments that the Centers for Medicare and Medicaid Services ("CMS") owed NHC under the Patient Protection and Affordable Care Act. Plaintiff alleged that CMS improperly withheld, or "offset," such payments for amounts CMS contended the insolvent NHC owed the government pursuant to a loan agreement.

On November 30, 2021, the Court granted Plaintiff's motion for summary judgment on the issue of whether the government's claimed offsets were proper as a matter of law. *Richardson v. United States*, — Fed. Cl. — , 2021 WL 5625391 (2021). Specifically, the Court held that:

1. The loan agreement's express terms limited the government's power to offset amounts owed to Plaintiff;
2. The government's asserted offsets were inconsistent with the results of the Nevada statutory liquidation process; and

3. The government cannot invoke 31 U.S.C. § 3728 to reassert the offsets and thereby somehow avoid the final judgment in this case.

*Id.* at *8–9, *28–29. Because the Court could not "discern from the filings the precise amount owed to [Plaintiff] (absent the government's offsets)," the Court ordered the parties to meet-and-confer regarding the amount owed to Plaintiff, and to file a joint stipulation or joint status report by December 30, 2021, indicating an agreed-upon sum for the purpose of entry of final judgment in this matter. *Id.* at *29.

On December 30, 2021, in compliance with the Court's order, the parties filed a joint status report.[1] ECF No. 49. Therein, the parties agreed that "the amount of the judgment [should] be $55,504,468.39" and "that there are no remaining unresolved issues that would prevent entry of final judgment." *Id.* at 1.

Accordingly, and based upon the parties' agreement, the Court hereby directs the Clerk of the Court to enter **JUDGMENT** in favor of Plaintiff, in her capacity as the receiver for NHC, in the amount of $55,504,468.39.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
**Matthew H. Solomson**
**Judge**

---

[1] The parties "[r]eserv[ed] all rights to appeal." ECF No. 49 at 1.

# In the United States Court of Federal Claims

**No. 18-1731 C**
**Filed: January 4, 2022**

**BARBARA D. RICHARDSON,**
**in her capacity as Receiver of**
**Nevada Health Co-Op.**

**JUDGMENT**

**v.**

**THE UNITED STATES**

Pursuant to the court's Order, filed December 31, 2021, and Opinion and Order, filed November 30, 2021, granting plaintiff's motion for summary judgment on liability with respect to Counts I-V and denying defendant's motion to dismiss,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiff, in her capacity as receiver for the Nevada Health Co-Op., recover of and from the United States the amount of $55,504,468.39.

Lisa L. Reyes
Clerk of Court

By: s/ Debra L. Samler

Deputy Clerk

<u>NOTE</u>: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of <u>all plaintiffs</u>. Filing fee is $505.00.