**No. 2022-1520**

**IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

BARBARA RICHARDSON, in her capacity as receiver of Nevada Health CO-OP,

*Plaintiff-Appellee,*

v.

THE UNITED STATES,

*Defendant-Appellant.*

---

On Appeal from the United States Court of Federal Claims
Case No. 18-1731C (Judge Solomson)

---

# PLAINTIFF-APPELLEE'S BRIEF

---

Michael J. Schaengold
Melissa P. Prusock
**Greenberg Traurig, LLP**
2101 L Street, NW, Suite 1000
Washington, DC 20037
(202) 331-3146
(202) 261-0186 (fax)
schaengoldm@gtlaw.com
prusockm@gtlaw.com

Mark E. Ferrario
Donald L. Prunty
Tami Cowden
**Greenberg Traurig, LLP**
10845 Griffith Peak Dr., Suite 600
Las Vegas, Nevada 89135
(702) 938-6840
(702) 792-9002 (fax)
ferrariom@gtlaw.com
pruntyd@gtlaw.com
cowdent@gtlaw.com

October 17, 2022

## TABLE OF CONTENTS


STATEMENT OF RELATED CASES ........ 1

INTRODUCTION ........ 1

STATEMENT OF THE ISSUES ........ 2

STATEMENT OF THE CASE AND FACTUAL BACKGROUND ........ 3

A. Statutory and Regulatory Background ........ 3

B. The Loan Agreement ........ 5

C. NHC's Entitlement to Premium Stabilization and Cost Sharing Reduction Funds Under the ACA ........ 9

D. State Court Insolvency Proceedings ........ 10

E. The Present Litigation ........ 12

SUMMARY OF THE ARGUMENT ........ 14

ARGUMENT ........ 17

I. The COFC Properly Determined that Offset is Unavailable Because the Government is Not Entitled to Repayment Under the Loan Agreement Until NHC Satisfies its Obligations for Claims Payments and Basic Operating Expenses ........ 17

A. The COFC Correctly Held that the Loan Agreement's Plain Language Requires Subordination of Government's Interest in Repayment of the Start-Up Loan ........ 18

1. Section 3.4 Applies in Events of Default, Including Insolvency ........ 19

2. The Start-Up Loan's Subordination to NHC's Liabilities for Claims Payments and Basic Operating Expenses Remained Effective After NHC Ceased Operating as a CO-OP ........ 23

B. The Loan Agreement's Terms Refute the Government's Contention that the Loans Were Intended to be Treated Differently ........ 27

C. The COFC's Interpretation Did Not Render § 19.12 Meaningless ....30

D. The Loan Agreement Drafted by the Government Reflects the Congressional Intent that the Loans be Subject to Nevada's Insurance Regulations ....33

1. The Agreement Aligns with the Nevada Priority Statute ....34

2. The Agreement is Consistent with NRS 693A.180, Which Precludes Offset ....36

E. Offset is Unavailable Under Federal Common Law Because the Government Subordinated Its Right to Repayment to Claims Payments and Basic Operating Expenses ....41

F. Offset Was Not Permitted Because There Was No Mutuality Between the Start-Up Loan and the ACA Receivables ....42

1. Obligations Subordinated by Contract Are Not Mutual and Cannot Be Setoff ....42

2. The Government's Offset Was Improper Because the Start-Up Loan and the Reinsurance and Risk Adjustment Receivables Are Not Mutual Obligations ....44

II. The Government is Bound by the Outcome of its Voluntary Participation in the Receivership Claims and Appeals Procedure ....46

III. The COFC Properly Ruled that its Judgment is Preclusive as to 31 U.S.C. § 3728 ....51

A. The COFC Correctly Decided that the Government Could Not Relitigate the Same Claim Under § 3728 ....51

B. The Secretary of the Treasury Is Not, and Cannot Be, a Party to This Litigation ....55

C. The Court's Ruling on § 3728 Does Not Constitute Nonmonetary Relief. ....57

CONCLUSION ....58

CERTIFICATE OF SERVICE ....59

CERTIFICATE OF COMPLIANCE TYPE-VOLUME LIMITATION TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS ..........60

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*344 Individuals v. Giddens (In re Lehman Bros. Holdings)*,
792 F. App'x 16 (2d Cir. 2019) .....31

*Adams v. RTC*,
927 F.2d 348 (8th Cir. 1991) .....43

*Agility Pub. Warehousing Co. K.S.C.P. v. United States*,
969 F.3d 1355 (Fed. Cir. 2020) .....20

*Agility Pub. Warehousing Co. KSCP v. Mattis*,
852 F.3d 1370 (Fed. Cir. 2017) .....18

*In re Ambac Assurance Corp.*,
339 Wis. 2d 48, 810 N.W.2d 450 (2012).....48

*In re Art Metal U.S.A., Inc.*,
109 B.R. 74 (Bankr. D.N.J. 1989) .....45

*Bank of Am., N.A. v. Fed. Deposit Ins. Corp.*,
962 F. Supp. 2d 165 (D.D.C. 2013).....41

*Blue Cross and Blue Shield of Nebraska v. United States*,
Case 1:18-cv-00491-EDJ, ECF Doc. 25.....45

*In re Cash Currency Exch., Inc.*,
762 F.2d 542 (7th Cir. 1985) .....46

*Citizens Bank of Maryland v. Strumpf*,
516 U.S. 16 (1995).....42

*Clark v. Fitzgibbons*,
105 F.3d 1049 (5th Cir. 1997) .....47

*Doe v. United States*,
58 F.3d 494 (9th Cir. 1995) .....45

*Energy E. Corp. v. United States*,
645 F.3d 1358 (Fed. Cir. 2011) .....24

*FDIC v. Bank of America National Trust Savings Association*,
701 F.2d 831 (9th Cir. 1983) ....................................................................42, 43

*FDIC v. de Jesus Velez*,
678 F.2d 371 (1st Cir. 1982)..........................................................................42

*Health Republic Ins. Co. v. United States*,
No. 16-cv-259C, 2022 U.S. Claims LEXIS 1789 (Fed. Cl. Aug. 19, 2022) ..........................................................................................................48

*Hercules Inc. v. United States*,
292 F.3d 1378 (Fed. Cir. 2002) ......................................................................33

*Langkamp v. United States*,
943 F.3d 1346 (Fed. Cir. 2019) ......................................................................25

*Leiter v. United States*,
352 U.S. 220 (1957)........................................................................................49

*Levy v. Lewis*,
635 F.2d 960 (2d Cir. 1980) ..........................................................................47

*In re Mastroeni*,
57 B.R. 191 (Bankr. S.D.N.Y. 1986)..............................................................45

*Minority Equity Cap. Co. v. Jackson*,
798 F. Supp. 200 (S.D.N.Y. 1992) ................................................................41

*Munich American Reinsurance*, 141 F.3d 585, 596 (5th Cir. 1998) .......................47

*New Mexico Health Connections v. United States Dep't of Health & Human Servs.*, 946 F.3d 1138 (10th Cir. 2019)................................................44

*Northwest Racquet Swim & Health Clubs, Inc. v. RTC*,
927 F.2d 355 (8th Cir. 1991) ..........................................................................42

*NVT Techs., Inc. v. United States*,
370 F.3d 1153 (Fed. Cir. 2004) ......................................................................25

*In re NXXI Inc.*,
216 F. Supp. 3d 381 (S.D.N.Y. 2016) ............................................................24

*Placida Prof'l Ctr., LLC v. FDIC*,
512 F. App'x 938 (11th Cir. 2013) .......... 41

*Rentrop v. Spectranetics Corp.*,
550 F.3d 1112 (Fed. Cir. 2008) .......... 25

*Sec. Pac. Nat'l Bank v.RTC*,
63 F.3d 900 (9th Cir. 1995) .......... 26

*Sickels v. Shinseki*,
643 F.3d 1362 (Fed. Cir. 2011) .......... 40

*Transit Casualty Company v. Selective Ins. Co.*,
137 F.3d 540 (8th Cir. 1998) .......... 42

*Turner Constr. Co. v. United States*,
367 F.3d 1319 (Fed. Cir. 2004) .......... 33

*U.S. Dep't of Treasury v. Fabe*,
508 U.S. 491 (1993) .......... *passim*

*United States v. Bank of New York Trust Co.*,
296 U.S. 463 (1936) .......... 48, 49

**Federal Statutes and Regulations**

11 U.S.C. § 109(b) .......... 47

31 U.S.C. § 3728 .......... 16, 17

42 U.S.C. §18042 .......... 17

42 U.S.C. § 18042(b)(3) .......... 34

45 C.F.R. Part 156 .......... 17

45 C.F.R. § 156.520(b) .......... 34

76 Fed. Reg. at 77,407 .......... 45

**State Statutes**

NRS 695C.145 .......... 36

NRS 696B.110 ....................................................................................................24

NRS 696B.190 ....................................................................................................47

NRS 696B.420 ....................................................................................................34

NRS 696B.440 ..............................................................................................35, 42

NRS 693A.180 ..............................................................................................23, 36

NRS 696B.440 ....................................................................................................23

**Other Authorities**

Nat'l Ass'n of Ins. Comm'rs, *Receiver's Handbook for Insurance Company Insolvencies*, at 29 (April 2021), https://content.naic.org/sites/default/files/publication-rec-bu-receivers-handbook-insolvencies.pdf ....................................................................................26

*Transitional Reinsurance Program*, at 5-6 (2017) ...............................................44

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Plaintiff-Appellee states that:

1. No other appeal from the same civil action has previously been before this or any other appellate court.

2. Counsel is not aware of any related cases within the meaning of Federal Circuit Rule 47.5(b), i.e., there no cases known to counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## INTRODUCTION

The Court of Federal Claims ("COFC") properly granted judgment in favor of Nevada Health CO-OP ("NHC") for $55,504,468.39. That sum represents monies owed to NHC under the Patient Protection and Affordable Care Act ("ACA") premium stabilization programs, which sums had been withheld by the Government (1) due to its misapprehension of its obligations under the ACA's Risk Corridors program, and (2) through the Government's improper offset of NHC's subordinated debt from a "Start-Up Loan" by the Government.[1]

The COFC properly determined that, under the terms of the Loan Agreement that applies to both the Start-Up Loan and the Solvency Loan (the latter of which the Government concedes is not at issue), the Government could not collect the Loans through offset. Additionally, the COFC properly found that the Government is bound by the outcome of its voluntary participation in the Nevada State Receivership

[1] The Government conceded that more than $42 million is owed to NHC under the Risk Corridors program, and has conceded that monies owed to NHC for a loan known as the "Solvency Loan" are not subject to offset, and are not at issue in this litigation. Appx220; Appx1620. In its Opening Brief ("OB"), the Government has not raised any argument challenging the COFC's decision as to these issues. But despite these concessions, the Government persists in withholding the full amount of the COFC's $55,504,468.39 judgment in NHC's favor. Appx49. The Government's continued refusal to pay the $38.4 million that it acknowledges it owes to NHC, *see* Appx1620&n.14; Appx1620, is improper and undermines the ACA's purpose of expanding access to healthcare coverage. *See Maine Community Health Options v. United States*, 140 S. Ct. 1308, 1310 (2020).

Court-approved Receivership Claims and Appeal Procedure, which resulted in a Notice of Claim Determination denying the Government's claim of offset that the Government elected not to appeal. The COFC properly held that, under the Federal Circuit's decision in *Conway v. United States*, 997 F.3d 1198, 1207-08 (Fed. Cir. 2021), "state law—including the liquidation process—is controlling" in insurer insolvency proceedings, Appx33, and that the Government cannot collaterally attack the results of that process, particularly where (as here) it voluntarily participated in that process by submitting a proof of claim. The COFC also correctly determined that the Government cannot relitigate its claim of offset post-judgment under 31 U.S.C. § 3728.

The COFC properly denied the Government's Motion to Dismiss, and properly granted NHC summary judgment. Thus, the judgment should be affirmed.

## STATEMENT OF THE ISSUES

1. Whether the COFC properly determined that offset is not an available remedy as the Government is not entitled to repayment under the Loan Agreement until NHC satisfies its obligations for claims payments and basic operating expenses.

2. Whether the COFC properly determined that the Government is bound by the outcome of its voluntary participation in the Receivership Claims and Appeals Procedure.

3. Whether the COFC properly ruled that 31 U.S.C. § 3728 does not allow the Government to reassert its same offset claim post-judgment.

## STATEMENT OF THE CASE AND FACTUAL BACKGROUND

The Plaintiff-Appellee, Barbara Richardson, is the Nevada Commissioner of Insurance ("Commissioner") and is the Receiver for NHC.

### A. Statutory and Regulatory Background

NHC generally agrees with the Government's descriptions of the ACA, and its premium stabilization and the Consumer Operated and Oriented Plan ("CO-OP") programs. OB3-6. Along with the funds owed under "3Rs" programs (Reinsurance, Risk Adjustment, and Risk Corridors) cited by the Government, the Government owes NHC money under the "Cost Sharing Reduction" ("CSR") program, a fourth premium stabilization program through which the Government subsidizes premium costs for lower income participants. Under this program, insurers offering Qualified Health Plans are required to reduce eligible individuals' costs by specified amounts, 42 U.S.C. § 18071(a), and the Department of Health and Human Services ("HHS") must reimburse the insurers for those costs. 42 U.S.C. § 18071(c)(3)(A). The subsidy payments are to be made by the Government to the insurers in advance monthly, with a yearly reconciliation for payments too high or too low. 42 U.S.C. §§ 18082(c)(3), 18071(c)(2); 26 C.F.R. § 1.36B-4; 45 C.F.R. § 156.430.

The ACA required HHS to promulgate regulations governing the issuance and

repayment of both Start-Up Loans and Solvency Loans (the latter of which are known as "grants" in the statute) "in a manner consistent with State solvency regulations and other similar State laws that may apply." 42 U.S.C. § 18042(b)(3). HHS' regulations provide that "[s]ubject to their ability to meet State reserve requirements, solvency regulations, or requisite surplus note arrangements, the loan recipient must repay its loans[.]" 45 C.F.R. § 156.520(b). This provision applies to both Start-Up and Solvency Loans. That regulation adds that "[a]ll loans awarded under this subpart must be used in a manner that is consistent with the FOA [Funding Opportunity Announcement], the **loan agreement**, and all other statutory, regulatory, or other requirements." 45 C.F.R. § 156.520(a)(1) (emphasis added).

The final rule implementing HHS' regulations specified that "[i]n the potential case of insurer financial distress, a CO–OP follows the same process as traditional issuers and must comply with all applicable State laws and regulations." *See* Patient Protection and Affordable Care Act; Establishment of Consumer Operated and Oriented Plan (CO-OP) Program (Final Rule), 76 Fed. Reg. 77,392, 77,407 (Dec. 13, 2011). It further provided that HHS would not preclude recipients from using funds from either loan (i.e., Start-Up and Solvency Loans) to pay the claims of insureds because:

> The purpose of State reserve requirements is to preserve the financial viability of carriers and enable the payment of claims when provider costs exceed premium revenue. A CO-OP that fails to maintain appropriate reserves or surplus may be subject to regulatory action,

> seizure, or liquidation. Such a prohibition would therefore not only defeat the purpose of the loans but would be contrary to the framework of State regulation.

*Id.* at 77,404; Appx24.

The Government's reference to the regulation requiring repayment of 110 percent of the aggregate amount of the Loans plus a higher rate of interest if HHS terminates the Loan Agreement for noncompliance with program rules or the Loan Agreement is irrelevant here. *See* OB6 (quoting 45 C.F.R. § 156.520(c)(3)). Under the Loan Agreement, these repayment terms apply only if the Government terminates the Agreement for "cause" under § 16.3. Appx1849-1851[2] (Loan Agreement § 4.4, Repayment of Start-Up Loan); Appx1852 (§ 5.6, Repayment Provisions for (Solvency Loan)). The Government acknowledged that it did not terminate the Loan Agreement under § 16.3. Appx1610n.6 (Government Reply in Support of Motion to Dismiss) ("The Liquidator rightly observes that the notice of default for cause was under Sections 15.3 and 16.2, not 16.3.").

### B. The Loan Agreement

On May 17, 2012, NHC's predecessor in interest, Hospitality Health, Ltd., and the Government closed on a Loan Agreement which included: (1) a Start-Up

[2] Because the COFC relied on the corrected appendix filed by NHC (Dkt. No. 37), *see* Appx3n.4, NHC's citations to the record are to the documents in Dkt. No. 37 from the COFC proceedings.

Loan of $17,105,047, and (2) a Solvency Loan of $48,820,349. *See* Appx1832. The Loan Agreement was assigned to NHC. Appx1914-1916.

NHC submitted the Loan Agreement to the Nevada Department of Insurance ("DOI") as part of the application process to obtain authority to operate as an insurer. Appx2151. On January 2, 2013, NHC received approval from the Nevada DOI for its Certificate of Authority. Appx2238.

The Loan Agreement includes both the Solvency and Start-Up Loans. Section 2.1 defines "Loans" (plural) to mean both the Start-Up Loan and the Solvency Loan. Appx1842. Similarly, "Loan Funds" or "Funds" means disbursements under both Loans. *Id.* Thus, every time the Agreement refers to the Loans or Loan Funds in the plural form, that provision applies to *both* Loans. Appx5.

All of the provisions in § 3 apply to both Loans. Section 3.1 provides that the Loans "will be on par with the other for security purposes." Appx1845. Section 3.4 states:

> The Loans and other Obligations will be general obligations of Borrower. Because the *intent of the Loans*, and the Solvency Loan in particular, is to provide financing to Borrower that meets the definition of "*risk based capital*"[3] for State Insurance Laws purposes, the Loans

---

[3] The Loan Agreement defines "Risk-Based Capital Reserves" as "the amount of required capital that [NHC] must maintain to remain in compliance with State Reserve Requirements." Appx1844 (Loan Agreement, Section 2.1); *see* Appx18n.18 (National Association of Insurance Commissioners risk-based capital system "'uses a formula that establishes the minimum amount of capital necessary for an insurance company to support its overall business operations' and then

> will have a claim on cash flow and reserves of Borrower that is *subordinate to (a) claims payments, (b) Basic Operating Expenses*, and (c) maintenance of required reserve funds while Borrower is operating as a CO-OP under State Insurance Laws. [Emphasis added.]

Appx1845.

Section 3.5 establishes permitted uses of "Loan Funds" (plural), which includes the "[c]ost associated with establishing and maintaining capital reserves for Borrower (including Risk-Based Capital Reserves) consistent with State Reserve Requirements[.]" Appx1846. Consistent with the governing statute and regulation, § 4.4 provides that "[u]nless Lender terminates this Agreement for cause under Section 16.3," NHC must repay "100%" of the Start-Up Loan plus capitalized interest "subject to its ability to meet State Reserve Requirements and other solvency regulations or requisite surplus note arrangements." Appx1849.

Section 16 provides the Government's "Termination Rights." Appx1869. Section 16.2 permits HHS to terminate the Agreement for "Program Viability Reasons" if it determines that "Borrower will not be likely to be able to establish a viable and sustainable CO-OP that serves the interests of its community and the goals of the CO-OP Program." Appx1870. If the Loan is terminated under § 16.2, the Loans must be repaid "consistent with Federal and State insurance laws, unless

---

compares '[t]hat amount . . . to the company's actual statutory capital to determine whether a company is technically solvent.'" (quoting *Carnegie v. Mut. Sav. Life Ins. Co.*, 2004 WL 3715446, at *9 n.57 (N.D. Ala. Nov. 23, 2004)).

and only to the extent that such payment is otherwise prevented, restricted, or delayed by a State Solvency Payment Restriction[.]" Appx1871. A "State Solvency Payment Restriction" is a "State Insurance Law provision or regulatory action by a state insurance agency or department that enforcement or implementation of which creates an actual legal impediment or restriction on repayment of Loans funds pursuant to the terms of this Agreement." Appx1844 (§ 2.1).

Section 15.3, which overlaps with § 16.2, provides "Rights and Remedies of Lender" in an "Event of Default." Appx1868. If HHS terminates the Agreement under § 15.3, "Borrower must immediately repay any unused Loan Funds to Lender following the resolution of any outstanding debts and run out of outstanding claim obligations, consistent with State insurance Laws." Appx1869. Additionally,

> Borrower must further comply with all State Insurance Laws relevant to its termination from the CO-OP Program at its sole cost and expense, and shall not be entitled to use any Loan Funds or proceeds for such purposes unless and only to the extent that such use is mandated by a State Solvency Payment Restriction

Appx1869**.**

Section 19.12 provides that "[n]otwithstanding any other provisions of this Agreement to the contrary," if an Event of Default is not cured, HHS will have "the full range of ***available*** rights, remedies and techniques to collect delinquent debts, … ***as appropriate***, including … administrative offset[.]" Appx1876 (emphasis added).

Pursuant to § 3.8, the Loan Agreement's closing was conditioned upon the Borrower's submission of an "Affirmation of Regulatory Acceptance of CO-OP Loans as Regulatory Capital." Appx1847-1848. Section 4.2 made disbursements of the Start-Up Loan contingent on the satisfaction of all requirements of § 3.8. Appx1849. Both parties considered the document in Appendix 10 to satisfy this requirement. *See* Appx1912-1913; Appx1989 (NHC Financial Statement as of June 30, 2015, showing Start-Up Loan disbursements beginning in May 2012); Appx28.

In January 2013, the Loan Agreement was amended to include a revised Promissory Note for the Solvency Loan, spelling out the subordination. Appx1922. The Second Amendment to the Loan Agreement "ratified, endorsed, and reaffirmed" all terms of the Loan Agreement that were not "expressly modified." Appx1918. The amended Solvency Loan Promissory Note expressly incorporated § 3.4 of the Loan Agreement by reference. Appx1922. The Second Amendment only changed the promissory note for the Solvency Loan. Appx1917. It did not change any of the original terms of the Agreement as applied to the Start-Up Loan, and expressly was not intended to reflect any change to the parties' original intentions. Appx1917.

### C. NHC's Entitlement to Premium Stabilization and Cost Sharing Reduction Funds Under the ACA

At the COFC, the Receiver presented evidence showing that NHC was entitled to recovery of:



ACTIVE 682758568v2

| | |
|---|---|
| Risk Corridors (Count I) | $43,042,673.80 |
| Reinsurance (Count II) | $4,592,187.03 |
| Risk Adjustment (Count III) | $4,759,869.76 |
| Cost Sharing Reduction (Count IV) | $3,096,411.11. |

Appx1709.[4]

### D. State Court Insolvency Proceedings

NHC operated as a CO-OP insuring Nevada residents in 2014 and 2015, but experienced significant financial distress. On August 21, 2015, after NHC's Board of Directors approved a voluntary suspension of NHC's Certificate of Authority to operate, the Nevada Commissioner of Insurance issued an "Order of Voluntary Suspension" of the Certificate. Appx2021; Appx2055. A Nevada Court subsequently appointed the Commissioner as Receiver due to NHC's unsound financial condition. Appx2063; Appx2067. As relevant here, the Receivership Court Order provided that:

> (11) . . . [A]ny governmental agencies who have claims of any nature against CO-OP, including cross claims, counterclaims and third party claims, are permanently enjoined from doing or attempting any of the following:
>
> * * *
>
> (c) Making or executing any levy upon, selling, hypothecating, mortgaging, wasting, conveying, dissipating, or asserting control

[4] There was disagreement between the parties as to certain figures, and ultimately, the agreed total by the parties was $55,504,468.39. Appx 48; Appx49.

> over the Property or the estate of CO-OP.
> (d) Seeking or obtaining any preferences, judgments, foreclosures, attachments, levies, or liens of any kind against the Property.
> (e) Interfering in any way with the ... Receiver ... in . . . [her] acquisition of possession of or control over, or their title to the Property[.]

Appx2071-2072. A Special Deputy Receiver ("SDR") was appointed. Appx2068. The Receivership Order provides that "[t]he SDR shall have all the responsibilities, rights, powers, and authority of the Receiver subject to supervision and removal by the Receiver and the further Orders of this Court." *Id.*

On December 23, 2015, the Government notified NHC that it was terminating the Loan Agreement "in accordance with sections 15.3 and 16.2[.]" Appx2081.

NHC was ordered liquidated in January 2016. Appx2098. The Receivership Appeals Procedure ("RAP") for submitting claims against the CO-OP was subsequently approved. Appx2103.

The Government declined to make any Risk Corridors payments to NHC, which the Government now acknowledges are due in full but still has not paid because of alleged offsets. OB15n.10. The Government took offsets against the other premium stabilization program receivables due to NHC. Appx2084-2085; Appx2086; Appx2089; Appx2090. Neither the Commissioner nor the Receivership Court authorized these offsets.

The Government invoked the Nevada Receivership Court's jurisdiction by

filing a claim for its purported right of offset in accordance with the RAP. Appx2106-2112. The SDR issued a Notice of Claim Determination ("NCD") finding that the Government could not offset the CO-OP Loans against the premium stabilization program receivables. Appx2115. The NCD advised that "[i]f you do not challenge this NCD in accordance with the provisions of the [RAP], the determinations regarding priority and other aspects of your claim made herein will become final and non-appealable." Appx2116. The Government did not appeal the NCD.

### E. The Present Litigation

NHC filed suit in the COFC seeking the premium stabilization program receivables and challenging the Government's right to setoff. *See* Appx150. The Government moved to dismiss. It claimed it did not have to make Risk Corridors payments because the program was budget neutral, meaning that the Government would not pay out more than it collected from issuers. As to the payments due under the Reinsurance, Risk Adjustment, and CSR programs, the Government argued it had made the necessary payments through setoff. *See* Appx217.

The case was stayed pending the Supreme Court's decision in *Maine Community Health Options v. United State*s, 140 S. Ct. 1308 (2020), which resolved the Risk Corridors issue consistent with NHC's position. Appx928. As a result, NHC was permitted to resubmit its response to the Motion to Dismiss addressing the

offset claim. Appx929-930. NHC filed a new Opposition to the Government's Motion to Dismiss and Cross-Motion for Summary Judgment. Appx939. The Government filed a Reply and Opposition to NHC's Cross-Motion, Appx1600, and NHC subsequently filed a Reply. Appx1658.

The Government conceded below that that it has no right to offset the $48.8 million Solvency Loan, acknowledging that the only amount at issue is the $17.1 million Start-Up Loan. Appx220; Appx2658.

Following briefing and a May 24, 2021 hearing, Appx2633, the COFC issued a detailed, well-reasoned decision granting NHC summary judgment. Appx1. The COFC held that the Government could not offset because the Loan Agreement subordinated its rights to repayment of the Start-Up Loan to claims payments and basic operating expenses. Appx19-25. The Start-Up Loan was intended to provide financing that qualifies as risk-based capital. Appx26-29. And, if the Government's view of the meaning of "[n]otwithstanding" in § 19.12 is adopted, it would "nullify the subordination agreement contained in Section 3.4[.]" Appx30. The COFC further ruled that the Government could not collaterally attack the NCD's finding that the Government had no right of offset, which the Government failed to appeal. Appx33. Finally, given subsequent developments in the *Conway* case, where the Government refused to pay the judgment citing 31 U.S.C. § 3728 despite this Court's holding that the Government was not entitled to offset, in the interest of judicial and

party economy, the COFC properly ruled that the Government could not relitigate the same offset claim post-judgment under § 3728. Appx42-43.

In a December 30, 2021 Joint Status Report, the parties agreed that the amount of the Judgment against the Government should be $55,504,468.39, which the Court ordered entered in that amount. Appx47-49.

The Government's appeal followed.

## SUMMARY OF THE ARGUMENT

The COFC properly granted summary judgment in favor of NHC for $55,504,468.39. Relying on the Loan Agreement's plain language, the COFC correctly determined that under § 3.4, the Government had contractually agreed to subordinate its right to repayment of both CO-OP Loans (the Solvency and Start-Up Loans) to NHC's liabilities for policyholder claims and basic operating expenses, and agreed that both Loans were "intended to provide financing to [NHC] that meets the definition of 'risk based capital[.]'" Appx20-22. The Government therefore has no right to any repayment unless and until the higher priority liabilities for claims payments and basic operating expenses have been satisfied.

The Government's arguments on § 3.4 go against the Loan Agreement's plain language. Section 3.4 plainly subordinates the Government's right to repayment to claims payments and basic operating expenses, and does not limit this subordination to the time that NHC operates as a CO-OP. Section 3.4 also plainly states that both

the Start-Up and Solvency Loans were intended to qualify as risk-based capital. Having drafted the Agreement, the Government cannot now claim that it does not mean what it says.

The Government's reading of §§ 3.4 and 19.12 deviates from basic contract interpretation principles, which require that a contract be interpreted in a manner that gives meaning to all of its provisions and makes sense. The Loan Agreement abounds in references to State insurance laws, solvency regulations, and the ability of the state insurance department to impose State Solvency Payment Restrictions that prevent repayment, even after the Government terminates the Loan Agreement and it has been determined that the CO-OP will dissolve. The goal of these requirements is to ensure policyholders receive the benefits promised under their policies. If the Government's interpretation is correct, it would vitiate the subordination clause in § 3.4 in insolvency, when it is most needed to protect policyholders, as well as every other provision of the Agreement requiring repayment of the Loans to be consistent with and subject to State requirements governing the solvency of insurance companies, even after a termination. In contrast, the COFC's reading of § 19.12, which only provides the Government a right of offset if it is legally available and appropriate, gives meaning to *all* of the Agreement's provisions, including the amendments to the Agreement.

The COFC's decision is consistent with Federal Common Law and Nevada Law, which only permit offset of mutual obligations. Because of the subordination clause, as well as the Government's status as a mere conduit for the Risk Adjustment and Reinsurance program funds, the premium stabilization program receivables and the Start-Up Loan lack mutuality, and cannot be subject to offset. The COFC's holding is also consistent with NRS 693A.180, which prohibits offset here.

The COFC correctly determined that the State Receivership *process*, as well as substantive law controls. That is particularly true where, as here, the Government voluntarily submitted to that process by filing a proof of claim. No waiver of sovereign immunity was required for the Government to be bound by the outcome of that process.

The COFC also correctly determined that the Government cannot reassert its offset claim post-judgment under 31 U.S.C. § 3728. The COFC properly considered this issue sua sponte by taking judicial notice of the Government's actions in *Conway*, where the Government tried to avoid this Court's decision through a post-judgment offset, forcing the Plaintiff-Appellee (the receiver of one of the other 20 insolvent CO-OPs) to file yet another complaint at the COFC. The COFC correctly held that the Government could not relitigate the same offset claim post-judgment under § 3728. The Government's other objections to this aspect of the COFC's holding lack merit. The Treasury Secretary would not be a party, even if NHC were

forced to file another COFC complaint for wrongful withholding if the Government refused to pay the Judgment under § 3728. And the COFC's holding was not non-monetary relief. It was an integral part of the decision awarding NHC $55,504,468.39 in monetary relief.

## ARGUMENT

### I. The COFC Properly Determined that Offset is Unavailable Because the Government is Not Entitled to Repayment Under the Loan Agreement Until NHC Satisfies its Obligations for Claims Payments and Basic Operating Expenses

After carefully reviewing the relevant contract provisions, the statutes, and regulations governing CO-OP loans, and Nevada's reserve and solvency requirements, the COFC determined that the Government's offset was improper because HHS had expressly agreed that repayment for both the Solvency and Start-up Loans would be subordinate to claims payments and basic expenses. This conclusion is supported by the Agreement's plain language; the intent expressed in the CO-OP Statute, 42 U.S.C. §18042; and its implementing regulations, 45 C.F.R. Part 156.

The Government objects to the COFC's construction of the Loan Agreement, arguing that § 3.4 does not apply, OB 24-28, that the Start-Up Loan was intended to be treated differently than the Solvency Loan, OB22-23, and that § 19.12 gave the Government "absolute right to offset." OB21. As demonstrated below, the Loan Agreement contradicts each of these contentions.

The Government also contends that Nevada law requires the offset at issue. Yet Nevada law only permits offset for mutual obligations. Here, the debts are not mutual because the Government subordinated its right to repayment. Additionally, the Start-Up Loan and the Risk Adjustment and Reinsurance program payments are not mutual obligations because the Government was a mere conduit for those funds, rather than a traditional creditor. Nevada law therefore neither permits nor requires offset.

Because the Government's offset was improper under the Loan Agreement and applicable law, the COFC's judgment should be affirmed.

### A. The COFC Correctly Held that the Loan Agreement's Plain Language Requires Subordination of Government's Interest in Repayment of the Start-Up Loan

The COFC correctly held that the "plain language" of § 3.4 limits the Government's ability to collect the Start-Up Loan through offset. Appx20; *see Agility Pub. Warehousing Co. KSCP v. Mattis*, 852 F.3d 1370, 1380 (Fed. Cir. 2017) ("The interpretation of a contract begins with the language of the written agreement.").

The COFC's holding was based on § 3.4's subordination provision:

> Because the **intent of the Loans**, and the Solvency Loan in particular, is to provide financing to Borrower that meets the definition of "**risk based capital**" for State Insurance Laws purposes, **the Loans** will have a claim on cash flow and reserves of Borrower that is **subordinate to (a) claims payments, (b) Basic Operating Expenses**, and (c)

> maintenance of required reserve funds while Borrower is operating as a CO-OP under State Insurance Laws.

Appx1845 (emphasis added). As the COFC noted, "Loans" (plural) means both the Start-Up and Solvency Loans. Appx20; Appx1842, Loan Agreement § 2.1 (defining Loans (plural) to mean both Loans).

Section 3.4 makes clear that the Government's entitlement to repayment of ***both*** Loans is — and was always intended to be — subordinate to NHC's liabilities for the claims of its insureds and its operating expenses, and that ***both*** the Start-Up and Solvency Loans were intended to be available as "risk-based capital." *See* Appx20-22. The Government does not dispute that NHC cannot satisfy its obligations for claims payments and basic operating expenses. *See* Appx31. Thus, under § 3.4, the Government cannot leapfrog the superior creditors listed therein by collecting the Start-Up Loan through offset.

The Government contends that § 3.4 does not apply here because: (1) § 3.4 does not mention the word default, and therefore cannot apply if an "Event of Default" occurs due to insolvency, *see* OB25-26; and (2) the subordination required under § 3.4 only applies "while [Nevada Health] is operating as a CO-OP under State Insurance Laws." *Id.* at 26 (quoting Appx1845). These arguments are meritless.

**1. Section 3.4 Applies in Events of Default, Including Insolvency**

The absence of the words "default" or "insolvency" from § 3.4 does not mean § 3.4 is inapplicable in insolvency. That § 19.12 uses the word "default" is

irrelevant. Section 19.12 permits the Government to use debt collection techniques to "collect delinquent debts" if such techniques are legally "available" and "appropriate." Appx1876. It does not permit the Government to collect debts that are not currently due and payable. *See Agility Pub. Warehousing Co. K.S.C.P. v. United States*, 969 F.3d 1355, 1364 (Fed. Cir. 2020). Whether NHC has a currently due and payable obligation depends on the Loan Agreement's provisions establishing the parties' substantive rights and obligations, including provisions that do not expressly reference default.

Section 3.4 is one of those provisions. By expressing the intent that both Loans be available as risk-based capital and contractually subordinating the Government's right to repayment to NHC's liabilities for policyholder claims and basic operating expenses, the Government accepted that it could be repaid only for the Start-Up and Solvency Loans *after* NHC had satisfied its obligations to those superior creditors. NHC cannot satisfy these obligations because it is insolvent. Since the Government has no right to collect either of the Loans, offset is neither available nor appropriate.

The Government's citations to other Loan Agreement provisions that mention "default" (§§ 15.1, 15.2, 15.3, 19.8) do not support its position. *See* OB25. Section 19.8 is a standard "No Waiver" clause conveying that the Government's delay or failure to exercise any right upon an "Event of Default" is not a waiver of the

"Default." Appx1875. It does not create any substantive rights or obligations regarding repayment of the Loans. Section 15.1 defines events of default, and § 15.2 prescribes notification requirements upon an "Event of Default." *See* Appx1867-1868. There is no reason that these provisions would need to reference § 3.4 for the subordination clause to remain effective after NHC became insolvent.

The Government also cites to § 15.3, which defines the "Rights and Remedies of Lender" in an "Event of Default." That section states that "Borrower must further **comply with all State Insurance Laws** relevant to its termination from the CO-OP Program at its sole cost and expense, and shall not be entitled to use any **Loan Funds** or proceeds for such purposes **unless and only to the extent that such use is mandated by a State Solvency Payment Restriction**." Appx1869 (emphasis added). Section 2.1 defines "State Solvency Payment Restriction" as "State Insurance Law provision **or regulatory action by a state insurance agency or department** that enforcement or implementation of which creates an actual legal impediment or restriction on repayment of **Loan funds** pursuant to the terms of this Agreement." Appx1844 (emphasis added); *see also* Appx1842 (defining "Loan Funds" or "Funds" to mean disbursements for both Loans). Since § 15.3 contemplates that, in an event of default, repayment could be completely prevented by regulatory action of a state insurance department, nothing in this provision conflicts with applying § 3.4's subordination clause in an event of default. *See also*

Appx1869, Loan Agreement § 15.3(c) (in the event of default, the Government may declare that "Borrower must immediately repay any unused **Loan Funds** to Lender **following the resolution of any outstanding debts and run out of outstanding claim obligations**, consistent with State insurance Laws.") (emphasis added).

The Government's argument that § 3.4 does not apply in events of default ignores that HHS also relied on § 16.2 ("Termination for Program Viability Reasons") when it terminated the Loan Agreement. *See* Appx2081. That section provides that "[i]f Borrower intends to dissolve, all Principal and Interest must be repaid prior to dissolution consistent with applicable Federal requirements and State Insurance Laws, **unless** and only to the extent that **such payment is otherwise prevented**, restricted or delayed **by a State Solvency Payment Restriction**."[5] Appx1871 (emphasis added).

Here, there are several "State Solvency Payment Restrictions" preventing NHC from repaying both Loans. First, the claims process put in place under Nevada's insurance insolvency — NRS Chapter 696B — limits how claims may be made and paid. Appx2017; Appx2063; Appx2067; Appx2098-2099. Second, NRS 693A.180 limits repayment of unsecured loans and precludes offset based on such loans. S*ee* Appx2048-2049. Furthermore, NRS 696B.440 limits offset to mutual

[5] This language also applies to a "Termination for Cause by Lender," Appx1872 (second subsection (f) within § 16.3), which did not occur here.

debts and credits. As a result of these State Solvency Payment Restrictions, NHC can only repay the Start-Up Loan from surplus, if any, after it satisfies its other obligations.

The Government's agreement that repayment of both Loans could be prevented, restricted, or delayed as a result of a "State Insurance Law provision or regulatory action by a State insurance agency or department," Appx1844, if the Government terminated the Loan Agreement for program viability reasons or default, Appx1871 (§ 16.2), Appx1869 (§ 15.3), shows that the Government intended repayment of the Loans to have a lower priority than other liabilities of the CO-OP in the event of insolvency. This reinforces the COFC's conclusion that § 3.4's subordination of the Government's right to repayment of both Loans to NHC's liabilities for claims payments and basic operating expenses remains "alive, well, and operative" despite NHC's insolvency. Appx25 (footnote omitted).

### 2. The Start-Up Loan's Subordination to NHC's Liabilities for Claims Payments and Basic Operating Expenses Remained Effective After NHC Ceased Operating as a CO-OP

As explained above, § 3.4 provides that "the Loans will have a claim on cash flow and reserves that is subordinate to (a) claims payments, (b) Basic Operating Expenses, and (c) maintenance of required reserves while Borrower is operating as a CO-OP under State Insurance Laws." Appx1845. The Government contends that the limiting clause "while Borrower is operating as a CO-OP under State Insurance

Law" in § 3.4(c) also applies to §§ 3.4(a) and 3.4(b), and that the subordination clause no longer applied to "claims payments" and "Basic Operating Expenses" once NHC ceased operating as a CO-OP. OB26-27. But there is no comma before the qualifying phrase "while Borrower is operating as a CO-OP under State Insurance Laws." Thus, the limiting clause "while Borrower is operating as a CO-OP" only modifies "maintenance of required reserves," not "claims payments" or "Basic Operating Expenses." *See Energy E. Corp. v. United States*, 645 F.3d 1358, 1361 (Fed. Cir. 2011); *In re NXXI Inc.*, 216 F. Supp. 3d 381, 392-93 (S.D.N.Y. 2016) (rule of the last antecedent "carries particular force where there is no comma after the last of the series and before the qualifying phrase."); Appx25 (collecting cases applying rule of the last antecedent to contract interpretation).

State insurance laws require operating insurers to maintain minimum reserves to ensure that they have sufficient funds to pay policyholder claims. *See also* Appx1844, Loan Agreement § 2.1 (defining "State Reserve Requirements" and "Risk-Based Capital Reserves"). An insolvent insurer, by definition, does not have the minimum reserves required to operate. *See* NRS 696B.110 (defining insolvency). But it can have unpaid policyholder claims and basic operating expenses. Adopting the Government's reading of § 3.4 would negate the subordination clause in the event of insolvency, when the CO-OP lacks sufficient reserves to cover its policyholder claims and subordination of the Government's

right to payment is most needed to protect policyholder interests. That would improperly render § 3.4's terms superfluous. *See Langkamp v. United States*, 943 F.3d 1346, 1353 (Fed. Cir. 2019) ; *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004).

The Government contends that interpreting the limiting clause "while Borrower is operating as a CO-OP" as applying to claims payments and basic operating expenses is correct because "cash flow and reserves" are "attributes of an operating insurance company, not the attributes of an entity in liquidation." OB27. The Government did not argue that insurance companies in liquidation have no "cash flow and reserves" before the COFC, and has therefore waived this argument. *See Rentrop v. Spectranetics Corp.*, 550 F.3d 1112, 1117 (Fed. Cir. 2008). If considered, this argument makes no sense. The Government withheld funds from the premium stabilization program receivables due to NHC, thereby reducing the amount of cash flowing into the receivership estate and reducing the cash available to pay claims that NHC's policy reserves were intended to cover. An insurer's "required reserves" exist to ensure that, in the event of financial distress, the claims and operating expenses can be paid *from those reserves.* Offsetting the Start-Up Loan against the premium stabilization program receivables reduces the reserves available to pay priority claims. Offsetting the Start-Up Loan against the premium stabilization program receivables is therefore a claim on NHC's cash flow and reserves.

The Government also failed to cite any authority to support this new assertion. Insurance companies in liquidation have cash flow. *See, e.g.*, Nat'l Ass'n of Ins. Comm'rs, *Receiver's Handbook for Insurance Company Insolvencies*, at 29 (April 2021), https://content.naic.org/sites/default/files/publication-rec-bu-receivers-handbook-insolvencies.pdf ("NAIC Receiver's Handbook") ("[C]ash flow and budget information will be essential for the day-to-day operations of the receivership."); *id.* at 158. Additionally, liquidation involves the run out and payment of claims that minimum required reserves for operating insurers are intended to cover. While insolvent insurers do not have minimum required reserves *to operate*, insurers in receivership still have reserves. *See id.* at 251 (for receivership proceeding to liquidate insolvent insurer, "[e]stablishing appropriate reserves is an integral part of the process."); *id.* at 281.

Since creditor priority is relevant only when the debtor has insufficient funds to pay all of its creditors, it is implausible the Loan Agreement's subordination clause would not apply in insolvency. *See Sec. Pac. Nat'l Bank v. RTC*, 63 F.3d 900, 904 (9th Cir. 1995) ("[T]he protection afforded by regulatory capital would be severely undermined if, at the time when the protection was most sorely needed, claims of general creditors or depositors were made contingent upon the lower priority claims of subordinated debt and equity interests.") (internal quotation and citations omitted).

At the COFC oral argument, the Government argued that "State Solvency Payment Restrictions" only apply while the CO-OP is operating. *See* Appx2058. Yet the very section cited by the Government for its termination of the loan, §16.2, makes clear that the subordination clause continues to apply after operations have ceased. Section 16.2 only applies if the Government determines that the CO-OP is not going to be "viable and sustainable." *See* Appx1870. When § 16.2 is invoked, the borrower must "**[i]mmediately cease its operations under the CO-OP Program** and thereafter comply with all applicable Federal requirements and State Insurance Laws relevant to its termination from the CO-OP Program." Appx1871 (emphasis added). Despite *requiring* a cessation of operations, § 16.2 provides that the Borrower need not repay the outstanding principal and interest due on the Loans if such repayment is "prevented, restricted, or delayed by a State Solvency Payment Restriction." *Id.* Thus, the subordination continues to apply regardless of insolvency or cessation of operations.

### B. The Loan Agreement's Terms Refute the Government's Contention that the Loans Were Intended to be Treated Differently

The Government contends that only the Solvency Loan cannot be subject to offset. It bases this argument on the Second Amendment to the Loan Agreement, OB9, which replaced the original promissory note for the Solvency Loan with another note which subordinates the Government's right to repayment for the

Solvency Loan to "all other classes of creditors other than surplus note holders." Appx1922.

The COFC correctly held that the Second Amendment did not impact the plain meaning of the Loan Agreement's original terms as applied to the Start-Up Loan. *See* Appx26. The Amendment did not modify § 3.4's statement that the "Loans" (defined to include both the Start-Up and Solvency Loans), Appx1842, were intended to be risk-based capital, and that both Loans had a claim on NHC's cash flow and reserves subordinate to NHC's liabilities for policyholder claims and basic operating expenses. Appx1845. In fact, the amended Solvency Loan Promissory Note expressly incorporated § 3.4 by reference. Appx1922. That the Second Amendment subordinated the Government's right to repayment under the Solvency Loan to more classes of creditors did not change the fact that repayment of the Start-Up Loan is subordinate to NHC's liabilities for claims payments and basic operating expenses.

The Second Amendment also did not amend other Loan Agreement provisions conveying that the Loans were intended to be treated the same, and that repayments of both Loans are subject to State Reserve Requirements and solvency regulations. Specifically, the Second Amendment did not amend: (i) § 4.4's provision that NHC's obligation to repay the Start-Up Loan is "subject to its ability to meet State Reserve Requirements and other solvency regulations," Appx67; (ii) §

3.1's statement that the Loans "shall be on a par with the other for security purposes," Appx1845; or (iii) the provisions of §§ 16.2 and 15.3 requiring that, in a termination, repayment of the Loans must comply with State Insurance Laws, and allowing repayment to be prevented by State Solvency Payment Restrictions. Appx87; Appx1871. On the contrary, the Second Amendment "ratified, endorsed, and reaffirmed" these terms and § 3.4 because they were not "expressly modified." Appx1918.

As the COFC observed, the Government wrote the Agreement. *See* Appx31n.30. The Government is a knowledgeable and sophisticated party that knows how to write a contract. If it intended to treat the Solvency and Start-Up Loans differently, it could have addressed them in separate loan agreements. Even within the same agreement, the Government still had the opportunity to treat the Loans differently. Had it intended to do so, it would not have treated the Loans (plural) together in § 3.4. Appx1845. It would not have included § 3.1's statement that the Loans "shall be on a par with the other for security purposes." *Id.* And it would not have included provisions signifying that repayment of both Loans could be prevented, restricted, or delayed by State Solvency Payment Restrictions. Having included all of these terms in the Loan Agreement and applied them to both Loans, it cannot now avoid their plain meaning.

### C. The COFC's Interpretation Did Not Render § 19.12 Meaningless

Applying § 3.4 after NHC became insolvent did not render § 19.12 meaningless. The Government asserts that the COFC's decision that offset could still be available and appropriate if § 3.4 applies in insolvency rests on the "improbable scenario" that an "Event of Default" could occur where the CO-OP is not in liquidation and has sufficient surplus in excess of its obligations for claims payments and basic operating expenses to repay the Loans. OB28. There are 12 categories of "Events of Default" in § 15.1, and only one involves insolvency and liquidation. Appx1867-1868. A CO-OP could be in default under the Loan Agreement under one of the other 11 categories (*e.g.*, nonpayment *not caused* by a State Solvency Payment Restriction, misrepresentations, noncompliance with the CO-OP Program, failure to pay taxes, and unauthorized organization changes) without being insolvent or in liquidation. If such an event of default occurred, offset under § 19.12 may be both available and appropriate if the CO-OP has sufficient funds to satisfy its obligations for claims payments and basic operating expenses first.

If the Government's interpretation were correct, it would be in a better position as a result of an event of default arising from insolvency than it would be if there were an event of default unrelated to insolvency. That cannot be the case. *See 344 Individuals v. Giddens (In re Lehman Bros. Holdings)*, 792 F. App'x 16, 19 (2d

Cir. 2019) (even if breach occurred, subordinated claims would not be transformed into unsubordinated claims).

The inclusion of "[n]otwithstanding" in § 19.12 did not give the Government an "absolute right to offset" once NHC became insolvent. OB21. Section 19.12 does not say that offset will always be available upon an "Event of Default." It states that the Government will have "the full range of *available* rights, remedies and techniques to collect delinquent debts, … as *appropriate*, including … administrative offset[.]" Appx1876 (emphasis added). To invoke offset under § 19.12, it has to be both "available" and "appropriate". Under the Loan Agreement, the Government has no right to collect the Start-Up Loan because it agreed to subordinate its right to repayment to NHC's liabilities for claims payments and basic operating expenses, which NHC cannot satisfy, and agreed that the Start-Up Loan was intended to provide financing that qualifies as risk-based capital. The Start-Up Loan therefore is not currently due and payable, and offset is neither available nor appropriate.

The Loan Agreement includes many references to State Insurance Laws and solvency regulations, as well as the ability of State insurance regulators to prevent repayment based on a State Solvency Payment Restriction. These are all intended to protect the interests of policyholders, above all else. *See U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 505-06 (1993) (State law, including law "that distributes the

insolvent insurer's assets to policyholders in preference to other creditors," is "enacted 'for the purpose of regulating the business of insurance' to the extent that it serves to ensure that, if possible, policyholders ultimately will receive payment on their claims." (quoting the McCarran-Ferguson Act, 15 U.S.C. § 1012(b)). As the Federal Circuit stated in *Conway*, "[p]rioritizing policyholder-creditors" over other creditors supports the "policy goal" of "promoting the claims of insured individuals above other debts" because it "increases the likelihood individuals will receive payment on their claims." 997 F.3d at 1210. A policy of promoting the claims of insureds over other creditors is "consistent with the ACA's policy goals" of expanding coverage in the individual health insurance market. *Id.* (citing *King v. Burwell*, 576 U.S. 473, 478-79 (2015)); *see also Maine Cmty. Health*, 140 S. Ct. at 1310 (2020) (ACA "expanded healthcare coverage to many who did not have or could not afford it."). Permitting the Government to read "[n]otwithstanding" in a manner that undermines the Loan Agreement's clear intent to protect the interests of policyholders over the Federal Government, consistent with State Insurance Laws, solvency regulations, and appropriate regulatory actions by the Nevada Division of Insurance ("DOI"), would render the rest of the Loan Agreement meaningless.[6] *See*

[6] The COFC correctly held that, because of § 3.4's unambiguous subordination provision, the Start-Up Loan is not a "currently payable debt," and that offset is therefore not "available 'under law,'" as required for the Government to invoke offset under § 19.12. Appx30 (quoting 45 C.F.R. § 156.520(d)). Because § 19.12

*Hercules Inc. v. United States*, 292 F.3d 1378, 1381 (Fed. Cir. 2002) ("The contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract."). As a result, the Government's interpretation of § 19.12 is not, and cannot be, correct.

Accepting the Government's interpretation of § 19.12 would read § 3.4's subordination provision completely out of the Loan Agreement. *See* Appx30. The reverse is not true. The COFC therefore properly interpreted the Loan Agreement in a manner that makes sense and gives meaning to ***all*** of its provisions. *See id.*

### D. The Loan Agreement Drafted by the Government Reflects the Congressional Intent that the Loans be Subject to Nevada's Insurance Regulations

Congress dictated that regulations on repayment of both Start-Up and Solvency Loans must be "consistent with State solvency regulations and other similar State laws that may apply." 42 U.S.C. § 18042(b)(3). HHS' implementing

---

only permits offset if it is legally available and appropriate, the word "[n]otwithstanding" does not override § 3.4's plain language subordinating the Government's right to repayment of both Loans to claims payments and basic operating expenses, or the many other provisions in the Loan Agreement specifying that repayment of the Loans would have a lower priority than other NHC obligations. Thus, there is no ambiguity. But the COFC correctly held that, to the extent there is any ambiguity, it should be construed against the Government as the Loan Agreement's drafter. *See* Appx31n.30; *Turner Constr. Co. v. United States*, 367 F.3d 1319, 1321 (Fed. Cir. 2004). The COFC raised the potential application of the rule of *contra proferentem* only after carefully examining the agreement as a whole and evaluating the impact of the Second Amendment on the application of the original Loan terms to the Start-Up Loan.

regulations likewise provide that loan recipients' obligation to repay the loans is "[s]ubject to their ability to meet State reserve requirements, solvency regulations, or requisite surplus note arrangements[.]" 45 C.F.R. § 156.520(b). In *Conway*, the Federal Circuit observed that the CO-OP "loan documents recognize Congress' intent" to "preserve[] state insolvency law for repayment of CO-OP program loans" by "subordinating 'any HHS claim for repayment of the [CO-OP] loan amounts ... to the claims of policyholders and other claimants.'" 997 F.3d at 1212-13 (citation omitted).

**1. The Agreement Aligns with the Nevada Priority Statute**

The COFC correctly held that § 3.4 reflects Nevada insolvency law, specifically the Nevada Priority Statute, *see* Appx23, which "prioritizes '[a]dministration costs and expenses' and then '[a]ll claims under policies' over 'claims of the Federal Government,' the latter of which are generally fourth in line. NRS 696B.420(1)(a)–(d)." *Id.* Section 3.4 similarly prioritizes policyholder claims and basic operating expenses over repayment of the Loans to the Government. This accords with the Priority Statute's goal of protecting policyholders, as well as case law holding that state priority schemes for insurer liquidation may "afford priority, over claims of the United States, to the insurance claims of policyholders and to the costs and expenses of administering the liquidation" because doing so is necessary to protect policyholders. *Fabe*, 508 U.S. at 493. The COFC correctly held that the

similarity between the Nevada Priority Statute (which only applies in insolvency) and § 3.4 reveals that the parties intended § 3.4 to apply during insolvency. *See* Appx23&n.23.

The Government's contention that the COFC failed to "explain how the Nevada Priority Statute is inconsistent with HHS's exercise of its offset rights" is incorrect. OB16 (quoting Appx23n.23). The COFC held that while Nevada's Offset Statute (NRS 696B.440) ordinarily creates an exception to the Priority Statute by permitting offset of mutual debts, because the Government agreed that its right to payment was "subordinate to" claims payments and basic operating expenses, it cannot leapfrog those classes of creditors via offset. *See* Appx23&n.23; *see also* Appx41 ("[A] creditor is permitted to relinquish its priority via a subordination agreement and, thus, the parties may contract around statutory priority schemes. Therefore, even if the Nevada Offset Statute is viewed as an exception to the Nevada Priority Statute, the former cannot displace the government's contractual agreement in Section 3.4[.]").

/ / /

### 2. The Agreement is Consistent with NRS 693A.180, Which Precludes Offset

The Agreement drafted by the Government is also consistent with NRS 693A.180,[7] which governs "[b]orrowing" by Nevada insurers, including Health Maintenance Organizations ("HMO") like NHC.[8] Under NRS 693A.180, an unsecured loan made to an insurer outside the ordinary course of business is payable only from surplus and cannot be "the basis of any setoff" or be repaid without the approval of the Nevada Insurance Commissioner. The requirements of NRS 693A.180 are intended to protect policyholders by ensuring that insurers comply with State solvency regulations. *See* Appx1691.

Loans subject to NRS 693A.180 must: (1) be made "without pledge of assets" by the insurer; (2) be used only to "defray expenses of [the insurer's] organization, provide surplus funds or for any purpose of the insurer's business"; (3) include a maximum annual interest rate of 6%; (4) be "subject to the [Nevada Insurance]

---

[7] The COFC determined that it was unnecessary to evaluate whether NRS 693A.180 applies because under the Loan Agreement, the parties contractually agreed to limit the Government's right of offset. Appx31-32. NHC's arguments concerning § 693A.180 were fully briefed before the COFC, and present an alternative ground for affirming the judgment.

[8] NHC was subject to the requirements of NRS 693A.180 under NRS 695C.145(2)(b) ("A health maintenance organization is subject to the requirements for insurers for …(b) Borrowing, pursuant to NRS 693A.180."); *see also* Appx1693n.7.

Commissioner's approval"; and (5) include "a written agreement" that loan repayment will be made only out of an "insurer's surplus in excess of the amount thereof stipulated in the agreement."

The Start-Up Loan satisfies all of these conditions. First, the Start-Up Loan was made without the pledge of NHC's assets — the Loan Agreement does not refer to any security for the Loans (other than § 3.4, entitled "Security for the Loans," which confirms that the Loans are intended to be risk-based capital and subordinates the Government's right to repayment). Second, the permitted uses of the Start-Up Loan's proceeds included expenses to establish the CO-OP and other specified initial operating expenses (in other words, defraying the expenses of its organization). Appx1845-1846, Loan Agreement §§ 3.2, 3.5. Third, the Start-Up Loan had a maximum interest rate of 0.71% (only in the event of default). Appx1906 (Loan Agreement Appendix 6).

Fourth, the Start-Up Loan was approved by the Nevada Commissioner of Insurance. *See* Appx1692; Appx1695-1697 (Decl. of Nevada Commissioner of Insurance, ¶¶ 8, 14-16); Appx2151-2236 (submission of Loan Agreement to Nevada DOI). On January 2, 2013, NHC received approval from the Nevada DOI for its Certificate of Authority, which included approval of the Loans as part of the application process for authority to operate as an insurer in Nevada. Appx2238. Additionally, the Loan Agreement was deemed approved because the Commissioner

did not disapprove of the loan within 15 days of its November 28, 2012 submission. Appx2151. *See* NRS 693A.180(3) ("The loan and agreement shall be deemed approved unless within 15 days after the date of such filing the insurer is notified of the Commissioner's disapproval and the reasons therefor.").

Finally, the Loan Agreement included "a written agreement" that repayment of the Loans would be made only out of an "insurer's surplus."[9] Appx1692-1693; Appx1697 (Commissioner Decl. ¶¶ 9, 17) (confirming that the Start-Up and Solvency Loans are subject to NRS 693A.180). Section 3.4 states that both CO-OP Loans were intended to provide financing that qualifies as risk-based capital under State Insurance Laws, and that repayment of the Start-Up Loan would be made only from the excess of NHC's "cash flow and reserves" not needed to pay for policyholder claims and basic operating expenses. Appx1845. Surplus, by definition, is the excess of "cash and reserves" beyond what is needed to pay policyholder claims and basic operating expenses. *See* Appx974n.13 (citing dictionary definition of surplus). Thus, the Loan Agreement expressly provided that both Loans would be repaid only out of NHC's surplus.

At the COFC, the Government argued that borrowed funds can be considered capital only if "the funds [are] carried as an asset on the insurer's books." Appx238.

[9] Section 693A.180 does not require that covered loans be described as surplus notes.

But NRS 693A.180 contains no such requirement; it merely states that such borrowings "shall not form a part of the insurer's legal liabilities **except as to its surplus**[.]" NRS 693A.180(2) (emphasis added). The Government's argument fundamentally misunderstands the nature of surplus (which is reported on an insurer's financial statements on the schedule of liabilities, capital, and surplus, not on the schedule of assets). *See* Appx1977-1978 (NHC 2015 Q2 Financial Statement).

NHC's financial statements reported the Start-Up Loan consistent with the requirements of NRS 693A.180. NHC originally accounted for the Start-Up Loan as a subordinated liability, with the restrictions on repayment noted in the footnotes to its financial statements. Appx1943 (NHC's 2013 and 2014 Audited Financial Statements, Note 4); NRS 693A.180 ¶ 2 ("[F]inancial statements filed or published by the insurer shall show as a footnote thereto the amount thereof then unpaid together with any interest thereon accrued but unpaid."). And the Nevada DOI granted NHC's request for permission to treat the Start-Up Loan as surplus, rather than a liability on the schedule of liabilities, capital, and surplus in NHC's most recent quarterly financial statements (for the period ending June 30, 2015). Appx2048-2049. Thereafter, NHC provided HHS with a copy of this quarterly financial statement, which reflected the permitted practice and explained the change in treatment. *See* Appx1971; Appx1985; Appx1987; Appx1989 (correspondence

between NHC and Government attaching Q2 2015 Financial Statement). That the Commissioner approved the permitted practice proves that the Start-Up Loan meets the requirements of NRS 693A.180, as it is presumed that public officials perform their duties appropriately. *See Sickels v. Shinseki*, 643 F.3d 1362, 1366 (Fed. Cir. 2011) ("The presumption of regularity provides that, in the absence of clear evidence to the contrary, the court will presume that public officers have properly discharged their official duties.").

HHS needed to comply with state solvency law in setting repayment terms for the CO-OP loans. *See Conway*, 997 F.3d at 1202. Section 693A.180 is a state solvency law — the restrictions on offset and repayment are intended to protect policyholders by ensuring that insurers have the minimum required reserves to operate. *See* Appx1691. Since the Start-Up Loan is subject to NRS 693A.180, it cannot be "the basis of any setoff" or be repaid without the approval of the Commissioner, who has not approved repayment of the Loan. *See* Appx1693 (Commissioner Decl. ¶ 10). Thus, under Nevada law, the Government is not entitled to repayment of the Start-Up Loan, and cannot offset it against the amounts due to NHC.

/ / /

### E. Offset is Unavailable Under Federal Common Law Because the Government Subordinated Its Right to Repayment to Claims Payments and Basic Operating Expenses

The Government's common law right of offset is not special — it has no more right to offset under common law than private parties. *Conway*, 997 F.3d at 1214 ("[T]he Supreme Court has never suggested the government has a common-law right to offset broader than that of an ordinary creditor. Instead, 'the government has *the same right* which belongs to every creditor' to offset." (quoting *United States v. Munsey Trust Co.*, 332 U.S. 234, 239 (1947) (emphasis in original)). Like a private party, the Government can agree that its right to receive payments on a loan is subordinate to other creditors. That is what the Government did here. By making ***both*** Loans available as risk-based capital and subordinating its right to repayment to claims payments and basic operating expenses, the Government agreed that it would not receive payment unless NHC had sufficient surplus to satisfy those obligations. *See, e.g., Minority Equity Cap. Co. v. Jackson*, 798 F. Supp. 200, 202 (S.D.N.Y. 1992) ("The purpose of a subordination agreement is [to] set out the relative positions of lenders in respect to their right to receive payments from the borrower."); *Bank of Am., N.A. v. Fed. Deposit Ins. Corp.*, 962 F. Supp. 2d 165, 173 (D.D.C. 2013) (declining to allow setoff of subordinated claims or the subordinated creditor to jump the line in front of superior creditors); *Placida Prof'l Ctr., LLC v. FDIC*, 512 F. App'x 938, 951 (11th Cir. 2013) (lower priority claims cannot be used

as setoff); Appx20-21 (discussing meaning of subordinate and subordination agreements). That agreement remained enforceable, even when NHC became insolvent. The general common law right of offset therefore does not support the Government's position.

### F. Offset Was Not Permitted Because There Was No Mutuality Between the Start-Up Loan and the ACA Receivables

Under both the Nevada Offset Statute and federal common law, offset is only permitted among ***mutual*** obligations. *See* NRS 696B.440; *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995) ("right of setoff (also called 'offset') allows entities that owe each other money to apply their ***mutual*** debts against each other" (emphasis added)). To be considered "mutual," and therefore subject to offset, debts must be "between the same parties, due in the same capacity or right, and there must be mutuality as to the quality of right." *Transit Casualty Company v. Selective Ins. Co.*, 137 F.3d 540, 545 (8th Cir. 1998).

#### 1. Obligations Subordinated by Contract Are Not Mutual and Cannot Be Setoff

A subordinated obligation does not exist in the same right as an unsubordinated one. *See Northwest Racquet Swim & Health Clubs, Inc. v. RTC,* 927 F.2d 355, 363 n.20 (8th Cir. 1991) ("Subordinated debentures do not exist in the same right as promissory notes"); *FDIC v. Bank of America National Trust Savings Association*, 701 F.2d 831, 836 (9th Cir. 1983) (creditor not entitled to setoff against

the FDIC when its claim was subordinated to the rights of depositors); *FDIC v. de Jesus Velez*, 678 F.2d 371, 376 (1st Cir. 1982) (subordinated debentures in insolvent bank not mutually extinguishable with promissory notes). Here, the Start-Up Loan is contractually subordinated to NHC's liabilities for policyholder claims and basic operating expenses. *See* Loan Agreement § 3.4. In contrast, the Government's debts to NHC under the premium stabilization programs are not subordinated. The Start-Up Loan and the premium stabilization program receivables therefore do not exist in the same right and cannot not be offset against each other.

Moreover, a "creditor's right to setoff is not absolute … Setoff will not be permitted when it would be inequitable or contrary to public policy to do so." *Bank of America*, 701 F.2d at 836-837. When issues of setoff arise in industries in which capital requirements are regulated, such as banking or insurance, subordinated debt cannot be the basis of setoff. *See Adams v. RTC*, 927 F.2d 348, 354 n.14 (8th Cir. 1991) (debt reported to satisfy regulatory capital requirements cannot be setoff unless unsubordinated debt is repaid). Allowing the Government to leapfrog its claim for payment of the Start-Up Loan ahead of policyholder claims would go against the intent of the ACA and applicable Nevada solvency laws. *E.g, Conway*, 997 F.3d at 1210.

### 2. The Government's Offset Was Improper Because the Start-Up Loan and the Reinsurance and Risk Adjustment Receivables Are Not Mutual Obligations[10]

The Government took offsets of $4,592,187.03 against receivables due to NHC under the Reinsurance Program and $4,759,869.76 due to NHC under the Risk Adjustment Program. Appx1710. These offsets were impermissible as there is no mutuality between the Start-Up Loan and the Risk Adjustment and Reinsurance Program receivables due to NHC because the Government is not acting in the same capacity as to the Start-Up Loan, on the one hand, and the Risk Adjustment and Reinsurance Programs, on the other.

The Government is seeking repayment of the Start-Up Loan in its capacity as a traditional creditor. But for the Reinsurance and the Risk Adjustment Programs, the Government serves only as a conduit for the collection and redistribution of two distinct pools of money that it collects from different groups of insurers. Both programs are budget-neutral — neither one is supported with taxpayer or general Treasury funds. The Government's obligation to pay the funds was not as a debtor repaying a contractual debt, but as an administrator collecting and distributing funds paid into the pool by participants. *See New Mexico Health Connections v. United States Dep't of Health & Human Servs.*, 946 F.3d 1138, 1164 (10th Cir. 2019) ("Risk

[10] The COFC did not address this aspect of NHC's argument, but it was fully briefed before the COFC. Appx979-982; Appx1675-1679.

adjustment payments would be fully funded by the charges that are collected from plans with lower risk enrollees (that is, transfers within a [s]tate would net to zero).” (quoting Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2014, 77 Fed. Reg. 73,118, 73,139 (Dec. 7, 2012)); Namrata K. Uberoi & Edward C. Liu, Cong. Rsch. Serv., R44690, *The Patient Protection and Affordable Care Act's (ACA's) Transitional Reinsurance Program*, at 5-6 (2017).

For these Programs, the Government's role was ministerial and more like a trustee than a creditor. When the liability of the party claiming the right of offset is in the nature of a trust, there is no mutuality of obligation. *See In re Mastroeni*, 57 B.R. 191, 193 (Bankr. S.D.N.Y. 1986) (debtor's IRA account could not be set off against debt). The identity of the party or parties whose money is being handled, and not the identity of the administrator handling the money, determines mutuality. *See In re Art Metal U.S.A., Inc.*, 109 B.R. 74, 78, 83 (Bankr. D.N.J. 1989) (agency not entitled to offset amounts it owed to plaintiff against amounts owed by plaintiff to different agency because the amounts held were not taxpayer funds, but rather administered separately from taxpayer funds); *see also Doe v. United States*, 58 F.3d 494, 498 (9th Cir. 1995) (United States does not claim that mutuality applies to the FDIC when it acts as receiver). While the Government was the operator or administrator entrusted with the collection and redistribution of non-governmental money for the participants in the Reinsurance and Risk Adjustment Programs, it was

not acting in the same capacity as to those funds as it was as to the CO-OP Loans, which were funded through federal appropriations. *See* 76 Fed. Reg. at 77,407.[11] As a result, the amounts due to NHC under those programs and the Start-Up Loan are not mutual obligations, and the Government has no right to offset those amounts against the Start-Up Loan.

## II. The Government is Bound by the Outcome of its Voluntary Participation in the Receivership Claims and Appeals Procedure

This Court held in *Conway* that the ACA does not preempt state insurance laws governing the solvency (or insolvency) of insurers. 997 F.3d at 1207-08, 1211-12. The COFC properly read this holding to encompass State's liquidation process. *See* Appx33. As the COFC observed, "[f]or a state's insolvency law to function properly, it is axiomatic that the state liquidation process must be permitted to proceed such that all creditors, including the government, are subject to it." Appx35.

"Congress has recognized the benefits of state regulation of insurance" in the McCarran-Ferguson Act, which states that "the continued regulation and taxation by the several States of the business of insurance is in the public interest." *Conway*,

[11] In another proceeding, the Government admitted that the risk adjustment program is budget neutral. Before Judge Damich, the Government argued that the risk adjustment program is budget neutral and "therefore does not require the states or HHS to expend additional resources beyond what it collects from insurers in risk adjustment charges." *See Blue Cross and Blue Shield of Nebraska v. United States*, No. 18-491C, ECF Doc. 25 at 8-9 filed September 14, 2020.

997 F.3d at 1208 (quoting 15 U.S.C. § 1011) (internal quotes omitted). Laws related to the liquidation of insurers regulate the business of insurance, and therefore have been left to the states. *See Fabe*, 508 U.S. at 505-06 ("The primary purpose of a statute that distributes the insolvent insurer's assets to policyholders in preference to other creditors is identical to the primary purpose of the insurance company itself: the payment of claims made against policies."). That is why insurers are exempt from federal bankruptcy laws. *See In re Cash Currency Exch., Inc.*, 762 F.2d 542, 556 (7th Cir. 1985) ("Insurance companies are among those entities precluded from being debtors under the [Bankruptcy] Code because Congress has determined not to interfere with the state's comprehensive liquidation scheme."); *see* NRS 696B.190; NAIC Receiver's Handbook, at iii ("Insurer insolvency proceedings are conducted in state courts because insurance companies are specifically exempted from the provisions of the federal Bankruptcy Code (See, 11 U.S.C. § 109(b)).").

The orderly liquidation and distribution of an insolvent insurer's assets requires that the entire liquidation process be consolidated in a single forum. *See Levy v. Lewis*, 635 F.2d 960, 964 (2d Cir. 1980) ("The experience of our own federal bankruptcy courts evidences the importance of consolidating all of the assets of an insolvent company and gathering all those who have claims against those assets in a single forum."). Allowing the Government to ignore the outcome of the liquidation process in which it voluntarily participated undermines the goals of state liquidation

proceedings, and goes against the McCarran-Ferguson Act's intent. *See Fabe*, 508 U.S. at 505-06; *Munich American Reinsurance*, 141 F.3d 585, 596 (5th Cir. 1998); *Clark v. Fitzgibbons*, 105 F.3d 1049, 1051 (5th Cir. 1997) (allowing creditor to proceed against insolvent insurer in federal court "would 'usurp [the state's] control over the liquidation proceeding by allowing [claimant] to preempt others in the distribution of [insurance company's] assets.'" (quoting *Barnhardt Marine Ins., Inc. v. New England Int'l Sur. of America, Inc.*, 961 F.2d 529, 532 (5th Cir. 1992) (alterations in internal quote in original)).

The Government has acknowledged state court jurisdiction over its claims against insolvent insurers by asserting claims in state liquidation proceedings. *See, e.g., Fabe*, 508 U.S. at 494-95 ("The United States … filed claims in excess of $10.7 million in the state liquidation proceedings."); *Health Republic Ins. Co. v. United States*, No. 16-cv-259C, 2022 U.S. Claims LEXIS 1789, at *48 (Fed. Cl. Aug. 19, 2022) (federal government filed proof of claim in state insurance liquidation proceedings). The Government is also aware of the cost of failing to pursue remedies in the Receivership Court. *In re Ambac Assurance Corp.*, 339 Wis. 2d 48, 52, 810 N.W.2d 450, 452 (2012) (federal government's failure to object to an adverse order in the receivership proceedings waived right to review).

Here, the Government apparently contends that every time it has filed a proof of claim in a state liquidation proceeding, the official who did so acted outside of his

or her authority. *See* OB37 ("The Supreme Court has for decades made clear that … the actions of an executive official cannot waive sovereign immunity."). But the Supreme Court long ago stated that "the United States may participate as a creditor in a state rehabilitation proceeding without raising sovereign immunity concerns." *United States v. Bank of New York Trust Co.,* 296 U.S. 463, 480-81 (1936). No waiver of sovereign immunity is required for the Government to be bound by the results of its voluntary submission of a claim in the Receivership Court-approved RAP.

The Government contends that the Supreme Court has backed away from its decision in *Bank of New York Trust*, citing *Leiter v. United States*, 352 U.S. 220 (1957), where the Court allowed a proceeding to continue in federal court apart from the state court liquidation proceeding. But in *Leiter*, the Government was not a party in the state court proceeding, whereas all of the state court parties were also parties in the federal court proceeding. 352 U.S. at 228-229.

Furthermore, as the Government admitted, the Nevada Receivership Court has "*in rem* jurisdiction over NHC's assets." Appx244. The COFC explained that:

> [T]he principle applicable to both federal and state courts that the court first assuming jurisdiction over property may maintain and exercise that jurisdiction to the exclusion of the other, **is not restricted to cases where property has been actually seized under judicial process** before a second suit is instituted, but **applies as well where suits are brought to marshal assets, administer trusts, or liquidate estates**, and in suits of a similar nature where, to give effect to its jurisdiction, the court must control the property.

Appx35-36 (quoting *Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 466 (1939) (emphasis added)). When the United States presents a claim in an *in rem* proceeding, such as a state receivership proceeding, sovereign immunity is not implicated because the Government is not being sued without its consent. The Government was not sued in the Receivership Court in this case. Rather, the United States voluntarily asserted what it considers its rights in the appropriate forum.

The Government invoked the jurisdiction of the State Receivership Court by voluntarily submitting its claims. The NCD issued to the Government properly denied the Government's claimed offset in accordance with the RAP and provided the Government with the opportunity to appeal. But the Government did not appeal, so the NCD became final. Appx2116. Having voluntarily participated in this process, the Government cannot now assert that it is not bound by its outcome. Allowing a creditor, including the Government, to ignore the outcome of the State Receivership process because it does not like the outcome would undermine the Receivership Court's ability to ensure the efficient and orderly liquidation and distribution of NHC's assets. Thus, the Government should not be permitted to collaterally attack the results of the State process.

Even if the Government prevailed on its argument that a waiver of sovereign immunity was required for it to be bound by the State Receivership process, the outcome here would not change. The COFC did not decline to exercise jurisdiction.

It correctly decided on the merits that the Government has no right to offset under the Loan Agreement. The Government acknowledges that the COFC had jurisdiction to decide this case. *See* OB38. So even if the Government is not bound by the NCD which it failed to appeal, it is still bound by the COFC's decision that the Loan Agreement did not permit offset.

## III. The COFC Properly Ruled that its Judgment is Preclusive as to 31 U.S.C. § 3728

The COFC properly considered and decided that the Government could not relitigate its offset claim through a post-judgment offset under 31 U.S.C. § 3728. *See* Appx42-45. The Government complains that it was improper for the COFC to address and resolve the Government's alleged right to invoke the same offset a second time under § 3728 because: (1) the question was not briefed by the parties before the COFC;[12] (2) the Secretary of the Treasury is not a party to the litigation; and (3) the COFC's ruling on this issue constitutes nonmonetary relief. OB38-39. These arguments lack merit.

### A. The COFC Correctly Decided that the Government Could Not Relitigate the Same Claim Under § 3728

The COFC properly took judicial notice of the Government's tactics in

[12] Having been decided by the COFC, this issue is properly before this Court. *Hollmer v. Harari*, 681 F.3d 1351, 1356 (Fed. Cir. 2012) (Board's sua sponte decision "without asking for briefing or comment" "properly before us on appeal.") (citing *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995)).

*Conway*, where this Court held that "the government did not have a right to offset" its ACA obligations to Colorado Health, 997 F.3d at 1216 (*Conway I*), but the Government still refused to pay, contending that it had a right to offset the debt post-judgment under § 3728. The COFC observed that Plaintiff-Appellee in *Conway I* had to file another action (*Conway v. United States*, Fed. Cl. No. 21-1808 (Sept. 3, 2021) (*Conway II*)) "alleging that the government refused to pay plaintiff pursuant to 31 U.S.C. § 3728, even though plaintiff obtained a money judgment from this Court, a result the Federal Circuit affirmed on appeal." Appx42-43; *see Janowsky v. United States*, 133 F.3d 888, 889 n.4 (Fed. Cir. 1998) (court "may take notice of proceedings in other courts … if those proceedings have a direct relation to the matters at issue.") (quotation omitted). Given the similarities between this case and *Conway*, and the Government's attempt to relitigate its alleged right of offset post-judgment in *Conway*,[13] the COFC sua sponte addressed that issue as applied here.[14] Appx42-45. It properly held that the Government cannot relitigate its offset claim post-judgment.

---

[13] The Government subsequently gave up its meritless argument and paid the judgment of $24,489,799 to Conway in full. *See Conway I* Docket Sheet No. 18-1623C, & ECF No. 31, Jan. 14, 2022; *Conway II*, No. 21-1808, ECF No. 10, Jan. 14, 2022. But that did not occur until after the COFC's November 30, 2021 Opinion and January 4, 2022 Judgment in this case.

[14] The COFC may consider issues sua sponte. *E.g.*, *Nat'l Australia Bank v. United States*, 452 F.3d 1321, 1330 (Fed. Cir. 2006).

Section 3728 does not give the Government any substantive rights; it merely prescribes the procedure for offsets against judgments obtained against the Government. *See Project Map, Inc. v. United States*, 486 F.2d 1375, 1376 (Ct. Cl. 1973). If the Treasury Secretary withholds a debt purportedly owed by a judgment creditor from a final judgment and the judgment creditor opposes that action, the Secretary must have a civil action brought to determine the claim *if one has not already been brought*. *See* 31 U.S.C. § 3728(a)(2)(B); *Eastport Steamship Co. v. United States*, 130 F. Supp. 333, 334-35 (Ct. Cl. 1955). The purpose of § 3728 is to obtain a judicial determination on whether the judgment creditor must pay the Government. *See id.* at 335; *Am. Potash Co. v. United States*, 8 F. Supp. 717, 719 (Ct. Cl. 1934). It does not give the Treasury Secretary authority to reexamine a judgment. *See United States v. Jones*, 119 U.S. 477, 480 (1886) (interpreting § 3728's predecessor, Act of Mar. 3, 1875, ch. 149, 18 Stat. 481). And it does not permit the Government to reduce a judgment based on a claim that it has already asserted as a setoff in the action that led to the judgment. *Bonnafon v. United States*, 14 Ct. Cl. 484, 491 (1878) (interpreting § 3728's predecessor, Act of Mar. 3, 1875). Here, the COFC has already issued a judgment holding that the Government cannot collect the Start-Up Loan through offset. *See* Appx43. The Government cannot relitigate its claim.

Considerations of judicial economy and conservation of the parties' resources strongly support the COFC's decision to consider this issue and its ruling. *See, e.g., Caldera v. Northrop Worldwide Aircraft Servs., Inc.*, 192 F.3d 962, 970 (Fed. Cir. 1999) (citing *Studio Art Theatre of Evansville, Inc. v. City of Evansville*, 76 F.3d 128, 130 (7th Cir. 1996), for the proposition that a "district court could raise issue of collateral estoppel *sua sponte* because the benefits of precluding relitigation of issues ran not only to litigants but also to the judicial system."); *see also Arizona v. California*, 530 U.S. 392, 412 (2000) (where court has previously decided an issue, thereby expending judicial resources, the issue of res judicata may properly be raised *sua sponte*). If the Government took a post-judgment offset under § 3728 for the same alleged Loan debt that has already been litigated, NHC would immediately file suit in the COFC for wrongful withholding. *See Eastport Steamship Co.*, 130 F. Supp. at 334-35 (judgment creditor remedy for improper government offset against a judgment is action in COFC for wrongful withholding); *Conway II* (Fed. Cl. Sept. 3, 2021), ECF No. 1 (Complaint). NHC would request that the case be assigned, as a directly related case, to the same COFC Judge as here, *see* RCFC 40.2, and would promptly move for summary judgment. And as the COFC held, the outcome would be the same; — the COFC would again hold that the Government has no right to offset. *See* Appx43. Allowing the Government to relitigate its alleged right of offset following entry of a judgment would waste judicial and party resources, contrary to

law, and would put further, unnecessary strain on the resources of NHC, which is already insolvent.[15]

Additionally, because the Start-Up Loan is subordinated to NHC's liabilities for claims payments and basic operating expenses, and the premium stabilization program receivables are not subordinated, the Start-Up Loan and the premium stabilization program receivables are not "mutual" obligations. As with common law and Nevada law, only mutual obligations can be offset under § 3728. *See Marre v. United States*, 117 F.3d 297, 303 (5th Cir. 1997) ("In order for the government to invoke its right of setoff [under § 3728], there must be mutuality of debt between the parties.). The Government therefore could not recover post-judgment under § 3728.

### B. The Secretary of the Treasury Is Not, and Cannot Be, a Party to This Litigation

The Government claims it was inappropriate for the COFC to address § 3728 because the Secretary of the Treasury was not a party in the COFC. OB39. In cases involving offsets under § 3728 (or predecessor statutes), the United States is a party, not the Treasury Secretary. *See, e.g.*, *Ikelionwu v. United States*, 150 F.3d 233, 239

[15] If this Court concludes that the § 3728 issue should not have been decided by the COFC, this Court has "noted the propriety of reaching issues in the interest of judicial efficiency when remand is unlikely to produce additional facts or guidance." *LAI Services, Inc. v. Gates*, 573 F.3d 1306, 1317 (Fed. Cir. 2009) (citation omitted); *see SUFI Network Servs., Inc. v. United States*, 755 F.3d 1305, 1312 (Fed. Cir. 2014); *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1386 n.7 (Fed. Cir. 2019).

(2d Cir. 1998); *In re Cascade Roads, Inc.*, 34 F.3d 756, 758 (9th Cir. 1994); *United States v. Eastport S.S. Corp.*, 255 F.2d 795 (2d Cir. 1958); *Eastport Steamship*, 130 F. Supp. at 334-35; *Am. Potash*, 8 F. Supp. at 719; *Jones*, 119 U.S. at 480-81; *Bonnafon*, 14 Ct. Cl. at 491-92. "The United States is the only proper defendant before" the COFC. *Lawton v. United States*, 621 Fed. App'x 671, 672 (Fed. Circ. 2015) (citation omitted); *McLarnon v. United States*, 154 Fed. Cl. 459, 462-63 (2021) (in the COFC, "the only proper defendant ... is the United States, not its officers, nor any other individual.") (quotation omitted). If the Government offset funds owed to NHC under § 3728, and NHC filed a complaint for wrongful withholding in the COFC, *the Treasury Secretary still would not be a party to the litigation*. *See* RCFC 10(a) (in COFC, "United States designated as the party defendant") (emphasis added). As a result, there is no merit to the Government's claim that the COFC could not rule on the § 3728 issue because the Treasury Secretary was not a party at the COFC.

Furthermore, "[t]here is privity between officers of the same government, for the purposes of claim preclusion, if in the earlier litigation the representative of the United States had authority to represent its interests in a final adjudication of the issue in controversy." *First Mortg. Corp. v. United States*, 961 F.3d 1331, 1339 (Fed. Cir. 2020) (internal quotations and citations omitted). Since the United States is the only possible defendant in the COFC, it cannot dispute that it had authority to

represent the United States in this litigation. Thus, the Treasury Secretary would be bound by the outcome here.

### C. The Court's Ruling on § 3728 Does Not Constitute Nonmonetary Relief.

The Government contends that the COFC's decision that the Government cannot relitigate its offset claim through a post-judgment withholding constitutes "non-monetary relief, beyond the Court of Federal Claims' jurisdiction." OB39. The COFC's ruling on § 3728 was not non-monetary relief. It was an integral part of the trial court's award of a money judgment to NHC. NHC explicitly sought and received a monetary remedy — payment of over $55 million that the Government owes to NHC. It did not ask for "a simple declaration of rights … which may or may not result in a subsequent payment of money outside of the court's processes." *Pauley Petroleum Inc. v. United States*, 591 F.2d 1308, 1315 (Ct. Cl. 1979) (en banc). That the COFC made "a ruling of law … in order to arrive at a money judgment does not render this court's decision a 'declaratory judgment' banned under [*United States v.*] *King*[, 395 U.S. 1, 4 (1969)]." *Pauley Petroleum Inc.*, 591 F.2d at 1315 (citing *Gentry v. United States*, 546 F.2d 343, 345-46 (1976)); *see also Halim v. United States*, 106 Fed. Cl. 677, 684-85 & n.8 (2012).

The COFC ruled that the Government cannot relitigate its offset claim under § 3728 in order to confirm and facilitate its award of a money judgment to NHC and

deny the Government's offset claims against NHC's money judgment. There is no merit to the Government's contention that this constituted non-monetary relief.[16]

## CONCLUSION

The Judgment of the Court of Federal Claims should be affirmed.

Date: October 17, 2022

Respectfully submitted,

*/s/ Mark E. Ferrario*
Mark E. Ferrario
Donald L. Prunty
Tami Cowden
Greenberg Traurig, LLP
10845 Griffith Peak Dr., Suite 600
Las Vegas, Nevada 89135
(702) 938-6840; (702) 792-9002 (fax)
ferrariom@gtlaw.com
pruntyd@gtlaw.com
cowdent@gtlaw.com

Michael J. Schaengold
Melissa P. Prusock
Greenberg Traurig, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
(202) 331-3146; (202) 261-0186 (fax)
schaengoldm@gtlaw.com
prusockm@gtlaw.com

*Counsel for Plaintiff-Appellee*

[16] The COFC ruled that the Government cannot relitigate its offset claim under § 3728 in order to confirm and facilitate its award of a money judgment to NHC and deny the Government's offset claims against NHC's money judgment. There is no merit to the Government's contention that this constituted non-monetary relief.

## CERTIFICATE OF SERVICE

This is to certify that on October 17, 2022, a true and correct copy of the foregoing ***Plaintiff-Appellee's Brief*** was served by via this Court's CM/ECF e-filing system, on counsel of record for all parties to this appeal.

*/s/ Andrea Lee Rosehill*
An employee of Greenberg Traurig, LLP

**CERTIFICATE OF COMPLIANCE TYPE-VOLUME LIMITATION TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1. This brief complies with the type-volume limitation of Federal Circuit Rule 32(a) and Federal Circuit Rule 28.1.

   This brief contains 13,576 words, as counted by MS Word's word count, and excluding the parts of the brief exempted by FRAP 32(f).

2. This brief complies with the typeface requirements of Federal Circuit Rule 32(a)(5) and the type style requirements of Federal Circuit Rule 32(a)(6).

   This brief has been prepared in a proportionally spaced typeface using MS Word 2016 in Times New Roman 14.

Date: October 17, 2022

Respectfully submitted,

By: */s/Mark E. Ferrario*

Mark E. Ferrario
Donald L. Prunty
Tami Cowden
Greenberg Traurig, LLP
10845 Griffith Peak Dr., Suite 600
Las Vegas, Nevada 89135
(702) 938-6840; (702) 792-9002 (fax)
ferrariom@gtlaw.com
pruntyd@gtlaw.com
cowdent@gtlaw.com

Michael J. Schaengold
Melissa P. Prusock
Greenberg Traurig, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
(202) 331-3146; (202) 261-0186 (fax)
schaengoldm@gtlaw.com
prusockm@gtlaw.com

*Counsel for Plaintiff-Appellee*