**No. 2022-1520**

**IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

BARBARA RICHARDSON, in her capacity as receiver of Nevada Health CO-OP,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

On Appeal from the United States Court of Federal Claims
Case No. 18-1731C (Judge Solomson)

# REPLY BRIEF FOR THE UNITED STATES

BRIAN M. BOYTON
*Principal Deputy Assistant Attorney General*

TERRANCE A. MEBANE
PHILLIP SELIGMAN
*United States Department of Justice*
*Civil Division, Commercial Litigation Branch*
*P.O. Box 875*
*Ben Franklin Station*
*Washington, DC 20044*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... ii

INTRODUCTION AND SUMMARY ..... 1

ARGUMENT ..... 2

I. HHS's Offsets Were Authorized By the Loan Agreement, Nevada Insolvency Law, and Federal Law ..... 2

A. Section 19.12 of the Loan Agreement Provides That HHS Could Offset Following Nevada Health's Default ..... 2

B. The Receiver's Other Arguments Do Not Support the Trial Court's Judgment ..... 7

II. Nevada Health's Insolvency Proceeding Did Not Preclude HHS From Exercising Its Offset Right ..... 12

III. The Trial Court Erred in Ruling on 31 U.S.C. § 3728 ..... 16

CONCLUSION ..... 20

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Annuity Transfers, Ltd. v. Thompson*,
86 Fed. Cl. 173 (2009) ........ 21

*Cherry Cotton Mills v. United States*,
327 U.S. 536 (1946) ........ 11

*Cisneros v. Alpine Ridge Group*,
508 U.S. 10 (1993) ........ 7

*Conway v. United States*,
145 Fed. Cl. 514 (2019) ........ 18

*Conway v. United States*,
997 F.3d 1198 (Fed. Cir. 2021) ........ 4, 18

*Department of Treasury v. Fabe*,
508 U.S. 491 (1993) ........ 18

*Donovan v. City of Dallas*,
377 U.S. 408 (1964) ........ 15

*Greene v. United States*,
440 F.3d 1304 (Fed. Cir. 2006) ........ 13

*Halim v. United States*,
106 Fed. Cl. 677 (2012) ........ 21

*In re Ambac Assurance Corp.*,
339 Wis.2d 48 (2012) ........ 18

*In re Hanssen*,
203 B.R. 149 (Bankr. E.D. Ark. 1996) ........ 11

*In re Orexigen Therapeutics, Inc.*,
990 F.3d 748 (3d Cir. 2021) ........ 11

*In re Turner*,
84 F.3d 1294 (10th Cir. 1996) ........ 11, 12

*In re United Sciences of Am., Inc.*,
893 F.2d 720 (5th Cir. 1990) ........ 11

*Janowsky v. United States*,
133 F.3d 888 (Fed. Cir. 1998) ..................................................................... 19

*Leiter Minerals, Inc. v. United States*,
352 U.S. 220 (1957) ..................................................................... 15

*Levy v. Lewis*,
635 F.2d 960 (2d Cir. 1980) ..................................................................... 18

*Markham v. Allen*,
326 U.S. 490 (1946) ..................................................................... 15

*Meyer Med. Physicians Grp., Ltd. v. Health Care Serv. Corp.*,
385 F.3d 1039 (7th Cir. 2004) ..................................................................... 11

*Munich Am. Reinsurance Co. v. Crawford*,
141 F.3d 585 (5th Cir. 1998) ..................................................................... 18

*NVT Techs., Inc. v. United States*,
370 F.3d 1153 (Fed. Cir. 2004) ..................................................................... 9

*United States v. Bank of New York Trust Co.*,
296 U.S. 463 (1936) ..................................................................... 15

*United States v. Shaw*,
309 U.S. 495 (1940) ..................................................................... 16

*United States v. Sineneng-Smith*,
140 S. Ct. 1575 (2020) ..................................................................... 18

*United States v. United States Fidelity & Guaranty Co.*,
309 U.S. 506 (1940) ..................................................................... 16, 17

**Statutes**

15 U.S.C. §§ 1011–1015 ..................................................................... 14

28 U.S.C. § 1491 ..................................................................... 19, 21

31 U.S.C. § 3728 ..................................................................... 5, 18, 20, 21

42 U.S.C. §§ 18061, 18062, 18063 ..................................................................... 12

**Other Authorities**

Nev. Rev. Stat. § 693A.180 ..................................................................... 10

Nev. Rev. Stat. § 696B.440 ..................................................................... 4, 10

## INTRODUCTION AND SUMMARY

The parties agree that their contract provided the Department of Health & Human Services (HHS) a contractual right of offset if Nevada Health defaulted on its obligation to repay the Start-Up Loan. Pl. Br. 15, 31; Loan Agreement § 19.12, Appx94.[1] The parties also agree that offset is permitted under Nevada insolvency law, Nev. Rev. Stat. § 696B.440(1). Pl. Br. 22–23, 35, 42. This Court also recently recognized the legality of offset against insolvent insurers when that right is afforded under state law. *See Conway v. United States*, 997 F.3d 1198, 1214–16 (Fed. Cir. 2021). Nevada Health defaulted, HHS exercised its offset right, and in opposition, the Receiver contends that HHS's offset right was somehow confined. In accepting the Receiver's contentions, the trial court erred and denied HHS its bargained-for right.

The Receiver's brief provides no plausible basis to support the trial court's ruling. Rather, the Receiver urges the Court to ignore the plain language of the Loan Agreement in favor of its mischaracterization of certain contract provisions subordinate to Section 19.12's express requirement that it shall govern "notwithstanding" the Loan Agreement's other provisions.

The Receiver's alternative argument—that the state court could adjudicate HHS's rights absent a waiver of the United States' sovereign immunity—also lacks merit. And no reason or authority supports the trial court's entry of injunctive relief

---

[1] Capitalized terms not otherwise defined have the same meaning attributed to them in the Government's opening brief.

related to authority provided to the Secretary of the Treasury under a statute, 31 U.S.C. § 3728, that was not exercised in relation to Nevada Health and was not at issue in this case. The trial court's judgment should be vacated.

## ARGUMENT

### I. HHS'S OFFSETS WERE AUTHORIZED BY THE LOAN AGREEMENT, NEVADA INSOLVENCY LAW, AND FEDERAL LAW

#### A. Section 19.12 of the Loan Agreement Provides That HHS Could Offset Following Nevada Health's Default

Section 19.12 of the Loan Agreement, entitled "Right of Set-Off," provides that "*[n]otwithstanding* any other provisions of this Agreement to the contrary," HHS "shall have at its disposal the full range of available rights, remedies, and techniques to collect delinquent debts, such as those found in the Federal Claims Collection Standards and applicable Treasury regulations, as appropriate, including . . . *administrative offset*." Appx94 (emphasis added).

As our opening brief explained, the trial court committed two related errors in construing this provision. First, the trial court created a conflict between provisions of the Loan Agreement by reading Section 3.4—a provision that does not address events of default or insolvency, and instead concerns payment priority while the insurer is operating—to waive the Government's offset rights. U.S. Br. 25-28. Second, having created this conflict, the trial court ignored the Loan Agreement's express instruction about how to resolve conflicts: Section 19.12 (and its reservation of offset rights)

controls "[n]otwithstanding any other provisions of this Agreement to the contrary." U.S. Br. 28-29.

The Receiver's efforts to defend the trial court's reasoning fail. The Receiver acknowledges, as she must, that Section 3.4 does not mention "default" or "insolvency." Pl. Br. 19. The Receiver instead seeks to deny the existence of any conflict between Section 3.4 and Section 19.12 by pointing to the inclusion of the terms "available" and "appropriate" in Section 19.12.[2] Because Section 3.4 purportedly precludes offset, the Receiver contends offset is not an "available" or "appropriate" remedy. Pl. Br. 20, 31. This argument reads those terms out of their context under Section 19.12 and nullifies the "notwithstanding" clause. Simply put, Section 19.12's scope cannot be limited by another term of the Loan Agreement.

The terms "available" and "appropriate" are used in Section 19.12 to describe the "full range of *available* rights, remedies and techniques to collect delinquent debts such as those found in the Federal Claims Collection Standards and applicable Treasury regulations, as *appropriate*, including . . . administrative offset." Appx94 (emphases added). "[A]vailable" is thus a general reference to the "rights, remedies and techniques" that are typically "available" to the Government (a point reinforced by the specific reference to Treasury regulations and Federal Claims Collection Standards), and the term "appropriate" simply makes clear that the Government may

[2] Throughout the brief, the Receiver adds the word "legally" before available, but "legally available" is not a term used in the Loan Agreement or Section 19.12.

use such available right "appropriate" to the circumstance. Indeed, it is difficult to imagine how this language could be more explicit in seeking to preserve the full range of governmental remedies in the event of a default.

If there were any doubt, the fact that this language appears after a "notwithstanding" clause that specifies how to construe this reservation of rights in relation to other terms of the Loan Agreement confirms that those other provisions cannot and do not waive the Government's right to administrative offset. *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1993) (explaining that the parties' use of a "'notwithstanding' clause clearly signals [their] intention that [this] provision . . . override[s] conflicting provisions"). Nothing about the use of the words "available" or "appropriate" suggests that the parties intended to defeat the plain meaning of the "notwithstanding" clause.[3]

The Receiver's inability to grapple with the plain meaning of Section 19.12 is underscored by her contention that the Government's reading of the Loan Agreement places the Government "in a better position as a result of an event of default arising from insolvency than it would be if there were an event of default unrelated to insolvency." Pl. Br. 30. Section 19.12 applies "in the event any Event of Default is not cured." Appx94. Thus, the Government's right of offset persists regardless of which

[3] As our opening brief explained, the trial court gave no meaning to the "notwithstanding" clause and determined that Section 19.12 is only a "truism" that provides "nothing" and "merely begs the question[] . . . whether the government's administrative offset is available." U.S. Br. 16; *see* Appx29–30.

event of default triggers it, and the Government's reading of Section 19.12 treats all uncured defaults in precisely the same manner. The Receiver, by contrast, believes that Section 19.12 is entirely inapplicable to one event of default (insolvency) while remaining effective for "11 categories" of other events of default, though only "if the CO-OP has sufficient funds to satisfy its obligations for claims payments and basic operating expenses." Pl. Br. 30. But Section 19.12 is clear that it applies to "any" uncured default, regardless of any other provisions of the contract, and the Receiver cannot justify a reading that makes Section 19.12 applicable only to some defaults, and then only subject to contingencies nowhere mentioned in the text of Section 19.12 itself.

The Receiver's argument (Pl. Br. 13, 15, 33) that applying Section 19.12's plain language would "nullify" Section 3.4 also fails. As our opening brief explained, far from being a nullity, Section 3.4 supports the purposes of the Affordable Care Act's CO-OP program by prioritizing Nevada Health's continued operations over repayment of the loans HHS provided. U.S. Br. 26. At the same time, however, the Loan Agreement's offset provision protects the public fisc and the taxpayer's investment of $68 million in Nevada Health and enables HHS to make downstream payments to still-operating insurers in Nevada. The Receiver and the trial court erred in discarding entirely this second purpose.

Moreover, the Receiver has no coherent account of the parties' contemporaneous pre-litigation understanding of the Loan Agreement. As discussed

in our opening brief (U.S. Br. 22–23), after the Loan Agreement was first executed, Nevada Health submitted the Agreement for review by the Nevada Insurance Commissioner.[4] The Commissioner determined that the Loan Agreement, as originally drafted, did not qualify either the Start-Up Loan or the Solvency Loan as surplus or reserve capital under Nevada law—in other words, the Loan Agreement did not subordinate the Government's right of offset and thus could not serve as surplus or reserve capital. In response, the parties amended the Solvency Loan—and only the Solvency Loan—to expressly subordinate that loan to other interests and to provide that Nevada Health's "obligation under this Promissory Note may not be subject to offset." Appx140–141. And after this amendment was executed, Nevada Health continued to treat the Start-Up Loan as debt rather than surplus—until, that is, the Nevada Insurance Commissioner granted Nevada Health "a limited one-time permitted practice to report the . . . Startup funds as surplus rather than as a liability." Appx2023, Appx2049–2050.

The Receiver has no explanation for why an amendment to waive offset rights as to the Solvency Loan was necessary if the "plain language" of the Loan Agreement, as originally drafted, itself waived offset rights as to the Solvency Loan. On her

[4] Under Federal law, the Start-Up Loan was authorized by Congress for the limited purpose "to provide assistance [to a person applying to become a qualified nonprofit health insurance issuer] in meeting its start-up costs." 42 U.S.C. § 18042(b)(1)(A); 42 C.F.R. § 156.505 (defining Start-Up Loan to mean "a loan provided . . . to a loan recipient for costs associated with establishing a CO-OP"). That purpose did not include contribution to a CO-OP's capital reserves.

theory, such rights were always waived by Section 3.4, and she insists that the amendment "did not impact the plain meaning of the Loan Agreement's original terms." Pl. Br. 28. But courts prefer readings "that give[] meaning to all parts of the contract" over those that "leave[] a portion of the contract useless, inexplicable, void, or superfluous." *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004).

The parties' express waiver of offset for the Solvency Loan in the Second Amendment demonstrates that the Loan Agreement in its original form preserved that right through Section 19.12, and that, contrary to the Receiver's position, Pl. Br. 18–27, the "plain language" of the Loan Agreement did not subordinate HHS's interest in repayment of the Start-Up Loan. The parties' execution of the Second Amendment demonstrates that the parties knew how to provide for subordination and for the waiver of an offset right where appropriate. The parties, however, did not make any comparable amendment for the Start-Up Loan, and the Receiver cannot infer a waiver of offset rights that does not exist in the Loan Agreement.

### B. The Receiver's Other Arguments Do Not Support the Trial Court's Judgment

The Receiver also advances various arguments, some of which the trial court did not rely upon in its judgment or consider at all. All lack merit.

**1.** First, although the Receiver does not dispute the trial court's view that Nevada law generally permits the exercise of offset rights, Appx14; *see* Nev. Rev. Stat. § 696B.440(1), the Receiver contends that offset is precluded in these circumstances

by a separate provision of Nevada law, Nev. Rev. Stat. § 693A.180. Pl. Br. 36-40. The trial court described this argument as a "red herring" that was "irrelevant" to the dispute, Appx31, and for good reason. As the trial court explained, § 693A.180 describes "how an insurance company must borrow money to achieve the preferred regulatory accounting treatment of the disbursements (*i.e.*, to qualify as a surplus note)." Appx31. A loan can qualify if it is made "upon a written agreement that such money is required to be repaid only out of the insurer's surplus in excess of that stipulated in such agreement," and such a loan "shall not form a part of the insurer's legal liabilities except as to its surplus in excess of the amount thereof stipulated in the agreement, or be the basis of any setoff." Nev. Rev. Stat. § 693A.180(1), (2).

Of course, the core of the dispute here is whether the Loan Agreement actually provided that the Start-Up Loan was "to be repaid only out of the insurer's surplus in excess of that stipulated in such agreement," and, thus, qualified as a surplus note. The Nevada Insurance Commissioner made clear that the Loan Agreement as originally drafted did *not* qualify either loan as a surplus note, which is why the parties entered into the Second Amendment that expressly waived offset as to the Solvency Loan and subordinated the Solvency Loan to all other creditors. And it is also why Nevada Health accounted for the Start-up Loan as debt rather than as capital until receiving "one-time" permission to treat it as surplus. Nothing in the record suggests that § 696B.440 has any application to the Start-Up Loan.

**2.** Second, the Receiver advances an argument the trial court did not consider, contending that the debts flowing between HHS and Nevada Health under the ACA were not mutual. Pl. Br. 42, 44-46. Mutual debts are "debts owing between two parties, specifically those owing from a creditor directly to the debtor and, in turn, owing from the debtor directly to that creditor." *In re Orexigen Therapeutics, Inc.*, 990 F.3d 748, 754 (3d Cir. 2021); *see also Meyer Med. Physicians Grp., Ltd. v. Health Care Serv. Corp.*, 385 F.3d 1039, 1041 (7th Cir. 2004) (explaining that mutuality exists when the debts are "in the same right and between the same parties standing in the same capacity"); *In re United Sciences of Am., Inc.*, 893 F.2d 720, 723 (5th Cir. 1990) ("The requirement of mutuality is 'that each party . . . own his claim in his own right severally, with the right to collect in his own name [and] in his own right and severally.'") (citation omitted). The defining feature of mutuality is that the "parties have the right, in their own name, to collect against the others, in their own right." *In re Hanssen*, 203 B.R. 149, 150 (Bankr. E.D. Ark. 1996) (citations omitted). For purposes of mutuality, all agencies of the United States are treated as a single unit. *See, e.g.*, *Cherry Cotton Mills v. United States*, 327 U.S. 536, 539 (1946); *In re Turner*, 84 F.3d 1294, 1296 (10th Cir. 1996) ("[T]he United States is treated as a unitary creditor, and agencies of the United States government . . . may set off debts owed by one agency against claims that another agency has against a single debtor.").

The Receiver contends that for programs other than the loan program HHS acts not as a creditor in its own right but merely as a "conduit" for funds. Pl. Br. 44.

The Receiver's argument misunderstands HHS's role in administering the Affordable Care Act's premium stabilization programs. HHS administers those programs by distinctly collecting funds from certain entities and making payments to others as a matter of that insurer's express statutory right to federal payment under those programs. *See* 42 U.S.C. §§ 18061(b), 18062(a), 18063(a). That the extent of the federal payment may be defined by federal receipts in some circumstances does not alter the nature of the federal payment. If entities fail to pay what they owe, HHS may sue in its own name to collect the funds; conversely, if HHS does not pay what issuers believe is owed, issuers may sue in their own name to collect damages from the United States. The dozens of cases filed in the Court of Federal Claims seeking payments under other ACA programs demonstrates that debts owed by or to HHS under the ACA are federal obligations. *See, e.g.*, *Maine Community Health Options v. United States*, 140 S. Ct. 1308, 1318–19 (2020); *Common Ground Healthcare Cooperative v. United States*, 142 Fed. Cl. 38 (2019), *appeal docketed*, No. 22-1019 (Fed. Cir.).

The Congressional Budget Office also expressly treats these collections and payments as revenue and outlays (not as trust funds). *See* Updated Estimates of the Effects of the Insurance Coverage Provisions of the Affordable Care Act, at 9, Congressional Budget Office (April 2014) ("CBO treats the [ACA 3Rs] payments as outlays and the collections as revenues").[5]

[5] Available at https://www.cbo.gov/sites/default/files/113th-congress-2013-2014/reports/45231-ACA_Estimates_OneColumn.pdf

These circumstances remove any doubt that the ACA debts at issue all shared mutuality between the United States and Nevada Health. The Start-Up Loan debt and the premium stabilization payments HHS used to offset that debt share mutuality.

**3.** Finally, the Receiver relies on the Loan Agreement's references to a "State Solvency Payment Restriction" or "State Reserve Requirements," asserting that these references preclude the assertion of offset rights. *See, e.g.*, Pl. Br. 21-23, 27–28, 33. The Loan Agreement defines a "State Solvency Payment Restriction" as "a State Insurance Law provision or regulatory action by a State insurance agency or department the enforcement or implementation of which creates an actual legal impediment or restriction on repayment of Loan funds pursuant to the terms of this Agreement." Loan Agreement § 2.1, Appx62. The Loan Agreement defines "State Reserve Requirements" as "the financial reserve requirements that [Nevada Health] must meet under applicable State Insurance Laws for the delivery of health insurance . . ." Loan Agreement § 2.1, Appx62.

The only "actual legal impediment[s]" or "requirements" the Receiver identifies are Nevada's general liquidation and claims procedure and the argument that the debts are not mutual. Pl. Br. 22-23. But as just discussed, Nevada law permits offset and the debts were mutual. The Receiver's reliance on the references to a "State Solvency Payment Restriction" and "State Reserve Requirements" is wholly derivative of those points and adds nothing to the analysis here.

## II. NEVADA HEALTH'S INSOLVENCY PROCEEDING DID NOT PRECLUDE HHS FROM EXERCISING ITS OFFSET RIGHT

As our opening brief explained, the trial court erred in holding that the Government was bound by Nevada Health's state court liquidation proceeding. U.S. Br. 31-38. At the outset, the Receiver's brief confirms that the trial court's ruling on this question was entirely gratuitous: if the Court agrees with the trial court's interpretation of the Loan Agreement, "the outcome here would not change," Pl. Br. 50, and consideration of the sovereign immunity question would be unnecessary. But, as explained above, the trial court's interpretation of the Loan Agreement is erroneous.

In any event, the Receiver's attempts to support this aspect of the trial court's decision fail. As our opening brief explained, Congress has not waived sovereign immunity in state court liquidation proceedings, and the trial court did not purport to find such a waiver. The Receiver likewise does not demonstrate any sovereign immunity waiver. She invokes (Pl. Br. 46-48) the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015, but that statute contains no waiver of sovereign immunity; it instead provides for reverse preemption of Federal law in certain circumstances. *See, e.g.*, *Greene v. United States*, 440 F.3d 1304, 1311-12 (Fed. Cir. 2006). More generally, the McCarran-Ferguson Act has no bearing here, where the Receiver does not argue that application of any federal law would "invalidate, impair, or supersede" any state law.

15 U.S.C. § 1012(b). (Indeed, as discussed above, all agree that Nevada law permits the exercise of offset.)

Instead, the Receiver, like the trial court, asserts that no waiver of sovereign immunity was required. *See* Pl. Br. 49 (citing *United States v. Bank of New York Trust Co.*, 296 U.S. 463, 480–81 (1936)). *Bank of New York* required the United States to pursue assets held by a state court through a proceeding in that court—the "forum where the funds [we]re held." *Id.* at 471-75, 481.[6] As that description implies, the Supreme Court has repeatedly made clear that the rule of *Bank of New York* applies where a state court has custody of property. *See, e.g.*, *Donovan v. City of Dallas*, 377 U.S. 408, 412 (1964); *Leiter Minerals, Inc. v. United States*, 352 U.S. 220, 227 (1957); *Markham v. Allen*, 326 U.S. 490, 494 (1946). That rule has no bearing here, where the Receiver has sued the United States seeking money that she contends is owed to Nevada Health that is not, and has never been, in the custody of the state court. For such suits, Congress has provided a specialized forum and sovereign immunity waiver exclusively in the Court of Federal Claims.

In submitting a proof of claim in Nevada Health's insolvency proceeding, the United States requested to share in the distribution of the remainder of the estate

[6] The Receiver's brief attributes to *Bank of New York* the quotation that "the United States may participate as a creditor in a state rehabilitation proceeding without raising sovereign immunity concerns." Pl. Br. 49. That language, however, appears nowhere in *Bank of New York*, and it seems that the quotation marks were added to counsel's characterization of the holding of *Bank of New York*.

administered by the state court. The state court undoubtedly had in rem jurisdiction over any Nevada Health property under its control. But the state court's control over property it holds does not and cannot alter Congress's decisions about what courts are empowered to determine the proper distribution of taxpayer funds held in the United States Treasury. The Receiver asserts that by appearing in state court and submitting a claim to property held by that court, the United States must accept as binding every determination made by the state court, even as to taxpayer money not under the jurisdiction of the state court and held by the United States. The Receiver has cited nothing suggesting that a state court can force the Federal Government to broadly waive its sovereign immunity in that fashion, much less override Congress's express provision of a specialized venue and narrow sovereign waiver for adjudicating claims seeking money from the United States.

In fact, the Supreme Court has specifically rejected the Receiver's rationale. In *United States v. Shaw*, the United States filed a claim in Michigan state probate court reflecting a judgment against the estate. 309 U.S. 495, 498 (1940). The probate court granted judgment to the administrator of the estate, and in doing so declared "that the United States was indebted to the estate" for the difference between its claim and the claim of another claimant of the estate. *Id.* The Supreme Court rejected that effort, holding that "the voluntary submission to the Michigan court by the United States of its claim against the estate" did not waive sovereign immunity as to a claim against the United States. *Id.* at 500. Similarly, in *United States v. U.S. Fidelity & Guarantee Co.*, the

United States submitted a claim related to lease royalties in a receivership proceeding in Federal court on behalf of the Choctaw and Chickasaw Nations (which likewise had tribal immunity). 309 U.S. 506, 510 (1940). The trial court adjudicated another debtor's cross-claim against the tribes, decreeing that the tribes owed over $9,000 to the estate. *Id.* The United States subsequently brought suit in a different Federal district court seeking payment of the same lease royalties, and the Supreme Court held that the first proceeding did not bar the second suit, because "[n]o statutory authority granted jurisdiction to the [first court] to adjudicate a cross-claim against the United States." *Id.* at 512. And in both cases, the Court specifically rejected the argument—pressed by the Receiver, Pl. Br. 47, 50—that where the United States "voluntarily seeks the aid of the courts for collection of its indebtedness it takes the form of a private suitor and thereby subjects itself to the full jurisdiction of the court," notwithstanding the general desire for "a single adjudication" of rights in the estate. *Shaw*, 309 U.S. at 501-02; *accord U.S. Fidelity*, 309 U.S. at 513 ("The desirability for complete settlement of all issues between parties must, we think, yield to the principle of immunity."). In short, "[t]he sovereignty possessing immunity" cannot be forced to accept the judgment of a court in which there is no express waiver of immunity "merely because its debtor was unavailable except outside the jurisdiction of the sovereign's consent." *Id.* at 513.

Given this long-settled backdrop, it is unsurprising that the Receiver cites no case holding that the submission of a proof of claim in a state court liquidation

overrides Congress's express instructions about the proper forum for adjudicating suits against the public fisc. The cases the Receiver cites do not address the issue; most do not involve governmental parties at all, while the one cited state-court case involves principles of appellate waiver. Pl. Br. 48–49 (citing *Levy v. Lewis*, 635 F.2d 960 (2d Cir. 1980); *Munich Am. Reinsurance Co. v. Crawford*, 141 F.3d 585 (5th Cir. 1998); *In re Ambac Assurance Corp.*, 339 Wis.2d 48 (2012)). Indeed, in *Department of Treasury v. Fabe*, which the Receiver relies on, a state liquidator brought a declaratory judgment action against the United States in Federal court to determine the United States' priority, notwithstanding that the United States had submitted claims in the state liquidation proceeding. 508 U.S. 491, 495 (1993). And the Receiver has no explanation for this Court's decision in *Conway*, which did not treat the state court's action on the Government's proof of claim as dispositive of that receiver's subsequent suit in the Court of Federal Claims. *See* 997 F.3d at 1208-15; *Conway v. United States*, 145 Fed. Cl. 514, 520 (2019).[7]

## III. THE TRIAL COURT ERRED IN RULING ON 31 U.S.C. § 3728

As our opening brief explained, after the trial court issued its opinion and order, the trial court entered a separate order on December 31, 2021, expressly providing, in part, that "[t]he government cannot invoke 31 U.S.C. § 3728 to reassert

[7] The Receiver also cites a portion of *Conway* addressing CO-OP loan agreements. Pl. Br. 34. But as noted in our opening brief, the Court was quoting from an allegation in the plaintiff's complaint, and in any event, no loan agreement was at issue in that case. U.S. Br. 33 n.11.

the offsets and thereby somehow avoid the final judgment in this case." Appx48. The trial court did so even though 31 U.S.C. § 3728 had not been invoked in the case, could not have been invoked, and had not been the subject of any pleading or briefing. Even aside from this departure from the basic principles of party presentation, *see United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020), the Receiver's defense of the trial court's award of prospective injunctive relief against the United States pursuant to 28 U.S.C. § 1491(a) misstates fact and law in its attempts to defend this ultra vires order.

Purporting to rely upon "judicial notice," the Receiver contends that the trial court's order was somehow justified by "tactics" undertaken by the United States in the prior litigation in *Conway*. But there is no foundation in the facts or the law for the Receiver's contentions. First, allegations from a complaint in another case are not "facts" subject to judicial notice, Pl. Br. 51–52 (citing *Janowsky v. United States*, 133 F.3d 888, 889 n.4 (Fed. Cir. 1998) (judicial notice taken regarding testimony in a criminal case )),[8] and no set of "tactics" can expand the jurisdiction of or relief available in the Court of Federal Claims. Second, the Receiver's contentions are untrue. Factually, in *Conway,* the litigant was not required to file a new complaint in order to obtain payment of its judgment. Rather, that plaintiff chose to initiate a new case on September 3, 2021, a mere week after this Court's mandate issued, demanding

[8] The Receiver cites footnote 4 in *Janowsky*, Pl. Br. 52, but we believe she intended to cite footnote 2.

"immediate" payment of the $24 million judgment. *See Conway v. United States*, No. 21-1808 ("*Conway II*"), ECF. No. 1. The filing was also made in apparent disregard of the time allowed for the consideration of the filing of a petition for writ of certiorari before the United States Supreme Court. *See* SUP. CT. R.13.1, 13.3 (providing that a petition for a writ of certiorari is to be filed within 90 days after judgment or denial of a petition for rehearing).

The United States never answered or responded to the new *Conway* complaint. Instead, the plaintiff voluntarily dismissed its complaint after being paid in the ordinary course by the Judgment Fund. *See Conway II*, ECF No. 10. 31 U.S.C. § 3728 was never invoked to withhold payment of any judgment in the *Conway* litigation and there was no unpaid debt owed by that insurer to HHS at the time the Receiver contends that "tactics" were holding up payment. The Receiver's argument is simply unfounded.

In a further distraction, the Receiver seizes upon a reference in our opening brief to the absence of the Secretary of the Treasury from the proceedings below to make arguments regarding the proper defendant in a case before the Court of Federal Claims. But the Receiver ignores the key question we raised regarding whether it was proper for the trial court to consider the Secretary of the Treasury's authority under 31 U.S.C. § 3728 where the Secretary had not exercised any authority subject to judicial review under the statute. As the Receiver must admit, she cannot, and did not, raise any allegations with regard to the Secretary of the Treasury's authority under 31

U.S.C. § 3728 before the trial court. Consequently, the trial court's advisory opinion and subsequent order barring any future action by the Secretary of the Treasury, is an improper injunction and must be vacated. Nothing supports the Receiver's novel assertion that the trial court could issue affirmative relief against the Secretary of the Treasury when no claims or allegations are asserted against any action taken by the Secretary.

Finally, the Receiver's effort to defend the trial court's actions by arguing its opinion and subsequent order regarding 31 U.S.C. § 3728 were "integral" to a monetary award has no foundation in the law. Pl. Br. 57–58 (citing *Pauley Petroleum Inc. v. United States*, 591 F.2d 1308 (1979); *Halim v. United States*, 106 Fed. Cl. 677 (2012)). The trial court's opinion and order regarding 31 U.S.C. § 3728 were simply not predicate or "integral" to the actual money judgment entered; they concerned only speculative, prospective suppositions.

It is well-settled that the trial court's jurisdiction to grant equitable or declaratory relief under the Tucker Act is limited to three statutorily defined circumstances: (i) "orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records" where "incident and collateral to" a money judgment, 28 U.S.C. § 1491(a)(2); (ii) actions brought under the Contract Disputes Act of 1978, *id.*; and (iii) bid protests, *id.* § 1491(b)(2). *See, e.g.*, *Annuity Transfers, Ltd. v. Thompson*, 86 Fed. Cl. 173, 181–82 (2009). None of those circumstances apply. The error in the trial court's expansion of

the defined limits of its jurisdiction are aptly captured in the Receiver's description of what "would" need to happen "if" the United States took certain, specific future action. *See* Pl. Br. 54–55 ("***If*** the Government took a post-judgment offset . . . NHC ***would*** immediately file suit . . . ***would request*** [transfer of the case]. . . and ***would*** promptly move for summary judgment . . . [and] the outcome ***would be*** the same . . .") (emphasis added). It was plain, reversible error for the trial court to base relief upon "if" certain events might occur and what a party "would" do in the future.

## CONCLUSION

For the foregoing reasons, and those set forth in our opening brief, the judgment of the trial court should be reversed.

Respectfully submitted,

BRIAN M. BOYTON
*Principal Deputy Assistant Attorney General*
*Civil Division*

RUTH A. HARVEY
*Director, Commercial Litigation Branch*

KIRK T. MANHARDT
*Deputy Director*

/s/ Terrance A. Mebane
TERRANCE MEBANE
PHILLIP SELIGMAN
*U.S. Department of Justice*
*Civil Division, Commercial Litigation Branch*
*P.O. Box 875*
*Washington, DC 20044*
*(202) 307-0493*
*terrance.a.mebane@usdoj.gov*

December 5, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2022, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Terrance A. Mebane
Terrance A. Mebane
Counsel for the United States

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,186 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

/s/ Terrance A. Mebane
Terrance A. Mebane
Counsel for the United States